```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3  JAMES PHILLIPS, ET AL        )      NO. 4:18-CV-821
                                 )
 4                               )
    VS.                          )         Houston, Texas
 5                               )         10:48 a.m.
                                 )
 6  WIPRO, LTD.                  )      November 8, 2019

 7


 8
       *******************************************************
 9
                         STATUS CONFERENCE
10
            BEFORE THE HONORABLE ALFRED H. BENNETT
11
                UNITED STATES DISTRICT JUDGE
12
                        VOLUME 1 OF 1
13

14     *******************************************************

15  APPEARANCES:

16  FOR THE PLAINTIFF:

17       Mr. Michael John von Klemperer
         Kotchen & Low LLP
18       1745 Kalorama Road NW, Suite 101
         Washington, DC  20009
19       Tel:  202-471-1995
         Email:  mvk@kotchen.com
20

21  FOR THE DEFENDANT:

22       Mr. James Bradley Spalding
         Mr. Kerry E. Notestine
23       Littler Mendelson PC
         1301 McKinney, Suite 1900
24       Houston, Texas  77010
         Tel:  713-951-9400
25       Email:  Bspalding@littler.com
                 Knotestine@littler.com
```

1  COURT REPORTER:

2       Ms. Kathleen K. Miller, CSR, RMR, CRR
        515 Rusk, Room 8004
3       Houston, Texas  77002
        Tel:  713-250-5087
4
   Proceedings recorded by mechanical stenography.
5  Transcript produced by computer-assisted transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S
 2              THE COURT:  Good morning.  Thank you.  Please
 3   have a seat.  Cause Number 4-18-cv-821, James Phillips, et
 4   al vs. Wipro, Ltd.
 5                      Counsel, your appearances for the record.
 6              MR. VON KLEMPERER:  For the plaintiffs, Michael
 7   von Klemperer.
 8              MR. SPALDING:  Brad Spalding and Kerry
 9   Notestine for the defendant.
10              THE COURT:  Counsel, this is a status
11   conference to take up any issues that may be percolating
12   among the parties.  One of the things that the Court notes,
13   and perhaps we will talk about it from counsel, I did
14   receive a filing of documents for an in camera review from
15   Wipro, and I want to talk about that a little bit.  But
16   other than that, by way of where we're at, how do you want
17   to start?
18              MR. VON KLEMPERER:  Your Honor, there is a few
19   issues that the plaintiffs would like to discuss.  We
20   provided a letter to the Court yesterday morning.  I would
21   be happy to go through those issues.
22              THE COURT:  Yes.  I didn't see it.  I was
23   traveling.  I was out of the office.  I had a board meeting
24   down in Austin, so I was traveling, and I did not see it.
25   And I'll pull it up as you talk, but if you could refresh
```

10:48:16

10:48:23

10:48:48

10:49:03

10:49:17

1 the discussion for us.

2         MR. VON KLEMPERER:  Absolutely, Your Honor.

3 And I apologize for the -- not providing it earlier.

4         And, also, I would like to apologize on

10:49:28  5 behalf of Mr. Kotchen.  He is in town.  He wanted to come

6 here but, unfortunately, he came down with an illness last

7 night.

8         THE COURT:  Yes, it's making its way.  I hope

9 -- you have reminded me to go get my flu shot.

10:49:42  10         MR. VON KLEMPERER:  Hopefully, he recovers

11 soon.

12         So there is two big-picture issues that

13 the plaintiffs would like to address, Your Honor.  There is

14 a few discovery issues, and then there is the case

10:49:53  15 schedule.  Starting with discovery, I believe, both sides,

16 in their letters address a dispute over the data fields

17 that Wipro would produce.

18         During the last hearing the Court ordered

19 plaintiffs to identify the fields that it was interested

10:50:10  20 in, and Wipro to identify whether or not those fields

21 existed.  We received from Wipro just last night the

22 identification of those fields.  So, unfortunately, we

23 haven't had a lot of time to go through that list and to

24 determine whether or not there is a dispute.  We are happy

10:50:31  25 to have the list.  We are hopeful we can resolve that issue

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  offline in the next week or two.

2              However, there are some other issues that

3  are still in dispute.  If Your Honor will recall, during

4  the last hearing Mr. Kotchen provided you an interrogatory

10:50:45  5  response from Wipro, and I have a copy of that if you would

6  like.  It identifies 11 what they call typically produced

7  reports.  And Wipro has argued that -- has not agreed to

8  produce those reports.

9              We believe they're responsive.  We believe

10:51:04  10  they are encompassed within the Court's April 12th order,

11  and that they should be produced.  These reports concern

12  staffing, hiring, attrition, issues of that nature that are

13  of central relevance to this case.

14              Wipro's position is that we don't need the

10:51:23  15  reports because everything that's in the reports is just

16  duplicative of the data that they are producing.  We

17  disagree with that position for a few reasons.  First of

18  all, the existence of data in a database is not the same as

19  the existence of an analysis that's in a report, even if

10:51:45  20  that analysis is created with the data.  And so if there is

21  an analysis run in the report and then it is handed to an

22  executive, that is a lot different than just the data

23  existing in the abstract in a database.

24              And so that is important for plaintiffs'

10:51:59  25  claims.  For example, if the executives are aware of

1 discrepancies in hiring practices, termination practices,

2 that goes to the issue of intent, and so we believe that

3 those reports should be produced.  There is also an issue

4 with the accuracy of the data.  The defendants have

5 identified some discrepancies that they say exist with

6 their affirmative action plans, discrepancies between what

7 is in the plans and what is in their database, and we would

8 believe that the reports wouldn't have those types of

9 discrepancies.  So that's another reason why it is

10 important for those reports to be produced.

11          There are a handful of other discovery

12 issues that I believe the parties are working to resolving.

13 We still have an ongoing dispute over redactions.  I think

14 we may be able to resolve those offline.  We are working on

15 the collection of ESI from custodians, but that's sort of

16 still in the early stages, and so we're working together on

17 that as well.  So for now I believe the main issue that is

18 ripe is the production of the reports.

19          THE COURT:  Very well.  Counselor.

20          MR. SPALDING:  Thanks, Your Honor.

21          Your Honor, we have a different vantage

22 point on these reports than the plaintiff does, and a

23 different perspective on it.  First of all, we disagree

24 that these reports were contemplated in the April 12th

25 hearing, in the order that arose out of that.  The first

1  time that we heard about these reports from plaintiffs'

2  counsel was in the September 12th meet-and-confer

3  conference that we had in early September.

4          THE COURT:  And just so we are clear, I now

10:53:49  5  have hard copies of the letters in front of me.

6          MR. SPALDING:  Yes.

7          THE COURT:  And when you say "report," are you

8  referring to the issue identified on page three of your

9  letter, EEO-1 reports?

10:54:02  10          MR. SPALDING:  No, sir.

11          THE COURT:  What are you referring to?

12          MR. SPALDING:  We're referring to the reports

13  that Mr. von Klemperer just mentioned --

14          THE COURT:  Right.

10:54:09  15          MR. SPALDING:  -- that are in this

16  interrogatory response that our clients served in February.

17          THE COURT:  Does the report -- because there

18  are other reports out there with other names, so the record

19  is clear as to what we're talking about, what's the name of

10:54:24  20  this report or classification of this report so that we

21  will know what we are talking about?

22          MR. SPALDING:  Yes.  The reports that Mr. von

23  Klemperer is referring to are called -- there is one called

24  a "Profile Report."

10:54:32  25          THE COURT:  A Profile Report.  Okay.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          MR. SPALDING:   There is an Attrition Report,

2 and there is an Actions Report.   I think those are the

3 primary reports that Mr. von Klemperer is referring to.

4                    Let me take us back to give a little

10:54:47    5 context to this.   As I was saying, we did not understand

6 these reports to be part of the April order, and these

7 reports were not on our radar whatsoever.

8                    Our understanding coming out of the April

9 order is, as I have conveyed to you a number of times, was

10:55:02   10 we have got to get this data on hiring, promotions,

11 terminations, staffing to the plaintiffs by the June

12 deadline that we had agreed to coming out of April.   And I

13 have explained to the Court that we underwent 60 days of

14 intensive attorney review and collection of this data.

10:55:20   15                    This data we pulled directly from the

16 company's SAP database, which is the repository for all of

17 the factual data about the numbers in this case.   That is

18 what we gathered and produced at great expense and at great

19 effort.   It was not until the meet and confer in September

10:55:37   20 that for the first time the word "Report" was used.

21                    In fact, if you look back, the Court may

22 remember, there was a Powerpoint that the plaintiffs relied

23 on in that April hearing, and it had four buckets in it.

24 And one of the buckets involved the data, and there was a

10:55:55   25 reference to business plans.   The word "report" does not

1  appear anywhere in that slide, in that bucket, and if -- if

2  anyone were masochistic enough to want to read that

3  transcript of our meet and confer in September, you will

4  see that when they raised the issue of reports, we had no

10:56:13  5  idea what -- what they were talking about.  So this is a

6  relatively new issue.

7                    We now know what they're referring to.  So

8  since our last hearing, and since the meet and confer, we

9  undertook our due diligence to look into these reports and

10:56:27  10  what they are.  And, Your Honor, what we have found is the

11  reports, first of all, are not nearly as -- as readily

12  available and compiled as the interrogatory that was --

13  that was served in February would suggest.  They -- they

14  are difficult to generate.  They contain company-wide data,

10:56:52  15  meaning data referring to 160,000 employees all over the

16  world.  And it is in many ways duplicative of the

17  information that we have produced by virtue of the SAP.

18                    So I think the two perspectives that the

19  parties have here is our goal coming out of the April

10:57:12  20  hearing was to provide the plaintiffs with the data that

21  they asked for and needed in this case to prove their

22  claims and give to their expert for analysis and so forth.

23                    What they -- the way they are approaching

24  this, from our perspective, is we will take that data, but

10:57:29  25  we will also take everything else that exists under the

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  sun.  And so now we get back to the Rule 26 proportionality

2  argument that I have been beating like a drum in this case.

3  If we now have to go back and search through these

4  reports -- and we tried, Your Honor.  We gave it an effort

10:57:44  5  to see what it would entail to get these reports and

6  produce them.  It will, again, be a major undertaking.  The

7  problem is that -- that the data that exists in those

8  reports are -- as I mentioned in my letter, don't help

9  them.  They don't help us.  It muddies the waters.  Where

10:58:04  10  the real information is the SAP data and the spreadsheets

11  that we gave them.

12            And if I can mention -- if I can speak on

13  the -- Mr. von Klemperer mentioned discrepancies in the

14  data that has been produced, and I can talk on that if you

10:58:16  15  would like me to.

16            THE COURT:  Let me address these reports

17  because I have two areas of inquiry.  One, perhaps I'm

18  misunderstanding your point, but when someone tells me a

19  report exists, is searchable, but at the same time he is

10:58:44  20  telling me it is going to be extremely difficult to go out

21  and produce, I am having a disconnect because if there is a

22  report, which means something has been condensed into some

23  form, usually written, but for us to put our hands on the

24  report, assuming that it is responsive and relevant and

10:59:06  25  produce it, that would be difficult.  I am having a

1  disconnect with that point.

2            MR. SPALDING:  I understand that, Judge.  And I

3  can tell you what my client is telling us.  And what our

4  client is telling us, as we come to them -- we have come to

10:59:20  5  them with this specific request:  We need to do our dead

6  level best to determine what these reports consist of,

7  where they are, how we get them, and how we would compile

8  them if we were to produce them.  And we are being told in

9  no uncertain terms that this would be a very difficult

10:59:36  10  project, and that the reports are -- are in many cases way

11  overcomprehensive.

12            THE COURT:  That's the second area of inquiry.

13  Let me just deal with the first area of inquiry.  And,

14  again, if you tell me there is a report that obviously you

10:59:58  15  or your client -- I am going to assume your client -- has

16  gone back, identified, Oh, this is the report that they

17  want us to produce, but to do that it would be extremely

18  difficult to produce what we just looked at to determine it

19  would be extremely difficult to produce, that is a

11:00:17  20  disconnect for me.  And I think you understand my

21  disconnect.

22            MR. SPALDING:  I do understand --

23            THE COURT:  Okay.

24            MR. SPALDING:  -- Your Honor.  I do.  I do.

11:00:25  25  And I am doing my best with this issue.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          THE COURT:  All right.  Well, let -- before I

2  put you on the spot --

3          MR. SPALDING:  Yes.

4          THE COURT:  -- because I assume what you are

11:00:35    5  relaying to me is what is being told to you.

6          MR. SPALDING:  Yes, sir.

7          THE COURT:  All right.  Knowing that point one

8  is a point of disconnect with me, I want you to have

9  another conversation with your client.

11:00:51   10          MR. SPALDING:  Yes.

11          THE COURT:  Because it does not make sense to

12  me that something that is called a report, has been viewed

13  in some form or fashion by your client to have a

14  conversation with you about how difficult it would be to

11:01:06   15  produce it, and going to point two, the scope of it, and

16  saying we shouldn't have to turn this over, how their point

17  can be it is going to be extremely difficult to produce.

18  That just -- I am having a disconnect.

19          Now, let's go in -- let's go to point two,

11:01:27   20  which kind of bleeds over into, which might solve the issue

21  anyway, if what we're looking for -- and, counsel, I

22  apologize for making this simplistic, but it helps me to

23  make my point as I am thinking.  If what we're looking for

24  is a BB and this report has that BB in it, but also 1,000

11:01:56   25  other BBs, other points of information, it may be that

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 that's not required to be produced if, in fact, that is

2 what it is.

3          It may be that even a series of redactions

4 won't solve the issue if, in fact, this all

11:02:20   5 overencompassing, like you say, just to go in and get these

6 particular data points that would be responsive, and that

7 would be relevant.  And so going to Point of Inquiry Number

8 2, let me hear your explanation as to that.

9          MR. SPALDING:  Well, and just to follow up on

11:02:38  10 what you're saying, so the way -- if I could encapsulate

11 this, I would call what they are looking for belt and

12 suspenders.  I mean, I have got a colleague on this team

13 who refers to it as the camel's nose under the flap of the

14 tent.

11:02:52  15          And what I am telling you, Judge, is that

16 the data that would be compiled in these reports is data,

17 the relevant portion of which is related to this case, we

18 have already sent them by virtue of the data.

19          THE COURT:  Okay.  I am going to take your word

11:03:09  20 at that, but now I am going to ask you point two, and I

21 want you to listen very carefully as I do so.

22          MR. SPALDING:  Yes.

23          THE COURT:  With the -- assuming that what you

24 have produced is relevant and responsive, assuming that

11:03:30  25 that relevant and responsive information is contained in

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  the report that is being sought in Form X, you have

2  produced it in Form X.  It exists in this report as Form --

3             MR. SPALDING:  Y.

4             THE COURT:  Well, I was going to say X.  I

11:03:53  5  mean, directly on point.

6             MR. SPALDING:  Uh-huh.

7             THE COURT:  Obviously, there is no need to

8  produce it again.  If it exists in form, for your example,

9  Y, which would also potentially lead to other relevant

11:04:12  10  discoverable materials, then it may be necessary to produce

11  it.

12             So am I looking -- when you are talking

13  about this report, is it the same data just captured in

14  this report, or is it in this report in, as you say, Form

11:04:36  15  Y, which not all is the same information, but it may be

16  presented in such a way that it could lead to more relevant

17  discoverable material?

18             Do you understand the distinction?

19             MR. SPALDING:  That is a very valid question.

11:04:49  20  I do understand the distinction, Judge Bennett.  I've got

21  to be careful --

22             THE COURT:  Okay.

23             MR. SPALDING:  -- because I haven't seen the

24  reports.  My colleague, Ms. Agena, has.  We have another

11:04:57  25  e-discovery partner in the firm who is working on the case.

1  She has seen it.  What -- what they're telling me is that

2  this data contains the same type of information that we

3  have already produced via the SAP database, but then goes

4  beyond to contain much more information that goes beyond

11:05:21  5  the realm of this case.

6                    THE COURT:  Okay.

7                    MR. SPALDING:  And the example that we have

8  kept --

9                    THE COURT:  Let me just stop you because I have

11:05:27  10  given you some homework --

11                    MR. SPALDING:  Yes.

12                    THE COURT:  -- and I will give you some more

13  homework.

14                    MR. SPALDING:  Yeah.

11:05:31  15                    THE COURT:  As to inquiry two from the Court,

16  as an officer of this Court, go and have the conversation

17  with your client, is the information -- is information

18  you're telling me that is contained in this report,

19  identical to X that we have already produced, and it's in X

11:05:57  20  form in this report, or is it the same information in Form

21  Y in this report which could potentially lead to more

22  relevant, more discoverable materials?

23                    MR. SPALDING:  I understand.

24                    THE COURT:  Okay.  And then kind of the third

11:06:15  25  part of that, the amount of nonresponsive, nonrelevant

1 material such that your proportionality argument can be

2 made with more concrete --

3            MR. SPALDING:  Yes.

4            THE COURT:  -- points because that's relevant

11:06:35  5 as well, too, to the -- to the potential --

6            MR. SPALDING:  More meat on the bone so we can

7 figure out --

8            THE COURT:  -- to the potential production of

9 these reports.

11:06:44 10            MR. SPALDING:  Just so the Court knows, my --

11 our concern with this, with reference to your point two and

12 point three is, then, if we have to produce this data

13 because it might lead to other relevant information, that's

14 where the Rule 26 and the fishing-expedition argument comes

11:07:02 15 in.

16            THE COURT:  Exactly.  That is why I put point

17 three on there as well.  But --

18            MR. SPALDING:  And I will have those

19 conversations with the client, for sure.

11:07:26 20            THE COURT:  Just so you know, I am prone every

21 now and then to ask direct questions.  I am going ask you

22 some very direct questions about what I have just inquired

23 about.

24            MR. SPALDING:  Yes.

11:07:35 25            THE COURT:  And I will be expecting some very

1    direct answers.  And it -- and I am not at this point

2    leaning towards production or nonproduction of these

3    reports because the proportionality point is very

4    important.  And as the point, if it's been produced, there

11:07:57    5    is not, in my view, the necessity to reproduce it in

6    another form if it is already in your hand, if it is X and

7    X.  But if it is X and Y, we're going to be having a

8    different conversation which will be overlapped with this

9    proportionality argument as to whether or not it makes

11:08:18    10   sense to produce --

11                   MR. SPALDING:  Right.

12                   THE COURT:  -- this additional report.

13                   MR. SPALDING:  Yes.

14                   THE COURT:  Or reports.

11:08:23    15                   MR. SPALDING:  Yes.

16                   THE COURT:  So we're clear as to what I am

17   asking?

18                   MR. SPALDING:  Absolutely.

19                   THE COURT:  Okay.

11:08:28    20                   MR. VON KLEMPERER:  And, Your Honor, if I could

21   just add one point to that.  We have asked for examples of

22   these reports, so before --

23                   THE COURT:  Well, first things first.  I don't

24   think I could have been any clearer with counsel as to what

11:08:46    25   they need to do.  Let them have that conversation.  And,

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  Counsel, if you want for my review during your argument

2  when I asked you these very direct follow-up questions,

3  Here, Judge, this is what I am talking about, I will do an

4  in camera review right here --

11:09:04  5            MR. SPALDING:  Yes.

6            THE COURT:  -- so that I can follow along in

7  your argument as to what we're talking about.

8                  Not -- and so I'll address that with my

9  questioning of counsel.

11:09:15  10            MR. VON KLEMPERER:  Thank you, Your Honor.

11            THE COURT:  All right.  So, I think we're on

12  the same page.

13            MR. SPALDING:  Yes, sir.

14            THE COURT:  All right.  Anything else, counsel?

11:09:21  15            MR. VON KLEMPERER:  Not on the discovery at

16  this time.  We do have the proposed schedules.

17            THE COURT:  Let me -- I am going to do that

18  last.

19            MR. VON KLEMPERER:  Okay.

11:09:28  20            THE COURT:  The other item which is still a

21  discovery issue, I received this in camera review, the

22  exhibits of which are D, and I'll tell you, Counsel, what D

23  is, is a letter dated September the 27th, 2019, which kind

24  of explains the following -- the next exhibit, which is E,

11:09:54  25  which the Court reviewed.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1      As to D, I had an issue with it being

2 under seal, and I assume counsel hadn't seen this.

3              MR. SPALDING:  They hadn't.  But just so you

4 know, Judge --

11:10:08   5              THE COURT:  They have or have not?

6              MR. SPALDING:  They have not.

7              THE COURT:  Okay.

8              MR. SPALDING:  But we did serve them with a

9 shorter, more concise letter.

11:10:14  10              THE COURT:  That was my next question

11 because contained in D under seal to me are not materials

12 that are the subject of the production, but it contains

13 legal argument as to why it shouldn't be produced, and I

14 want to give counsel the opportunity to respond directly to

11:10:36  15 those legal arguments --

16              MR. SPALDING:  Right.

17              THE COURT:  -- that the Court has seen under

18 seal as part of Exhibit D.

19              MR. SPALDING:  Right.

11:10:45  20              THE COURT:  So you are telling me that that has

21 been provided to him in a shorter form?

22              MR. SPALDING:  In our notice of filing under

23 seal, we had a more condensed version of those legal

24 arguments that we made to you in the letter.  That went to

11:10:56  25 opposing counsel.

1                    The reason why we submitted a longer

2   letter that was more detailed is because in order to fully

3   make our arguments, we had to address some of the things

4   that we think are private.

11:11:09   5                    THE COURT:  The factual background.

6                    MR. SPALDING:  That's right.

7                    THE COURT:  I understand that perfectly.

8                    MR. SPALDING:  That's right.

9                    THE COURT:  But the portion that I'm

11:11:14   10  specifically concerned with under Exhibit D, the letter,

11  would be part 2, which is titled, "Additional Argument and

12  Authorities."  That's kind of the legal argument portion of

13  it.

14                    And -- well, it's 2A and 2B.  Those are

11:11:41   15  the specific points that before I entertain your argument,

16  I would like to give counsel the opportunity -- and since

17  he hasn't seen it, I don't know what he has seen, but with

18  the direction from the Court, that I think that that's

19  appropriate for him to see without referencing the

11:12:00   20  underlying investigation, the factual background of that

21  investigation, such that that can be teed up from both

22  sides.

23                    MR. SPALDING:  I understand.  And, Your Honor,

24  I don't have the letter with me.  I -- and I don't know if

11:12:15   25  Mr. von Klemperer is --

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          THE COURT:  Hand him this, just so you will

2 know what I am talking about.

3               I am handing counsel what was the filing

4 under seal.  That is Exhibit D, and I am referring to

11:12:32   5 specifically 2A and 2B.

6          MR. SPALDING:  Right.  Your Honor, I am

7 familiar with the argument.

8          THE COURT:  Okay.  And so he needs to be made

9 aware of that argument, and if he wants to respond, because

11:12:43  10 I believe those sections do not relate to the factual

11 background, or the underlying investigation in particular,

12 but just why it shouldn't be produced.

13          MR. SPALDING:  And these arguments, Your Honor,

14 are in a more condensed form in the notice that we gave to

11:13:00  15 plaintiffs' counsel.

16          THE COURT:  So I want to confirm that.

17          MR. SPALDING:  Yes.

18          THE COURT:  If you will hand that back to my

19 clerk.  All right.

11:13:06  20               So when did you receive that?

21          MR. VON KLEMPERER:  Well, it was filed on the

22 docket, Your Honor, I believe September 30th.  That is

23 Docket 99.  We responded to what was publicly filed.  That

24 is Docket 100.

11:13:18  25          THE COURT:  Okay.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1                MR. VON KLEMPERER:  But we have not seen what

2 is under seal.

3                THE COURT:  Right.  All right.  So -- so this

4 is -- what was the document, the public -- your response is

11:13:38   5 100.

6                MR. SPALDING:  And theirs was 99.

7                THE COURT:  99.  All right.

8                MR. VON KLEMPERER:  Actually, I'm sorry.

9                THE COURT:  I have it as brief regarding -- 94.

11:13:50  10 Is it 94?

11                MR. VON KLEMPERER:  That's correct.  Yes.

12                THE COURT:  Okay.  Okay.  Let me -- in light of

13 that, I was not aware that that had occurred.  Let me go

14 back and read your response before I weigh in on that

11:14:08  15 point.

16                MR. SPALDING:  If they would like to file an

17 additional response or more time to talk about that, that

18 is fine with us, too.

19                THE COURT:  Okay.  Well, if you do, so be it.

11:14:20  20 But that's where I'll -- when I took a look at this, that

21 was the only thing that kind of concerned me, because it

22 wasn't just here's -- this is what we're -- don't want to

23 produce.

24                MR. SPALDING:  Yes.

11:14:33  25                THE COURT:  It was actual legal argument.

1           MR. SPALDING:  We're savvy enough to know,

2 Judge, not to do that.

3           THE COURT:  No.

4           MR. SPALDING:  Okay.

11:14:40   5           THE COURT:  I wasn't casting aspersions.

6           MR. SPALDING:  I know.

7           THE COURT:  You were conveying information.

8 But once I saw it, I thought it would be appropriate to

9 give them the opportunity to respond.

11:14:50  10           MR. SPALDING:  But also I will commit to going

11 back to the office this afternoon and ensuring that what

12 they have is the --

13           THE COURT:  2A, 2B.

14           MR. SPALDING:  Yes, in some form.  Right.

11:14:59  15           THE COURT:  Very well.  Now, briefly, without

16 weighing in, without discussion as to the Exhibit E, which

17 was the underlying filing for the in camera review, I was a

18 little confused.  And that goes also back to the Exhibit D

19 talking about the different types of -- let me find it --

11:15:29  20 the different types of visas.

21           MR. SPALDING:  Right.

22           THE COURT:  Counsel, and perhaps there may need

23 to be some additional clarification, but on your letter in

24 D, in Section 1A, you refer to L-1 and B-1 visas.

11:15:53  25           MR. SPALDING:  That's right.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          THE COURT:  And then --

2          MR. SPALDING:  I might be able to help you,

3  Judge.

4          THE COURT:  Okay.  Was it a -- I thought --

11:16:21   5          MR. SPALDING:  Well, the original subpoena from

6  the government, and I think the information this brought, I

7  can say publicly in open court, but the original subpoena

8  from the government involved L-1 and B-1 visas, which are

9  two different types of visas.

11:16:37  10          THE COURT:  Right.

11          MR. SPALDING:  Ultimately, what the

12  documentation that --

13          THE COURT:  Well, hold on.  Here it is.  I see

14  in Footnote 2, on Page 2, a reference to "H-1B," and so

11:16:50  15  I'll -- I was turned around a little bit.

16          MR. SPALDING:  Yes.  Ultimately, Your Honor,

17  what was ultimately given to the government by the client,

18  and they had a separate outside counsel working on this

19  matter, ultimately what was provided was just L-1 Visa

11:17:07  20  information alone.

21              Now, part of our argument as to why this

22  is not something that should be produced is that this case

23  involves "H-B1" visas, which is a completely different

24  category of visas, and there has been no reference or

11:17:20  25  mention in the complaint or anyone else -- anywhere else to

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  L-1 visas.

2          THE COURT:  And H-1B is different from L-B1.

3          MR. SPALDING:  Different from L-1 and different

4  from B-1, that is right, Your Honor.

11:17:30  5          THE COURT:  All right.

6          MR. SPALDING:  And L-1 visas are actually

7  fairly rare.

8          THE COURT:  I saw the --

9          MR. SPALDING:  And I am not an immigration

11:17:37  10  attorney.

11          THE COURT:  I saw "B-1" and I then I saw "1-B,"

12  and I didn't know if that had been a misprint, but that is

13  correct language?

14          MR. SPALDING:  Yes.  That's right.

11:17:45  15          THE COURT:  Okay.

16          MR. VON KLEMPERER:  And, Your Honor, if I could

17  briefly respond to that, we strongly disagree that the B-1

18  visas or L-1 visas are irrelevant to this case.

19          THE COURT:  Well, that is the argument.  And so

11:17:56  20  that is what I am giving you the opportunity to respond to.

21  I saw that argument as part of the Section 2, and I wanted

22  to hear you weigh in, and I would assume that you have told

23  me now that you have weighed in on that in you're filing

24  which is document 100.

11:18:15  25          MR. VON KLEMPERER:  We did.  We did not know

1  that the investigation at issue involved those visas, I

2  believe, when we filed that.  That is new information to

3  us.  We assume that those were probably the issues.

4          THE COURT:  Why don't you take counsel's kind

11:18:25  5  offer and update your response such that you can

6  incorporate that type of argument in writing to me such

7  that I'll have it before me.

8          MR. VON KLEMPERER:  Absolutely, Your Honor.

9          THE COURT:  Okay.  That was my only --

11:18:39  10          MR. SPALDING:  And, ultimately, Judge there is

11  a lot of water under the bridge since April, but in that

12  hearing, you know, there was a lot of discussion about what

13  we meant by producing that information regarding government

14  investigations.  And you talked quite a bit on the record

11:18:53  15  about what you mean by government investigation, and it

16  provided us with some parameters, and as I think we

17  mentioned in the public filing, and to you --

18          THE COURT:  I will say again --

19          MR. SPALDING:  This is way beyond.

11:19:08  20          THE COURT:  -- I hate -- I don't hate, because

21  I said it -- but quoting me to me.  And in that hearing

22  there are investigations that result in no findings, no

23  additional action, and just the fact that an investigation

24  was undertaken and then later closed does not result in

11:19:35  25  some adverse finding, or adverse positioning of the

1 defendant versus the plaintiff.

2                    There are -- there are other

3 investigations that result in adverse findings by the

4 government, which may or may not then be relevant but,

11:19:58  5 obviously, from my point of view, someone should not be

6 prejudiced by the fact that the government in its due

7 diligence of protecting the public took a look at something

8 and then made a determination this warrants no further

9 action, and then having that fact, you know, brandished

11:20:19 10 about as if it means something.  And so that is what I was

11 referring to.

12                    And so I now have the copy, a copy of one

13 of the investigations that counsel has brought to my

14 attention.  The only thing that was left outstanding, in my

11:20:35 15 mind, from the letter that was filed with that was that

16 there was some legal argument that I did not have a

17 response to, and I wanted to have that in writing before I

18 made a determination as to the merit of that legal

19 argument, with the investigation sitting on my desk, which

11:20:53 20 I now have.  So, I think we're okay with proceeding.

21                    By way of updating your argument, now

22 knowing what types of visas are at issue with the

23 investigation in question, how long do you think you would

24 take?

11:21:09 25            MR. VON KLEMPERER:  Just one point of

1  clarification, Your Honor.  Are they going to be providing

2  a redacted version of the Exhibit D that was filed, with

3  more extensive argument or potentially more extensive

4  argument?

11:21:21    5       THE COURT:  I think counsel told me -- I told

6  him what my concern was.  He said he was going to go back

7  to his office and confirm that all legal argument was

8  included in his public filing.  To the extent that it was

9  not, he will make sure that that's included as well.  If

11:21:40   10  that is the case, you have to add clarification, how long

11  will that take?

12       MR. SPALDING:  Oh, gosh.  I ought to be able to

13  confirm what was in that letter versus what they saw, you

14  know, and provide them an update, if necessary.  I would

11:22:00   15  think a week.

16       THE COURT:  Okay.  So week from his filing?

17       MR. VON KLEMPERER:  Absolutely, Your Honor.

18       THE COURT:  Okay.  So next Friday, and then two

19  weeks -- or two weeks from today or one week from his

11:22:11   20  filing, if any, you will provide an updated response.

21       MR. SPALDING:  And it may not be a filing, Your

22  Honor, unless you want it to be.  I could just send it to

23  them.

24       THE COURT:  Well, I need to see it.

11:22:20   25       MR. SPALDING:  I see.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          THE COURT:  Because you have made argument to

2  me and I need to have them side-by-side.

3          MR. SPALDING:  I understand.

4          THE COURT:  All right.

11:22:30   5          MR. SPALDING:  Scheduling order, I think, is

6  what comes up next.

7          THE COURT:  Yes.  So I think that takes care of

8  the issue that I walked out kind of concerned about.

9  Scheduling issues.

11:22:40  10          MR. VON KLEMPERER:  Your Honor, we submitted a

11  proposed schedule yesterday, and I have a copy of that for

12  the Court, if you don't have one in front of you.

13          THE COURT:  I do not have one in front of me.

14  If you will hand one up to the --

11:22:52  15          MR. VON KLEMPERER:  I'll provide you both ours,

16  and you already have a copy.

17          MR. SPALDING:  Yeah.  We will give him a copy

18  of both of them.  So this is plaintiffs' proposal.

19          THE COURT:  Hand it to the law clerk.  He wants

11:23:02  20  to take a look at that.

21          MR. SPALDING:  And this is ours.

22          THE LAW CLERK:  Thank you.

23          THE COURT:  Thank you, sir.

24          MR. VON KLEMPERER:  And, Your Honor, just for

11:23:08  25  clarity, ours at the top says "Plaintiffs' Proposed

1  Schedule."

2              THE COURT:  Yes.

3              MR. VON KLEMPERER:  And theirs just says

4  "Proposed Schedule."

11:23:28  5              THE COURT:  That is unusual.  So from your

6  perspective -- I tell you what, by way of --

7              MR. SPALDING:  Your Honor, there was no -- that

8  was not any kind of calculated omission.  I just --

9              THE COURT:  What omission?

11:23:55  10             MR. SPALDING:  That we don't have "Defendant's"

11 in front of the "Proposed Schedule."

12             THE COURT:  Oh, yeah.  No.  No.

13             MR. SPALDING:  Yeah.

14             THE COURT:  The big difference that I am

11:24:05  15 looking at is a September trial date versus a March trial

16 date.

17             MR. SPALDING:  That is, I think, the only

18 difference aside from this early summary judgment phase we

19 want to build in.  The only other difference is the trial

11:24:17  20 dates.  And, Your Honor, the March trial date in our

21 proposed order simply matches the trial date that you

22 proposed in your first proposed scheduling order back in

23 April that you then abandoned.  We are okay with keeping

24 that schedule.  I think they want an extra six months, and

11:24:32  25 that is really the only -- the only other difference in

```
 1   them.
 2              THE COURT:  Okay.
 3              MR. SPALDING:  In the proposed order.
 4              MR. VON KLEMPERER:  That is correct, Your
 5   Honor.  We added six months to essentially every date that
 6   was included in the Court's original proposed schedule, and
 7   including the trial date just because given where we are
 8   with discovery, we just don't believe it is feasible to
 9   have the trial on that date.
10              THE COURT:  Understood.  I will give this my
11   attention, and get something out to you.  All right?
12   Anything else, counsel?
13              MR. VON KLEMPERER:  Just one point regarding
14   the early summary judgment phase that they are seeking to
15   work in.  We address that briefly in our letter.  We don't
16   believe that's appropriate under the Teamsters framework to
17   address individual summary judgment before the class issues
18   are resolved.
19                   The Fifth Circuit has -- has addressed
20   that issue in the case Munoz v. Orr, 200 F3rd 291 at 306.
21   It is a 2005 Fifth Circuit case in which it held that it is
22   well established that individual liability cannot be
23   adjudged before class liability is determined.  And I know
24   we have discussed this in the past with the Court, the
25   Teamsters framework, where first there is an initial stage
```

11:24:38 (line 5)
11:24:51 (line 10)
11:25:06 (line 15)
11:25:20 (line 20)
11:25:40 (line 25)

1    where you determine whether or not there is a pattern of

2    discrimination; and if the plaintiffs can establish that,

3    then there is a second phase where individual liability is

4    determined.  And so we don't believe that doing summary

11:25:58    5    judgment on the individual plaintiffs would be appropriate

6    before we resolve that first-phase issue.

7                 MR. SPALDING:  Your Honor, that argument is a

8    red herring.  I can explain to you why that is.

9                 THE COURT:  I'll give you an opportunity to

11:26:09    10    respond.

11                 MR. SPALDING:  All right.  Here is -- Your

12    Honor, here is a copy of a case, and I have highlighted the

13    relevant language in this copy.  It's a case out of the

14    Southern District of New York in 2006.

11:26:23    15                 What Mr. von Klemperer is referring to is

16    the allocation of proof at trial in a pattern and practice

17    class action.  And the *Teamsters*' case is well settled, and

18    it will apply in this case, most likely, at trial.  But

19    what we're talking about is summary judgment.  And if you

11:26:41    20    look at -- and what we plan to do, Your Honor, is -- is for

21    purposes of these motions for summary judgment, concede for

22    purposes of the motions only, the pattern and practice.

23                 And then what these cases say, Your Honor,

24    what this line of cases say, is that once you -- you know,

11:27:00    25    at the summary judgment stage, if you look at page 24 that

1   I have got a green flag on, Your Honor --

2                   THE COURT:  Uh-huh.

3                   MR. SPALDING:  -- here is what the Court says:

4                       "The *Teamsters*' presumption generally

11:27:11  5   arises in the context of determining the parties' burdens

6   at trial rather than on summary judgment.  Nevertheless,

7   defendants have conceded that for the purposes of summary

8   judgment only the individual plaintiffs' claims are

9   entitled to the *Teamsters*' presumption should the class

11:27:26  10  claim survive summary judgment."

11                      That is what we plan to do at summary

12  judgment, Your Honor, is concede for purposes of the motion

13  that a pattern and practice exists, but then tackle the

14  individual plaintiffs' claims on their merits.  And what

11:27:40  15  this case law says is that you simply apply the *McDonnell*

16  *Douglas* burden-shifting scheme as you would ordinarily.

17                      And what we have been saying since April,

18  Judge, is that the individual plaintiffs' claims are so

19  weak that we believe this is summary judgment material, and

11:27:53  20  so what we want to do, now that we have spent all this time

21  and all this money on this very broad discovery is press

22  pause; give us, both parties, time to do discovery on the

23  individual plaintiffs' claims, just a few months; and then

24  a summary judgment deadline.  And the Court can read those

11:28:10  25  motions for summary judgment, and if they are granted with

1   respect to every plaintiff, the case is over.  If they are

2   not, we move on.  But, it's --

3           Now we go back to the Rule 26 allocation

4   here, and I think we -- it is our turn to have a shot at

11:28:28   5   this, Your Honor.  And this approach doesn't prejudice them

6   at all with respect to *Teamsters* because if we're wrong and

7   the cases don't -- and the cases survive summary judgment

8   and go to trial, the *Teamsters* will --

9           THE COURT:  Well, first things first.  And this

11:28:54   10  case has been a little bit more difficult than your average

11  case when it comes to discovery, and it is not saying

12  anything bad.  It is just some cases are like that.  So

13  let's get to the bottom of the discovery issues.

14          Counsel, you have my word that until I get

11:29:16   15  satisfied that the discovery that is responsive and

16  relevant has been produced to the plaintiffs, we're not

17  even moving to the summary judgment stage.  I want to make

18  sure that you have available all the information that you

19  have requested that's relevant, and responsive, and that

11:29:35   20  you're entitled to before we move to that phase.  I am

21  still struggling with where we're at right now.

22          MR. SPALDING:  We want that, too, Your Honor.

23          THE COURT:  Yeah.  So once that is done, I

24  think it is appropriate then to talk about what's the

11:29:48   25  appropriate mechanism to dispose of any claims that need to

1  be disposed of, if any, and we are not quite there yet,

2  but your argument is on my radar regarding how soon certain

3  things should be teed up.  I understand.  And we will have

4  an additional discussion on this point in the coming weeks

11:30:16   5  as these discovery issues are finally tied off with some

6  finality, and hopefully sooner rather than later.  Because

7  it's my hope, too, that your client is going to stop

8  spending money on searches for information, that we will

9  have gotten to the point that that's done, now let's talk

11:30:40   10  about the merits of the case, which summary judgment

11  obviously entails.

12           MR. VON KLEMPERER:  Thank you, Your Honor.

13           THE COURT:  All right.

14           MR. SPALDING:  Thank you, Judge.

11:30:48   15           THE COURT:  Counsel, anything else?

16           MR. VON KLEMPERER:  Just one note I would like

17  to make for the Court so it doesn't come as a surprise.  We

18  are in the process of amending the complaint.  We provided

19  it to Wipro, adding several additional plaintiffs.  And

11:31:00   20  we're just waiting to hear back whether they will consent;

21  and if not, we will file a motion to amend shortly.

22           THE COURT:  Sure.  That was anticipated based

23  upon prior discussions you have had with me, and I'll deal

24  with it in due course, but I anticipated that.

11:31:15   25           Very well.  Anything else, counsel?

1                 MR. VON KLEMPERER:  No, Your Honor.

2                 MR. SPALDING:  No.

3                 THE COURT:  Counselor?

4                 MR. SPALDING:  No, sir.

11:31:19    5                 THE COURT:  Counsel, you have done a wonderful

6     job again, as usual.

7                 MR. NOTESTINE:  Thank you.  Appreciate it.  I

8     am supposed to be in trial in this courtroom this week, so

9     that's part of the reason I was not here.

11:31:30    10                 THE COURT:  Yes.  Judge Hanks was scheduled to

11    be here, and not talking out of turn, but the case

12    resolved.

13                 MR. NOTESTINE:  Yeah.  We settled at the World

14    Series.

11:31:41    15                 THE COURT:  At the World --

16                 MR. NOTESTINE:  So therefore, we -- right

17    before trial was to start.

18                 THE COURT:  Well, good deal.

19                 MR. NOTESTINE:  Thanks for letting him use this

11:31:51    20    courtroom because he doesn't have a jury box, I understand.

21                 THE COURT:  I think they are working on that,

22    but I was talking -- I was telling -- still hadn't had a

23    chance to look at what you filed yesterday.  I was in

24    Austin Wednesday and Thursday -- which was perfect for me

11:32:08    25    and one of the reasons the courtroom was available for

11:32:28

1 Judge Hanks -- at a board meeting for the law school, and
2 Judge Hinojosa from McAllen was there and had a chance to
3 have a cup of coffee with him.  And we were kind of both
4 chuckling and agreed nothing clears the mind like a firm
5 trial setting and an available courtroom.  So --

6            MR. SPALDING:  And, Judge, one more comment I
7 think relevant to make.  You know, I had mentioned this at
8 the beginning.  The parties have been talking, you know.
9 We have had really three meet and confers if you include

11:32:44

10 last night's meeting at the Flying Saucer as a meet and
11 confer, over the last two weeks.  And there is a mutual
12 respect, and I think if Mr. Kotchen were here, he would
13 agree with that, and we're doing our best to get us there.
14 I think they're doing their best, and I think that we're

11:33:04

15 past the issues of, you know, the apparent, you know,
16 mistrust.

17            THE COURT:  Well, I have said this often and
18 I'll say it again.

19                When you have quality counsel involved

11:33:19

20 that will just invest some personal time in sitting across
21 the table, and sometimes it is not necessarily even about
22 the case, but getting to know one another, you know, how
23 you practice law, how you view the practice of law, the
24 level of trust goes up.  And then when you return to the

11:33:39

25 issues that are before you, you come to it from a point of

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  mutual respect and admiration, and some of the issues that

2  seem big are not so big anymore.  And the honest disputes

3  that you have left, you present them to me, and I'll give

4  you a decision.  And whether you agree with that decision

11:34:02  5  or not, at least it provides you with, okay, this is how

6  we're going to have to go forward based upon what we have

7  agreed to, what the Judge has decided.  And so continue

8  your discussions in that manner, and this case becomes a

9  lot more manageable for all involved.

11:34:24  10              Gentlemen, enjoy your weekend.  Safe

11  travel home, sir.

12              MR. VON KLEMPERER:  Thank you, Your Honor.

13              THE COURT:  Very well.  You're excused.

14              MR. SPALDING:  Thank you.

11:34:32  15  (Proceedings recessed at 11:34 a.m.)

16              COURT REPORTER'S CERTIFICATE

17      I, Kathleen K. Miller, certify that the foregoing is a

18  correct transcript from the record of proceedings in the

19  above-entitled matter.

20

21  DATE: Nov. 20, 2019      /s/     _Kathleen K. Miller

22                           Kathleen K. Miller, RPR, RMR, CRR

23

24

11:35:01  25

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com