<u>UNITED STATES DISTRICT COURT</u>
<u>SOUTHERN DISTRICT OF TEXAS</u>
<u>HOUSTON DIVISION</u>

| | | |
|---|---|---|
| JAMES PHILLIPS, and ROBERT SAEMIAN, | § § § | |
| | § | CIVIL ACTION NO. 4:18-cv-00821 |
| Plaintiffs, | § § | |
| vs. | § | |
| | § | CLASS ACTION |
| | § | |
| WIPRO LIMITED, | § | Jury Trial Demanded |
| | § | |
| Defendant. | § § | |

<u>AMENDED COMPLAINT</u>

Plaintiffs James Phillips and Robert Saemian bring this action on behalf of themselves and a class of similarly situated individuals to remedy pervasive, ongoing race and national origin discrimination by Defendant Wipro Limited ("Wipro"), and allege as follows:

<u>NATURE OF THE ACTION</u>

1.      Wipro is an Indian company that provides information technology and consulting services. Wipro employs approximately 14,000 employees in the United States. While only about 12% of the United States' IT industry (the industry in which Wipro operates) is South Asian, at least 80% (or more) of Wipro's United States workforce is South Asian (primarily from India).[1] As discussed below, this grossly disproportionate workforce results from Wipro's intentional pattern and practice of employment discrimination against individuals who are not South Asian and who are not of Indian national origin, including discrimination in hiring, promotion, and termination decisions, and its use of employment practices that result in a disparate impact on those

_____

[1] As used herein, "South Asian" refers to individuals who trace their ancestry to the Indian sub-continent. "Indian" refers to individuals born in India, or whose ancestors came from India.

1

same groups.

2.      Wipro's employment practices violate the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiffs seek, on their own behalf, and on behalf of three classes of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress Wipro's pervasive pattern and practice of discrimination.

## PARTIES

3.      Plaintiff James Phillips was born in the United States and is of American national origin and Caucasian race. Mr. Phillips is a resident of Florida.

4.      Plaintiff Robert Saemian was born in Tehran, Iran (to parents of Russian descent) and is of Caucasian race. He is a naturalized citizen of the United States and is a resident of Texas.

5.      Plaintiffs are members of a protected class, as recognized by 42 U.S.C. § 1981 and Title VII. Plaintiffs Phillips and Saemian have exhausted their administrative remedies and have complied with the statutory prerequisites of filing a Title VII complaint by filing charges against Wipro with the U.S. Equal Employment Opportunity Commission, which were cross-filed with the California Department of Fair Employment and Housing, and receiving notices of their right to sue from the EEOC and DFEH.

6.      Defendant Wipro Limited is an Indian multinational corporation that provides consulting, technology, and outsourcing services. Wipro Limited is headquartered in Bangalore, India and employs over 160,000 workers worldwide, including over 14,000 employees in the United States.

## JURISDICTION

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C.

§ 2000e-5(f), *et seq.*, and 42 U.S.C. § 1981(a).

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a state and a foreign corporation.

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one class member who is a citizen of a state and is brought against a foreign corporation.

10.      This Court has personal jurisdiction over Wipro because it engages in continuous and systematic business contacts within the State of Texas and maintains a substantial physical presence in this State. Additionally, Plaintiffs' claims arise, in part, out of Wipro's activities in Texas.

## **VENUE**

11.      Wipro moved to transfer this case from the Northern District of California to this District. The Court granted Wipro's motion. *See* Order (Mar. 14, 2018), ECF No. 25.

## **STATEMENT OF FACTS**

*Overview of Wipro's Business Model*

12.      Wipro has approximately 22 offices in the United States and employs over 14,000 employees domestically. Wipro made over $8.5 billion in revenue in the past fiscal year, and derives approximately 52% of its IT revenue from North and South America, the vast majority of which is from the United States. Wipro's U.S. headquarters is in East Brunswick, New Jersey. Wipro has described this location as having the "largest concentration of Wipro's U.S. operations, administrative, and HR personnel work …  including the Senior Vice President, HR and Global Head Strategic Hiring, Santosh Karagada." Sachdev Decl. ¶ 4, ECF No. 19-1. "Wipro also has a

major center of operations in the U.S. in Dallas, Texas," where other heads of Wipro's human resources department are located. *Id.* ¶ 5.

13.     Wipro contracts with U.S. companies to provide IT-related services. Once Wipro secures a contract with a client, it hires individuals to fill positions to service the client. Both external applicants and existing employees must apply and interview for these positions. Once a position servicing a client comes to an end (or if an employee is removed from a position), employees are placed in a non-productive status referred to as being on the "bench." Once on the bench, employees must again seek new positions within Wipro, going through an application and interview process, just as external applicants must.

*Overview of Wipro's Discriminatory Scheme*

14.     Wipro operates under a general policy of discrimination in favor of South Asians and against individuals who are not South Asian and not Indian. This general policy of discrimination manifests itself in the same general fashion with respect to Wipro's hiring, staffing, promotion, and termination decisions. It consists of at least four inter-related, mutually reinforcing prongs, pursuant to which applicants and employees outside of Wipro's favored class are similarly disadvantaged and harmed.

15.     First, Wipro engages in a practice of securing H-1B, L-1A, L-1B, and B-1 visas (and other visas) for South Asian and Indian workers located overseas who will then be used to staff U.S. positions. The federal government annually awards 65,000 H-1B visas (plus an additional 20,000 for individuals with advanced degrees). These visas are awarded on a lottery basis. Given the cap on H-1B visas, companies compete to secure visas for prospective visa workers. Each year, companies submit H-1B visa petitions at the beginning of April for visas to be awarded later that year. H-1B visa petitions must identify an actual job at a specific location

that the prospective visa worker will fill if awarded a visa.

16.     To fulfill its employment preference for South Asians and Indians, Wipro seeks to maximize the number of visas it receives each year from the federal government. Wipro is consistently one of the top five H-1B visa recipients. Wipro submits visa petitions for more positions than actually exist in the U.S. in order to maximize its chances of securing the highest number of available H-1B visas from the lottery process. In this way, Wipro has been able to secure visas for far more individuals than it actually has a present need for. For example, in 2015, Wipro received 5,968 new visas, while in 2016, it received 6,831 new visas – far more positions that could actually exist given that Wipro employs less than 15,000 individuals in the United States.

17.     All, or substantially all, of the individuals for whom Wipro secures visas are South Asian and Indian. While both individuals already located in the U.S. and foreign individuals who are visa-ready are considered for open positions in the U.S., Wipro's South Asian and Indian visa-ready individuals are given preference for these positions. Similarly, non-South Asian and non-Indian individuals are often displaced from their current positions in favor of South Asian and Indian visa-ready individuals.

18.     Second, Wipro gives preference to South Asian and Indian applicants located in the U.S. over non-South Asian and non-Indian applicants. Wipro has an internal recruiting department responsible for locating talent within the U.S. These efforts are supplemented by third-party recruiting companies. On information and belief, both Wipro's internal recruiters and its third-party recruiters give preference to locating and recruiting South Asian and Indian candidates, who are then given preference throughout the hiring process. As a result, on information and belief, Wipro hires a disproportionately high percentage of South Asians and Indians within the United States that far exceeds the proportion of those individuals in the relevant labor market.

19.     Third, because of its discriminatory preference for South Asians and Indians, Wipro promotes South Asians and Indians at disproportionately high rates compared to non-South Asians and non-Indians. To be promoted, Wipro employees must receive a favorable appraisal score and must be nominated for a promotion by their immediate manager and have that nomination approved by their manager's manager (known as a "Level 2 manager"). Employees receive quarterly or annual appraisals. The appraisals include a rating of either outstanding, exceeds expectations, highly valued contribution, more contribution expected, or unsatisfactory contribution. Because of Wipro's preference for South Asians and Indians, these individuals are regularly awarded higher appraisal scores, compared to their non-South Asian and non-Indian colleagues. Additionally, some non-South Asian and non-Indian individuals are never given appraisal scores at all. Wipro's managers, almost all of whom are South Asian and Indian themselves, are also more likely to nominate South Asians and Indians for promotions. In turn, Level 2 managers are more likely to approve promotion nominations for South Asian and Indian individuals. Finally, on information and belief, Wipro regularly promotes unqualified junior South Asian employees to managerial positions in order to satisfy the legal requirements for L-1A visas. As a result, South Asians and Indians are regularly promoted at substantially higher rates than non-South Asians and non-Indians. This results in diminished career prospects for non-South Asian and non-Indian individuals, among other harms.

20.     Fourth, because of its discriminatory preference for South Asians and Indians, Wipro terminates non-South Asians and non-Indians at disproportionately high rates, compared to South Asians and Indians. Non-South Asians and non-Indians assigned to projects are terminated at substantially higher rates than South Asian and Indians. Additionally, because of Wipro's preference for filling positions with South Asian and Indian visa workers and South Asian and

Indian individuals hired within the U.S., non-South Asian and non-Indians are disproportionately relegated to the bench and disproportionately unable to locate new assignments. Wipro has a policy to terminate employees who are on the bench for four weeks. This results in substantially higher termination rates for non-South Asians and non-Indians.

21.     In addition, Wipro engages in employment practices that have a disparate impact on non-South Asian and non-Indian applicants and employees. First, Wipro' practice of relying on visa workers to staff U.S. positions results in available positions overwhelmingly going to visa holding South Asian and Indian individuals, to the exclusion of non-South Asian and non-Indian candidates. Second, Wipro's employee allocation practices result in available positions overwhelmingly going to South Asian and Indian individuals, to the exclusion of non-South Asians and non-Indians, who are then terminated at disproportionate rates. Third, Wipro's appraisal and promotion process results in South Asians and Indians receiving more promotions. Fourth, Wipro's benching and termination practices result in South Asians and Indians receiving positions more frequently, while non-South Asians and non-Indians remain on the bench for longer periods, resulting in diminished career prospects and disproportionate terminations for these individuals. Finally, Wipro's hiring and staffing decision-making process, as a whole, results in available positions overwhelmingly going to South Asians and Indians to the exclusion of non-South Asians and non-Indians.

22.     Wipro's U.S. workforce reflects the result of its discriminatory scheme. While only about 12% of the U.S. IT industry is South Asian, at least 80% (or more) of Wipro's United States-based workforce is South Asian and Indian, as is, the vast majority of its managerial and supervisory-level staff.

*Plaintiff Phillips' Experiences*

23.     Mr. Phillips is an experienced and highly skilled information technology professional. He holds a Bachelor of Arts degree in Computer Science from Clark University and has over thirty years of professional experience. Mr. Phillips has a wide array of skills that includes expertise in programming, software, hardware, system design, development, testing, technical support, robotics, medical systems, and software and voice recognition applications. Mr. Phillips has been engaged in Android software engineering, architecting, and application development since 2010 (around the time Google first introduced the Android operating system).

24.     Mr. Phillips began working for Wipro Limited in June 2013. Mr. Phillips was employed by the company for approximately one year and performed well in his role servicing Wipro client Dish Network in Denver, Colorado. However, Mr. Philips never received a performance appraisal or promotion while working for Wipro.

25.     During the course of Mr. Phillips' employment, he observed Wipro's preference for staffing open U.S. positions with South Asian and Indian workers. For instance, all of the Wipro managers servicing Dish Network were South Asian and Indian, and Mr. Phillips was one of the few non-South Asians and non-Indians (out of thousands of individuals) at the client site. Mr. Phillips also observed Indian managers routinely communicating in Hindi while discussing client-related work, which was detrimental to employees and job applicants like Mr. Phillips who do not speak Hindi, and were thus precluded from participating in the conversations.

26.     In 2013, Mr. Philips learned that Wipro had applied for an H-1B visa for a South Asian individual located in India, and that Wipro intended to bring this individual to the U.S. to work in a position servicing Wipro client Dish Network in Denver, Colorado. Once Wipro secured a visa for this individual, Mr. Phillips was removed from his position servicing Dish Network in

January 2014 and was placed in a non-productive/benched status. The South Asian employee assumed Mr. Phillips' position at the client site and was assigned to sit at Mr. Phillips' desk. It is Mr. Phillips' understanding that he was hired as a placeholder on the Dish Network client project, so that the open position was not lost to a competing vendor, and that Wipro intended to utilize his services only until it secured a visa for the South Asian employee located in India.

27.     While on the bench, Mr. Phillips repeatedly sought new positions within Wipro and applied to five or more positions on Wipro's website. Mr. Phillips also contacted the manager he was assigned to while on the bench, yet this individual failed to help Mr. Phillips locate a new position within the company. Mr. Phillips was invited to interview for just one open position while on the bench. However, after pitching new business to Wipro client Microsoft during a meeting in Seattle, Washington, Mr. Phillips was informed that Wipro had not secured the new business with Microsoft and that he would not be selected for a new role. Wipro terminated Mr. Phillips' employment in June 2014.

28.     In July 2014, Mr. Phillips was contacted by Monika Gupta, an employee of Wipro's recruitment vendor ACS Global Services, regarding an Android application development position for Wipro client Intel in Hillsboro, Oregon. Ms. Gupta is South Asian and Indian. Mr. Phillips provided Ms. Gupta with a copy of his resume and exchanged emails and telephonic communications with her regarding the Android application development position. Mr. Phillips also indicated to Ms. Gupta his willingness to travel for the position. After submitting his resume to Ms. Gupta, Mr. Phillips received no further contact from Ms. Gupta, and was not invited to interview for the Android application development position. Mr. Phillips was highly qualified for the position due to his extensive training and experience working with Android applications, and his familiarity with and ability to perform the duties listed in the job description. However, Wipro

did not offer Mr. Phillips the position. On information and belief, Wipro instead hired a South Asian of Indian national origin for the role.

29.     In August 2014, Mr. Phillips uploaded his resume and applicant information to Wipro's online candidate management and recruitment system called "Synergy." Shortly thereafter, he was contacted by Wipro's recruitment vendors, ACS Global Services and ACS Global Tech Solutions Pvt. Ltd., and their recruiters Dinesh Kumar and Shivani Jindal, respectively. Both Mr. Kumar and Mr. Jindal are South Asian and Indian. Mr. Phillips submitted his resume to the recruiters in order to be considered for one or more Android Architect positions servicing Wipro client Medtronic Positions in Mounds View, Minnesota. Mr. Phillips again indicated his willingness to travel for the position. That same month, Mr. Phillips underwent a telephone interview with Wipro for the position, but received no follow-up telephone calls or emails from Mr. Kumar or Mr. Jindal following his interview. Mr. Phillips was well qualified for the role, as he has been engaged in Android software engineering, architecting, and application development since 2010. However, Wipro did not offer Mr. Phillips an Android Architect position. On information and belief, Wipro hired a South Asian of Indian national origin for this position.

30.     In August 2014, Mr. Phillips was contacted by Rahul Kumar, a recruiter for Wipro's recruitment vendor, IDC Technologies Inc. regarding an Android Platform Developer/Lead position for Wipro in Hillsboro, Oregon. Mr. Kumar was located in Milpitas, California and, is South Asian and Indian. Mr. Phillips provided Mr. Kumar with a copy of his resume, and Mr. Kumar indicated that he would "upload [Mr. Phillips'] profile to [the] Wipro portal." Mr. Phillips also indicated to Mr. Kumar his willingness to travel for the role. Mr. Phillips then underwent a telephone interview with Wipro, but received no feedback from Mr. Kumar following his interview, despite his qualifications for the role. On information and belief, Wipro

hired a South Asian of Indian national origin for the Android Platform Developer/Lead position.

31.     In August 2014, Mr. Phillips applied for an Android Architect position for Wipro in Mounds View, Minnesota and provided a copy of his resume to the company. On September 10, 2014, Mr. Phillips participated in a telephone interview for the position, which was conducted by Wipro's Human Resources representatives Karthi Mail, Kiran Aral, and Rajaram Kamat. All three interviewers are South Asian and Indian. Mr. Kamat was located in India at the time of the interview. Mr. Phillips performed well during the interview, and exchanged emails and telephonic communications about his interest in this position with Mr. Mail, Mr. Aral, and Mr. Kamat throughout September 2014. Mr. Phillips also indicated to them his willingness to travel for the position. Although Mr. Phillips was well qualified for the role and had significant experience with Android applications, Wipro did not offer Mr. Phillips the position, and provided him with no justification for his rejection. On information and belief, Wipro hired a South Asian of Indian national origin for the Android Architect role.

*Plaintiff Saemian's Experiences*

32.     Mr. Saemian has been employed in the IT field since 1983 and holds a Bachelor of Science degree in Process Engineering from the University of Leeds. Mr. Saemian has a wide array of skills that include expertise in enterprise asset management ("EAM") software and related business process planning involving SAP, Oracle, and IBM software. Over the course of his career, Mr. Saemian has held multiple EAM Lead positions in the areas of Mobility, Work Management, Asset Management and other disciplines related to Enterprise Asset Management.

33.     Mr. Saemian was hired by Wipro in May 2014. Wipro informed Mr. Saemian at the time of his hire that he would eventually be required to relocate from his home in Orlando, Florida to Houston, Texas. Mr. Saemian put his home on the market shortly thereafter.

34.     From May 2014 through June 2015, Mr. Saemian worked from his home office in Orlando, Florida and worked primarily with colleagues located in Wipro's Houston, Texas office. Mr. Saemian made frequent business trips to the Houston office and to various Wipro clients in the United States and Puerto Rico. Mr. Saemian reported to Wipro Senior Manager, Richard Prime, and oversaw three employees on his own team. Mr. Saemian performed well in role as an Enterprise Asset Management Practice Lead, Americas and received no written or verbal criticism regarding his performance.

35.     Despite performing well in his EAM role, Mr. Saemian never received a performance appraisal or promotion while working for Wipro. However, Mr. Saemian noticed that South Asians and Indians routinely received promotions within Wipro. Mr. Saemian is not aware of a single non-South Asian or non-Indian employee (out of 50) working at the Houston, Texas office who received a promotion.

36.     During his tenure with Wipro, Mr. Saemian observed through his interactions with coworkers both in person and by telephone that approximately 90% of Wipro's employees (including Wipro management) were South Asian and Indian.

37.     In July 2014, Wipro entered into an agreement to purchase a United States-based company called ATCO.  As part of the purchase, Wipro assumed employment of ATCO's employees, the vast majority of whom were non-South Asian. Shortly after the purchase, a South Asian Wipro executive traveled from India to the United States to visit an ATCO facility. While in the U.S., the executive stated, "When we come to a company [that Wipro has purchased], we make their employees' lives miserable, and when they leave, we replace them with someone from India." Mr. Saemian learned of this comment from John Bergsten, the Head of Global Sales, who was present when the executive made this statement.

38.     In the spring of 2015, Wipro's management required Mr. Saemian to terminate two non-South Asian non-Indian workers on his team so that it could replace them with South Asian Indian employees. The two terminated employees, Daniel Hunter and Glyn Thorman, were scheduled to begin working in EAM positions servicing Wipro client Williams Pipeline. Both employees had over 20 years of professional experience and at least 10 years of more pertinent EAM experience than did their South Asian Indian replacements.

39.     Mr. Saemian also observed that many other non-South Asian non-Indian workers were replaced by Wipro with less qualified South Asian Indian employees. For instance, Amina Valley was removed from her position servicing Wipro client Shell Oil after seven years of employment and replaced by a South Asian of Indian national origin. Ms. Valley has a Ph.D. and was highly qualified for her role. However, Ms. Valley was removed from her position, placed on the bench, and terminated by Wipro four weeks later.

40.     Mr. Saemian voiced his objection to Wipro's practice of replacing non-South Asian and non-Indian workers with South Asian and Indian employees to the Vice President of Global Head of Cross-Industry Consulting, Stuart Deignan. However, Mr. Deignan failed to take any corrective action, and instead warned Mr. Saemian that "this is an Indian company" and that Wipro would "get rid of" Mr. Saemian if he continued to complain about the displacement of non-South Asian and non-Indian employees. Moreover, when Mr. Saemian complained of this discriminatory conduct during an April 2015 meeting, Mr. Deignan told Mr. Saemian to "shut up" when he again voiced his concerns.

41.     Mr. Saemian also repeatedly complained to his manager, Mr. Prime, that the company was displacing non-South Asian and non-Indian workers with less qualified South Asian and Indian employees. Mr. Prime told him to keep his mouth shut, and that if Mr. Saemian kept

raising these concerns, he would lose his position with Wipro. Mr. Prime also reminded Mr. Saemian that Wipro was "an Indian company" and that Mr. Saemian "cannot disagree with Indians." Mr. Prime's former employer, SAIC Consulting Company had been purchased by Wipro and Mr. Prime stated that he and Mr. Saemian "needed to be careful about what [they] say to the Indians."

42.     Following these encounters, Mr. Saemian stopped raising his concerns of Wipro's discriminatory conduct to management, as Wipro had failed to take any corrective action and he feared additional retaliation.

43.     In March 2015, Wipro informed Mr. Saemian that the company would stop reimbursing his travel from Orlando to Houston, and that Mr. Saemian would need to relocate in order to work out of Wipro's Houston office. Mr. Saemian promptly lowered the listing price on his home in Orlando to expedite the sale process.

44.     Two weeks prior to Mr. Saemian's move, he noticed an advertisement posted on Wipro's internal website for his EAM Practice Lead role in Houston, Texas. Mr. Saemian immediately contacted both Mr. Price and Mr. Deignan, and asked why his position was listed as open on the Wipro website. He also asked Mr. Price and Mr. Deignan whether the company sought to replace him in the EAM Practice Lead position. However, Mr. Saemian was repeatedly told not to worry, that his position was safe, and that he should continue to move forward with selling his home and relocating to Houston, Texas.

45.     In June 2015, Mr. Saemian sold his Orlando home at approximately $90,000 below market value and moved to a new home near Houston, Texas. The job posting was still active at the time of Mr. Saemian's move.

46.     When he arrived in Houston, Jignesh Takkar, a South Asian employee of Indian

national origin, was working in Boston, Massachusetts in the same EAM Practice Lead role as Mr. Saemian. Mr. Saemian was required to perform a "knowledge transfer" with Mr. Takkar to allow him to take over Mr. Saemian's position. Mr. Saemian was also required to provide Mr. Takkar all the sales leads he had developed. On July 2, 2015, approximately two weeks after Mr. Saemian had relocated to Texas, Wipro terminated Mr. Saemian's employment.

## CLASS ACTION ALLEGATIONS

47.     Plaintiffs bring this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for Wipro's systematic pattern and practice of discriminatory employment practices based upon individuals' race and national origin. This action is brought on behalf of the following three classes:

*Hiring Class*

a.  All persons who are not of South Asian race or Indian national origin who applied for positions with Wipro in the United States and were not selected for the position;

*Promotions Class*

b.  All persons who are not of South Asian race or Indian national origin who were employed by Wipro in the United States for the minimum amount of time necessary to be eligible for a promotion pursuant to Wipro's policies and/or practices, and were not promoted; and

*Terminations Class*

c.  All persons who are not of South Asian race or Indian national origin who were employed by Wipro in the United States and were terminated.

48.     Members of the classes are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown

to Plaintiffs, it is believed to be in the thousands. Furthermore, the classes are readily identifiable from information and records in Wipro's possession.

49.     There are numerous questions of law and fact common to the classes. Among the common questions of law or fact are:  (a) whether Wipro has engaged in a pattern and practice of discrimination  against non-South Asian and non-Indian individuals in its hiring, promotion, and termination/retention decisions; (b) whether Wipro's employment practices have resulted in a disparate impact against non-South Asian and non-Indian individuals; (c) whether Wipro has violated 42 U.S.C. § 1981; (d) whether Wipro has violated Title VII; (e) whether equitable and injunctive relief is warranted for the classes; and (f) whether compensatory and/or punitive damages are warranted for the classes.

50.     Plaintiffs' claims are typical of the classes. All members of the classes were damaged by the same discriminatory policies and practices employed by Wipro, *i.e.*, they were denied the opportunity to fairly compete for and obtain employment with Wipro, were denied positions and promotions within the company, and/or were terminated by the company.

51.     Plaintiffs will fairly and adequately protect the interest of other class members because they have no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in class litigation to represent them and the classes.

52.     Because of Wipro's actions, which were taken intentionally and/or with reckless disregard for the federally protected rights of Plaintiffs and the classes, Plaintiffs and the classes have suffered substantial harm for which punitive damages is warranted.

53.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Wipro has acted and/or refused to act on grounds generally applicable to the

classes, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the classes. Members of the classes are entitled to declaratory and injunctive relief to end Wipro's discriminatory policies and practices.

54. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) for determination of the damage claims of individual class members because the issue of whether Wipro engages in a pattern and practice of discrimination and/or its corporate practices result in a disparate impact against non-South Asian and non-Indian individuals is common and predominates over individual issues of proof. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because, among other reasons, certification will avoid the need for repeated litigation by each individual class member. The instant case will be manageable as a class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

55. In the alternative, class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Plaintiffs' claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate Wipro's discrimination. Certification under this rule is also appropriate to decide whether Wipro has adopted a systemic pattern and practice of racial and national origin discrimination and/or has engaged in practices that have resulted in a disparate impact against non-South Asian and non-Indian individuals. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

## **CLAIMS**

### **COUNT I**
**(Disparate Treatment on the Basis of Race)**
**(Violation of Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)**

56. Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

57. This claim is brought by Plaintiffs on behalf of themselves and the Hiring Class,

the Promotions Class, and the Terminations Class.

58.     Throughout the class liability period, Wipro has engaged in a pattern and practice of discriminating against individuals who are not of South Asian race by: (a) knowingly and intentionally favoring South Asian individuals in employment decisions, including hiring, promotion, and termination decisions, (b) knowingly and intentionally disfavoring non-South Asian individuals (including Plaintiffs) in employment decisions, including hiring, promotion, and termination decisions, and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of at least 80% (or more) South Asian employees.

59.     As a direct and proximate result of Wipro's intentional discrimination, Plaintiffs and members of the classes have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to promotion and/or continued employment with Wipro.

60.     Wipro's actions constitute unlawful discrimination on the basis of race in violation of 42 U.S.C. § 1981.

## COUNT II
### (Disparate Treatment on the Basis of Race and National Origin)
### (Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

61.     Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

62.     This claim is brought by Plaintiffs on behalf of themselves and the Hiring Class, the Promotions Class, and the Terminations Class.

63.     Throughout the class liability period, Wipro has engaged in a pattern and practice of discriminating against individuals who are not of South Asian race or Indian national origin by: (a) knowingly and intentionally favoring individuals of South Asian race and Indian national origin

in employment decisions, including hiring, promotion, and termination decisions, (b) knowingly and intentionally disfavoring individuals who are not of South Asian race and Indian national origin (including Plaintiffs) in employment decisions, including hiring, promotion, and termination decisions, and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of at least 80% (or more) South Asian employees (primarily from India).

64.     As a direct and proximate result of Wipro's intentional discrimination, Plaintiffs and members of the classes have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to promotion and/or continued employment with Wipro.

65.     Wipro's actions constitute unlawful discrimination on the basis of race and national origin in violation of 42 U.S.C. § 2000e, *et seq.*

### COUNT III
**(Disparate Impact on the Basis of Race and National Origin)**
**(Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)**

66.     Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

67.     This claim is brought by Plaintiffs on behalf of themselves and the Hiring Class, the Promotions Class, and the Terminations Class.

68.     Throughout the class liability period, Wipro has used policies and practices related to hiring, promotion, and termination of individuals that have had a disparate impact on the basis of national origin and race (harming those who are not of South Asian race or Indian national origin) that are neither job-related for the positions at issue nor consistent with business necessity.

69.     Wipro's actions constitute unlawful discrimination in violation of 42 U.S.C. § 2000e, *et seq.*

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the classes pray for relief as follows:

a.   Certification of the case as a class action pursuant to Federal Rule of Civil Procedure 23;

b.   Designation of Plaintiffs as representatives of the classes;

c.   Designation of Plaintiffs' counsel as counsel for the classes;

d.   A declaratory judgment that the practices complained of herein are unlawful and violate 42 U.S.C. § 1981;

e.   A declaratory judgment that the practices complained of herein are unlawful and violate Title VII;

f.   A permanent injunction against Wipro and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

g.   Order Wipro to adopt a valid, non-discriminatory method for hiring, promotion, termination, and other employment decisions;

h.   Order Wipro not to retaliate against individuals who complain of racial or national origin discrimination;

i.   Order Wipro to post notices concerning its duty to refrain from discriminating against employees on the basis of race and national origin, or retaliating against those who complain of racial or national origin discrimination;

j.   Award Plaintiffs and the classes damages – including (without limitation) punitive damages and compensatory damages – for the harm they suffered as a result of Wipro's violations of § 1981 and Title VII;

k.   Award Plaintiffs and the class pre- and post-judgment interest at the prevailing rate on damages as a result of Wipro's discrimination against them in violation of § 1981 and Title VII;

l.   Award Plaintiffs and the classes front- and back-pay, and such other equitable relief as the Court deems just and appropriate;

m.  Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

n.   Award Plaintiffs and the class such other relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs and the classes respectfully demand a trial by jury on all issues properly triable by a jury in this action.

Dated: March 13, 2020

By: /s/Daniel Kotchen
Daniel Kotchen (*pro hac vice*)
Daniel Low (*pro hac vice*)
Lindsey Grunert (*pro hac vice*)
Amy Roller (*pro hac vice*)
KOTCHEN & LOW LLP
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
Facsimile: (202) 280-1128

Dwaine M. Massey
State Bar No. 00791199
Federal Bar No. 18418
MASSEY LAW FIRM PLLC
601 Sawyer St., Suite 225
Houston, TX 77007
Telephone:  (713) 223-1550
Facsimile:   (713) 588-8437

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system.

Dated:  March 13, 2020

By: /s/Daniel Kotchen
Daniel Kotchen