EXHIBIT 2



Page 1

```
1            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                    HOUSTON DIVISION
3   JAMES PHILLIPS, ET AL.    )
            Plaintiffs        )
4                             )
                              )
5   VS.                       )  Civil Action No.
                              )  4:18-cv-00821
6                             )
    WIPRO LIMITED,            )
7        Defendant            )
8
    *********************************************************
9     ORAL AND VIDEOTAPED DEPOSITION OF DAVID NEUMARK, PH.D.
10                    AUGUST 25, 2021
11  *********************************************************
12        ORAL AND VIDEOTAPED DEPOSITION OF DAVID NEUMARK,
13  PH.D., produced as a witness at the instance of the
14  Defendant and duly sworn, was taken in the above styled
15  and numbered cause on Wednesday, August 25, 2021, from
16  10:00 a.m. to 1:38 p.m., before SARA BIELAMOWICZ, CSR,
17  RPR, in and for the State of Texas, reported by
18  computerized stenotype machine via Zoom Videoconferencing.
19  The witness is located at his residence in San Francisco,
20  California, pursuant to the Federal Rules of Civil
21  Procedure and any provisions stated on the record herein.
22
23
24
25
```

Page 3

```
1                 I N D E X
2
                                 PAGE
3
4   APPEARANCES................................  2
5     DAVID NEUMARK, PH.D.
6   EXAMINATION
      BY MR. KING............................   5
7     BY MR. LOW.............................  98
8
     REPORTER'S CERTIFICATION..................  100
9
10
11          E X H I B I T S
12  NO.        DESCRIPTION          PAGE
    Exhibit 1    Report by Dr. Neumark     7
13  Exhibit 2    2014 Wipro Global Company
                 Policy              67
14  Exhibit 3    2015 Wipro Global Company
                 Policy              67
15  Exhibit 4    2017 Wipro Global Company
                 Policy              67
16  Exhibit 5    2018 Wipro Global Company
                 Policy              67
17
18
19  REPORTER'S NOTE:
20  All quotations from exhibits are reflected in the manner
21  in which they were read into the record and do not
22  necessarily denote an exact quote from the document.
23
24
25
```

Page 2

```
1             A P P E A R A N C E S
2
    FOR THE PLAINTIFF:
3      Mr. David Low
       KOTCHEN & LOW, LLP
4      1745 Kalorama Road, NW, Suite 101
       Washington, D.C.  20009
5      202.471.1995
       Dlow@kotchen.com
6
7
    FOR THE DEFENDANT:
8      Mr. Allan G. King
       Ms. Analiza Rodriguez
9      LITTLER MENDELSON, P.C.
       1301 McKinney Street, Suite 1900
10     Houston, Texas  77010
       713.951.9400
11     Agking@littler.com
12
13  VIDEOGRAPHER:
       MR. AVERY GROSS - LEXITAS
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1        VIDEOGRAPHER:  Good morning.  Today's date
2   is August 25th, 2021.  We are on the record.  The court
3   reporter will swear in the witness, and we may begin.
4        COURT REPORTER:  All right.  This deposition
5   of David Neumark, Ph.D., is being conducted remotely via
6   LegalView/Zoom.
7        The witness is located in San Francisco,
8   California.  My name is Sara Bielamowicz, CSR No. 4838,
9   and I am reporting this deposition remotely from my
10  residence in Cypress, Texas.
11       All right.  Mr. Neumark, please raise your
12  right hand.
13       (Witness sworn.)
14       MR. KING:  Mr. Low, before we begin, can we
15  have an agreement that although the witness is not in --
16  in the presence of a court reporter, that this testimony
17  will be given the same force and effect as if it were
18  taken under more conventional circumstances?
19       MR. LOW:  Yeah.  Assuming we have that
20  agreement for all depositions.
21       MR. KING:  Yeah.
22       MR. LOW:  Yeah.
23       MR. KING:  Thanks very much.
24
25
```

Page 5

1          DAVID NEUMARK, PH.D.,

2 having been duly sworn, testified as follows:

3          EXAMINATION

4 BY MR. KING:

5     Q. Dr. Neumark, my name is Allan King.  I am an

6 attorney with the law firm of Littler Mendelson, and I

7 represent the defendant in this case, Wipro Limited, and

8 we're here to take your deposition in that matter.

9          Is that your understanding as well?

**10    A. Yes.**

11    Q. And I know you've been deposed in the past, so

12 you're familiar with the procedure, but still, if I ask a

13 question that you don't understand, will you please ask me

14 to repeat it?

**15    A. Yes.**

16    Q. And if you don't do that, will it be agreeable

17 that I can assume that you've understood the question?

**18    A. Yes.**

19    Q. And if you need a break, will you please let us

20 know but not while a question is pending?

**21    A. Sure.**

22    Q. You provided a report in this case dated

23 August 17, 2021.  Is that correct?

**24    A. Yes.  I -- I printed out a copy of it here.  It's**

**25 the only thing I have just in case --**

Page 6

1     Q. Okay.  Well --

**2     A. -- in case that's easier.**

3     Q. Okay.  When you held it up, it was a little thin.

4 Do you have the appendices with you as well?

**5     A. I don't have it all -- it doesn't have the title**

**6 page, and I cut it off at my CV because I didn't**

**7 actually -- I didn't have to review my CV.**

8     Q. Let's introduce this report into evidence if you

9 will.

10          MR. KING:  And Ms. Rodriguez has a copy that

11 she can pass to the court reporter.

12          MR. RODRIGUEZ:  Sara, I will be sending it

13 through the chat.

14          COURT REPORTER:  If you don't mind, I use a

15 separate computer.  Can you just email me all the exhibits

16 at the end?  That would be easier.

17          MR. KING:  Well, then we need a way to share

18 it with the witness.

19          MS. RODRIGUEZ:  I can use share screen.

**20          THE WITNESS:  I can open it.  Oh, you can do**

**21 that or the chat?  I'd rather you send it in the chat, and**

**22 I can open it in a separate screen.  Otherwise -- well,**

**23 then I can page through it freely, but however you want to**

**24 do it.**

25          MR. KING:  No, that's a good idea.  I like

Page 7

1 that idea.

2          MR. RODRIGUEZ:  I can do both if that's

3 acceptable or just send it to the witness.  What's the --

4 what's the preference?

5          MR. KING:  Well, I want Mr. Low to have a

6 copy of it as well.

7          MR. RODRIGUEZ:  Okay.  So I will send it to

8 everyone.  Attaching it now.

9          (Exhibit 1 marked.)

**10    A. Mr. King, while we're waiting, I have a few**

**11 typos, so at some point I would like to give them to you.**

12    Q. (BY MR. KING) I'm sorry, did you say "typos"?

**13    A. Yeah, things I noticed in reviewing.**

14          MR. KING:  Mr. Low, do you have a copy?

15          MR. LOW:  I do, thank you.

16    Q. (BY MR. KING) In that case, please turn to the

17 last couple of pages which is Appendix E where you list

18 your expert work in the last four years.

**19    A. I am there.**

20          MR. LOW:  Do you know what page number that

21 is?

22          MR. KING:  Yes, it's page 65.

23    Q. (BY MR. KING)  And, Dr. Neumark, I would like to

24 go through a couple of the cases you identify.

**25    A. Ok.**

Page 8

1     Q. And I'd like to start with Koehler versus Infosys

2 Technologies.  Do you see that?

**3     A. I do.**

4     Q. Okay.  And is that a case in which you've been

5 retained by the Kotchen & Low firm?

**6     A. Correct.**

7     Q. And you offered an opinion in that case regarding

8 the treatment of non-South Asian employees?

**9     A. Yes.**

10    Q. There's another case called Heldt versus Tata

11 Consultancy.  Is that a case in which you were retained by

12 the Kotchen & Low law firm?

**13    A. Yes.**

14    Q. And in that case you offered an opinion regarding

15 the treatment of non-South Asian employees and applicants?

**16    A. I -- I -- I don't recall what we do on**

**17 applicants.**

18    Q. Okay.

**19    A. I didn't -- I didn't review it for this case.**

**20 Employment, yes.  I refer here to hiring and termination,**

**21 so that's -- the year is correct, that's correct, but I**

**22 don't remember the details.  It was a while ago.**

23    Q. Okay.  Thank you.

24          Do you know of a case called Grant versus

25 Tech Mahindra?

LEXITAS

Page 9

1    A. No.

2    Q. Okay. Do you know of a case called Hanloser

3 versus ETO Technologies?

4    A. Yes.

5    Q. You appeared as an expert witness in that case,

6 didn't you?

7    **A. I filed a report. I believe that's the last**

8 **thing I did. So the answer might be no as an expert**

9 **witness, but I don't know if that's --**

10    Q. Okay.

11    **A. I don't know the jargon.**

12    Q. Yeah. So maybe what I ought to ask about the

13 criteria you used in determining whether to list a case in

14 which you served as -- as an expert witness.

15    **A. Right. So -- so my understanding of what is --**

16 **what is asked for, I don't know if required is too strong**

17 **a word, is --**

18    Q. Uh-huh.

19    **A. -- deposed and/or did I testify.**

20    Q. So you may have submitted more reports, for

21 example, than -- scratch that.

22        You have been hired and engaged in more

23 cases than what would appear in Appendix E because you may

24 only have submitted a report in those cases.

25    **A. Or -- or -- or more -- well, I mean, that --**

Page 10

1 **that's not -- that's correct. It's -- that's not that**

2 **common, although my recollection is HCL, that is the case.**

3 **And of course in other cases, I'm in a much more**

4 **preliminary stage where nothing's even been submitted, but**

5 **I'm not even sure I'm supposed to reveal those anyways**

6 **until a report is filed.**

7    Q. Okay. In the -- I'm sorry, I thought I heard

8 someone speak.

9        In the HCL Technologies case, you were

10 engaged by Kotchen & Low?

11    **A. Correct.**

12    Q. Have you been engaged in the Palmer versus

13 Cognizant case?

14    **A. I -- I actually don't -- I am engaged in the**

15 **Cognizant case. I actually don't recall the plaintiff's**

16 **name, but -- comes -- to me --**

17        (Audio distortion.)

18    Q. Were you engaged by Kotchen & Low in the

19 Cognizant case?

20    **A. Yes.**

21    Q. Did you submit a report in that case?

22    **A. No.**

23    Q. And does that case concern the treatment of

24 non-South Asian employees relative to South Asian

25 employees?

Page 11

1    **A. Yes.**

2    Q. Have you been engaged in a cases called Myerson

3 versus Larsen Toubro Infotech?

4    **A. No.**

5    Q. Have you ever been engaged in a case on behalf of

6 an employer that was facing a charge of discrimination?

7    **A. Let me -- I'm thinking what I can say. Engaged?**

8 **No.**

9    Q. Have you ever provided a report in a case where

10 non-South Asians were suing over employment discrimination

11 in which you concluded there was no evidence of

12 discrimination?

13    **A. No, I've never -- I've never -- never been**

14 **engaged in such a case, never -- never seen evidence**

15 **pointing in that direction.**

16    Q. Have you read the plaintiffs' motion for class

17 certification in this case?

18    **A. The one just filed?**

19    Q. Yes.

20    **A. Yes.**

21    Q. Did you make any corrections or changes to the

22 draft you reviewed?

23    **A. I didn't review a draft. I saw only the final**

24 **version. Let me close my door, please. One second.**

25    Q. Sure.

Page 12

1        Turning back to your report, is there any

2 work that you did that analyzes the employment or hiring

3 experience of non-Indian employees as distinct from

4 non-South Asians?

5    **A. I didn't distinguish.**

6    Q. Have you done any work in connection with this

7 case that assesses whether Indians are a preferred group

8 of employees relative to others?

9    **A. I'm sorry, is that -- was it -- was the previous**

10 **question about this case or a general question?**

11    Q. Yeah, this is -- talk about this case.

12    **A. I haven't looked at the difference between those**

13 **two questions. Sorry.**

14        MR. KING: Okay. Madam Court Reporter,

15 would you mind reading that back.

16        (Reporter clarification.)

17        (The question was read as follows:

18        "Question: Have you done any work in

19 connection with this case that assesses whether Indians

20 are a preferred group of employees relative to others?")

21    **A. So what I meant, Mr. King, when you said relative**

22 **to others -- the previous question was Indians versus**

23 **non-South Asians.**

24        **So I'm trying to figure out if you are**

25 **asking me the same question or more general others.**



Page 13

1  Q. (BY MR. KING) Let me repeat.

2  **A. Sure.**

3  Q. Have you done an analysis where you assessed

4  whether Indians are a preferred group of employees

5  relative to those who are not Indians?

6  **A. I -- I have not studied Indians broken out from**

7  **other South Asians in any way because -- mainly because of**

8  **data limitations.**

9  Q. Okay. All right. If you recall from the motion

10  for class certification, there's often a reference being

11  made to South Asians/Indians. Did you notice that?

12  **A. I -- I didn't, but it wouldn't surprise me**

13  **because, you know -- so when I said there's data**

14  **limitations, that has to do with the name matching.**

15  **There's not a distinction hard and fast that I can draw**

16  **between Indian and South Asian names.**

17  **     The nationality data for the Visa workers**

18  **would indicate that, and I don't recall. I may have**

19  **looked at that. I don't recall, but it wouldn't surprise**

20  **me if the over -- if most of the South Asians are Indians.**

21  **     So --**

22  Q. Right.

23  **A. -- may be using -- because it's essentially the**

24  **same thing. It's virtually the same thing.**

25  Q. In your work it's identical, isn't it, because

Page 14

1  there is no distinction being made between which

2  South Asian country you originate from, correct?

3  **A. There's no -- in my work there's no distinction**

4  **being made.**

5  Q. Right. Have you done any analysis of the

6  treatment of South Asians who are not Indian relative to

7  others in the -- employees of Wipro?

8  **A. I mean, they're -- I mean, apart from schedule,**

9  **yes, but not separately. They're -- they're in the --**

10  Q. Yes.

11  **A. They're -- they're in the group but not**

12  **acceptable. I did not -- have not broken out Indians from**

13  **other South Asians.**

14  Q. Thank you.

15       You also did a comparison between the

16  treatment of employees within Wipro versus the treatment

17  of employees within Wipro Technologies, correct?

18  **A. Yes.**

19  Q. So just to set the stage, so you did analyses of

20  all Wipro employees, and you've done other analyses of

21  employees of Wipro Technologies?

22  **A. There -- there was a limited set of tables**

23  **that -- that essentially replicates some of the tables for**

24  **all of Wipro employees, just for Wipro Technologies**

25  **employees.**

Page 15

1  Q. Right. Have you done any analysis of employees

2  who work for Wipro but were not within the Wipro

3  Technologies division?

4  **A. Not -- not directly, but implicitly one can back**

5  **out the numbers from the two tables.**

6  Q. Right. Have you done that?

7  **A. No.**

8  Q. Have you reached any conclusions about the

9  treatment of employees who work for Wipro Limited but not

10  within Wipro Technologies?

11  **A. Not directly, no.**

12  Q. You mean not independently of others who work for

13  Wipro Technologies?

14  **A. I -- I have not done or reported analyses that**

15  **look only at the Wipro but non-Wipro Technologies**

16  **employees.**

17  Q. So as we sit here there is no way to know whether

18  results reported for Wipro Limited employees simply

19  reflect the treatment of employees within the Wipro

20  Technologies division?

21  **A. No, that's not correct.**

22  Q. How would -- okay. No. I interrupted you, so

23  please continue.

24  **A. I didn't know if you wanted to ask a follow up.**

25  **     Because -- because I haven't -- I haven't --**

Page 16

1  **I mean, the numbers are in the table, so if I look at, you**

2  **know, number of let's say -- you know, I have the shares,**

3  **let's say for example in -- in table -- from memory, I**

4  **think -- I think Table 2, but the table of, let's say,**

5  **hiring by band for Wipro overall and hiring by band Wipro**

6  **Technologies, sitting here -- is what you mean sitting**

7  **here is could I get out my calculator or spreadsheet and**

8  **calculate the difference between those.**

9  **     Yes, I would know -- I would know exactly wt**

10  **the numbers were for Wipro tech- -- excuse me, for**

11  **Wipro excluding Wipro Technologies, so sitting here today,**

12  **there is a way to know that, yes.**

13  **     I just haven't reported it, and I haven't --**

14  **I couldn't -- I could -- I could do shares with a**

15  **calculator. I can't -- I couldn't -- I would have to take**

16  **a little more work to do the physical test.**

17  Q. I don't mean to give you any more work, but if we

18  look within the four corners of your report, there's not

19  an analysis pertaining to solely Wipro Limited employees

20  who are not within the Wipro Technologies division?

21  **A. There's not -- there's not an analysis in my**

22  **report that breaks out that subset, correct.**

23  Q. Could you agree with me that non-South Asians

24  constitute a significant share of the world's population?

25  **A. Yes.**

Page 17

1    Q.  Obviously South Asia is large, but it doesn't
2  encompass the world.
3    A.  That's correct.
4    Q.  And if we focus only on non-South Asians, we
5  would know that they differ in terms of where they reside,
6  their religion, their race, et cetera, correct?
7    **A.  Well, they will differ in terms of where they**
8  **reside.  I'm not an expert, but I know there's multiple**
9  **religions in India, and -- but -- well, if you really want**
10 **to get into race, we can, but I -- I think they're all the**
11 **same race, but that's a -- I'm not sure we need to parse.**
12   Q.  Right.  So my next question is whether you
13 performed any analyses with respect to non-South Asians
14 that distinguishes in any way based upon the nationality
15 or ethnicity of a group of non-South Asians?
16   **A.  Sorry, can you -- can you -- can you repeat the**
17 **question?**
18   Q.  Yeah, let me break it down.
19   **A.  Sure.**
20   Q.  Non-South Asians consist of persons of various
21 nationalities, correct?
22   **A.  Correct.**
23   Q.  Okay.  Have you done any analyses of how those
24 employees fair relative to South Asians?
25   **A.  So you're asking me among -- I mean, you asked me**

Page 18

1  **this question -- this sort of funny question about the**
2  **world population, which is not at issue here.  The issue**
3  **is the Wipro -- the Wipro workforce.  You're asking me if**
4  **I broke out the Wipro US workforce by, let's say, black,**
5  **white and Latino?**
6    Q.  That's one possibility.  Yes.  Have you done
7  that?
8    **A.  I have not.**
9    Q.  Have you done it by the nationality of the
10 non-South Asian employees of Wipro?
11   **A.  The non-US nationality?**
12   Q.  No.
13   **A.  You mean the nationality of other Visa workers?**
14   Q.  No.  Let's -- let's start over, okay?
15   **A.  Okay.**
16   Q.  So we can divide all Wipro employees into the
17 groups of South Asian and non-South Asian, correct?
18   **A.  Based on nationality, yes.  I mean, in the -- in**
19 **the data, yes.**
20   Q.  Right.  Everybody belongs in one bucket or the
21 other?
22   **A.  They -- they don't have it recorded but, yes,**
23 **most of them do.**
24   Q.  Okay.  Let's look at the non-South Asian bucket.
25 Employees in the non-South Asian bucket differ in terms of

Page 19

1  their nationality, correct?
2    **A.  Yes.**
3    Q.  Okay.  Did you do any analyses that is unique to
4  any of those nationalities in the non-South Asian bucket?
5    **A.  There's nothing in the report.  There's -- very**
6  **early on -- and I -- I -- I can't point to any exhibit**
7  **because this is just sort of early -- early -- very early**
8  **stage, looking at the data, trying to see what I have,**
9  **et cetera, you know.**
10   **The people who are either non-South Asian or**
11 **non-American, just talking nationality here, are --**
12 **there's very few of them.  There's a smattering from this**
13 **country and that.  So -- but I didn't do anything more**
14 **than that.**
15   Q.  Right.  You didn't compare their hire rates or
16 their termination rates or their promotion rates to
17 South Asians?
18   **A.  You mean like French -- like the French to the**
19 **South Asians?**
20   Q.  Yeah, yeah.  And the answer would be the same for
21 every other nationality that's represented within Wipro,
22 apart from the South Asians?
23   **A.  The answer would be the same.  My -- my strong**
24 **supposition based on a little -- a little -- early look of**
25 **the data, but again, I don't remember all the details,**

Page 20

1  **would be -- those would be very small groups, except for**
2  **the Americans.**
3    Q.  Okay.  In terms of the treatment of equally small
4  groups though, you have no analysis in your report
5  regarding how they faired, correct?
6    **A.  That's right.**
7    Q.  In defining South Asian, the people that you
8  determine to be South Asian are defined in terms of their
9  nationality, number 1, and the likeness of their names to
10 others with those nationalities?
11   **A.  Correct.**
12   Q.  So everything you've done to classify employees
13 begins with a cat- -- categorization according to
14 nationality?
15   **A.  That's right.  The way the -- not everything.  A**
16 **large part of my -- let's start with nationality, and I --**
17 **and that generates a list of names of people from**
18 **South Asian countries, and I list those countries in the**
19 **report.**
20   **I also though recall used names from a**
21 **couple other sources.  So -- so matching those to names of**
22 **Wipro employees and classifying them does not require**
23 **having the Wipro nationality data.**
24   Q.  Right.  Although they're all methods that are
25 nationality based rather than ethnic -- ethnically based



Page 21

1 or racially based?

2    A.  Yeah.  I think -- I'm not quite sure I agree with

3 that question because -- with that premise because that --

4 I mean, one of the studies uses Social Security records --

5 I mean, it's for America, right?

6    Q.  Uh-huh.

7    A.  And I -- if I have -- if I'm recalling correctly,

8 where your parents were born.  So if my parents were born

9 in India and I live here, am I -- I mean, that's -- I

10 mean, again -- we can argue about terms forever.  I think

11 that that becomes my ethnicity, not my nationality, but,

12 you know, you can interpret it how you want.

13    Q.  Yeah.  As a -- as a literal matter, it is your

14 national origin, correct?

15    A.  If my parents were born somewhere else and I was

16 born here, I think I'm an American of India ethnicity.  I

17 mean, I don't know.  If my parents were born in India --

18 if my parents immigrated from India and I'm born here?  I

19 don't know.  I'd -- I would say my parents' national

20 origin is Indian, and mine is American, but I'm of India

21 ethnicity, which is more of an identification issue than

22 a -- I'm not an expert in, you know, these -- you know,

23 this -- ask an anthropologist.

24    Q.  Right.  Let's move on.  Please turn to page 1 of

25 your report.

Page 22

1    A.  It is it okay if I use paper?

2    Q.  Oh, yeah, you can do whatever you'd like.  It's

3 the one that has "Introduction" at the top.

4    A.  Yes.

5    Q.  So we're beginning in the same place.

6    A.  Yeah.

7    Q.  I'd like you to look at the last sentence of the

8 first paragraph.

9    A.  Okay.

10    Q.  And you say "The goal of much of this

11 research" -- meaning the research you cite above -- "is to

12 better understand the role of discrimination versus other

13 explanations of differences in labor market outcomes by

14 sex, age, race, or ethnicity."

15        Did I read that right?

16    A.  Yes.

17    Q.  Okay.  And what do you mean by that?

18    A.  What I mean by that is -- is that -- let's say a

19 concrete example, and you can ask me more general if you

20 want.  You know, we --

21    Q.  Sure.

22    A.  We often hear that women are 69 or 70 or $0.72 on

23 the dollar, whatever -- whatever the current number is.

24    Q.  Yes.

25    A.  That's a fact, right?  If you -- if you look at

Page 23

1 average earnings of -- of men and women in -- in a -- in a

2 big US dataset, let's say.  There's no reason to think

3 that that gap is necessarily all discrimination even

4 though some people incorrectly interpret it that way,

5 right?

6        There could be differences in how much

7 people work, how many hours, and so, maybe we're looking at

8 annual earnings and not adjusting for that.  There could

9 be differences in how much education people have.

10        That's actually something that would make it

11 bigger because women these days are more educated than

12 men.  There could -- you know, there's -- there's a

13 variety of things that could explain it.  Some could make

14 it bigger, some could make it smaller.

15        And the context of that particular question,

16 when you account for other factors, I think most people

17 would agree the gap -- the gap -- the overall gap is --

18 you know, overstates a discriminatory gap and the gap

19 attributable to discrimination is smaller than that raw

20 gap would indicate.

21        That doesn't necessarily -- that's -- that's

22 one specific example.  It may or may not apply to other

23 context, other firms, et cetera.

24    Q.  Sure.  So in your example, the failure to account

25 for what we would call nondiscriminatory reasons could

Page 24

1 lead to a biased conclusion about the magnitude of this

2 gender pay gap that you just described?

3    A.  Yes.

4    Q.  As an economist, you would want to take into

5 account these nondiscriminatory reasons before concluding

6 that the gap between men and women is X percent or perhaps

7 nonexistent?

8    A.  If I was -- if I was -- if I was doing an

9 academic research with the goal of a paper -- my papers

10 let's say because I've done a lot of them, I try to

11 research a definitive conclusion based on the data I have.

12        I would want to -- I would want to

13 account -- you have to be careful, you don't want to

14 account for things that potentially reflect

15 discrimination, like a bias performance rating or

16 something like that.  But you'd want to try to account for

17 things that appropriately controlled for other sources of

18 the gap analysis.

19    Q.  The failure to include these other considerations

20 that you just described is often referred to as -- this

21 constellation of facts that they're not considered may be

22 considered what's called omitted variables?

23        MR. LOW:  Object to the misstated testimony.

24 Go ahead.

25    Q.  (BY MR. KING) Are you comfortable with that



Page 25

1 characterization?

2    A.  Yes.  I mean, that -- that's -- yes, except --

3 except it -- you know, it's a more -- it -- it -- there's

4 a more nuance -- there's a more nuance set of

5 considerations that have to be given as to, you know, what

6 should be -- you know, there may be some things you omit

7 because they should be omitted, like something that

8 self-reflects discrimination.

9        I mean, for -- let me give you an example in

10 this context.  So you might say, Well, you know, if I

11 control for the occupations men and women work in -- and

12 now I'm talking about a general dataset, not -- you know,

13 not a company dataset like we're talking about here.

14        Women on average working lower paying

15 occupations, so I've controlled for occupation, the gender

16 gap gets smaller.  But some believe that there is

17 discrimination against women into hiring into higher paid

18 occupations.

19        So literally occupation is omitted from the

20 wage progression if you don't include it because that's --

21 you know, it's an omitted variable, but arguably you

22 don't -- you don't want to include it because then you're

23 essentially what we call over-controlling.  You're --

24 you're essentially controlling for the discrimination via

25 occupation even though it contributes to the pay gap.

Page 26

1    Q.  Is it correct that what and -- how it's like

2 yourself decides should be included in the model or

3 described as the model specification?

4    A.  Yes.

5    Q.  And if it -- there is a consideration that is

6 included in this specification but is unavailable or for

7 some reason is absent from the model, would that be

8 considered a specification error?

9    A.  So now you're drawing the distinction between

10 what you generically called omitted variables and

11 something that I think should be in the model, but I don't

12 have data.

13    Q.  That's exactly right.

14    A.  Yeah.  I mean, I can't -- I can't -- yeah, I

15 can't -- I can't include things I don't have data on.  I

16 should point out that -- I should take two things to

17 clarify the outset you may -- you know, this may be where

18 you're going.

19        First of all, there is a difference -- I

20 mean, you know, you pulled out page 1 of my report which

21 is discussion of my academic research.  There's -- there's

22 an important distinction between what I say here about my

23 research and what I'm doing at this stage of this case,

24 which is documenting disparities.

25        And my understanding is -- I'm not a lawyer,

Page 27

1 but my understanding is there -- there -- there -- there

2 are more rounds at which nondiscriminatory explanation may

3 or may not be preferred by the defendant, you know,

4 presumably based on the same data I have or I guess that's

5 not allowed, and then I'll you know -- I will consider,

6 you know -- consider that evidence on rebuttal.

7        It's also the case that, you know -- my

8 understanding is that -- that some of the -- some of the

9 variables you're referring to that might, you know -- that

10 may be -- if -- if I were, you know, not just documenting

11 disparities at the outset, but -- but considering possible

12 other explanations, which I haven't done in this report,

13 were things that Wipro declined to provide data on, such

14 as performance appraisals.

15        Now, again, would I have taken performance

16 appraisals at -- at face value?  Maybe, maybe not, but

17 without getting into that, these data simply weren't made

18 available.

19    Q.  So it's your view that you did not have access to

20 data regarding performance?

21    A.  Yes.

22    Q.  If you did, you would have considered it.

23    A.  I would have considered it.  That's a general

24 statement.  I'm -- I'm -- I'm not committing to what I

25 would have done with it.

Page 28

1    Q.  Fair enough.

2        Did you form any conclusions about what you

3 might call the locus of decision making.  In other words,

4 where or who at Wipro is responsible for making hiring

5 decisions.  Do you know?

6    A.  I was not -- I -- I was not asked to consider

7 that, and I didn't.  I didn't form any opinions about it

8 because of that.

9    Q.  Same question with respect to promotions.  Do you

10 know who decides whether to promote a given employee?

11    A.  No.  I was -- I was asked here to perform the

12 statistical analysis of -- of the -- the outcome, not --

13 not to delve into what I could or couldn't learn, and --

14 and you can't from the data I have about the questions of

15 who's making the decisions and how -- the internal

16 operations of the company.

17    Q.  Okay.  Same thing with terminations.  Do you know

18 who makes termination decisions?

19    A.  No.

20    Q.  But you reached conclusions regarding the

21 presence of discrimination, and those are meant to apply

22 throughout the company, correct?

23    A.  I reached conclusions that the data are -- I --

24 I -- I'm pretty sure I say every time consistent or

25 strongly consistent with discrimination, and that's a



Page 29

1  statement about the statistics.

2      Q.  Right.  But it's -- it's a statistic that applies

3  company wide and is not specific to any division within

4  the company, apart from Wipro Technologies, or any

5  location within the company?

6      A.  There's -- there's nothing in my analysis by

7  location or division except for the -- the one distinction

8  you drew, if you want to call Wipro Technologies a

9  division.  There is -- there are other -- there are other

10  dimensions of this segregation like Career Band.

11      Q.  Yeah.

12      A.  It -- it doesn't solely come from a pooled

13  analysis of either Wipro overall or Wipro Technologies

14  overall.

15      Q.  So if my interest was in learning how pervasive

16  your finding of discrimination or consistency with

17  discrimination is and I wanted to know, does it pervade

18  all locations, your report would not provide guidance with

19  respect to that?

20      A.  I don't have -- no, there's no direct evidence of

21  that, and it's important to understand though that, you

22  know, when you test the statistical significance of an

23  estimate, right, and something is strongly significant, I

24  mean, that is telling you something about, you know --

25  that it's -- it doesn't go -- it doesn't go in one

Page 30

1  direction in half the company and the other direction in

2  the other half of the company.

3          I mean, that is -- you know, I -- I often

4  see experts say, Oh, you know, there's -- defense experts

5  I should say.  There's variations you haven't explained,

6  and therefore, you know, this can't -- this can't tell the

7  whole story, and my answer is no.

8          Then the statistical test doesn't -- it

9  doesn't -- it doesn't -- it doesn't literally do what you

10  say, run a model location by location, division by

11  division or something, but it does speak -- it does

12  address the commonality of the evidence in that there's a

13  strong statistical pattern.

14      Q.  Well, there's a strong statistical difference

15  between the average treatment of South Asians and the

16  average treatment of non-South Asians, correct?

17      A.  Correct.  But it -- but it let's say -- let's

18  take -- well, let's take a term- -- just to name it --

19  let's take involuntary termination.

20          If, in fact, the -- the difference between

21  involuntary termination rates between South Asians and

22  non-South Asians varied a lot by location and varied a lot

23  by division, and in some divisions, it went one way that

24  is favoring non-South Asians and other divisions it went

25  the other way and the same by location, you wouldn't get a

Page 31

1  statistically significant result in the aggregate saying

2  that there's -- there's a strong differential favoring

3  South Asians.

4          I mean, could there be some var- -- you

5  know, would you get the same estimate, division by

6  division, location by location?  Of course not.  Just like

7  if I flip a coin ten times and flip it another ten times,

8  I'm not going to get the exact same fraction.

9          But all I'm saying is it's not -- it's not,

10  you know -- you learn something about how little or much

11  an estimate varies from its statistical significance.

12      Q.  Well, let's suppose I was interested in assessing

13  whether the differential you report in your report

14  characterize each and every state throughout the country.

15          There's nothing in your report that would

16  allow me to conclude whether it is present in 10 states,

17  5 states or even 55 states, correct?

18          55 -- let's not go to 55.  That would be a

19  little extreme, okay?  Let's say I meant to say 26 states.

20      A.  There's -- there's -- there's nothing about that

21  directly.  If one looked at the distribution of employment

22  by state, which I haven't done, and most of the employment

23  was in a couple of states, you'd be pretty sure where it

24  was all coming from, but there's nothing in that

25  direction.

Page 32

1      Q.  Okay.  And in the same vein, you did not

2  determine whether the relevant labor market for Wipro

3  employees differs in its ethnic makeup or racial makeup,

4  however you describe it as, by location?

5      A.  I did not do a location by location analysis.

6      THE REPORTER:  Mr. King?

7      MR. KING:  Yes?

8      THE REPORTER:  Can we go off the record for

9  just a second?

10      VIDEOGRAPHER:  And we are going off the

11  record at 10:42.

12      (Recess taken from 10:42 a.m. to 10:47 a.m.)

13      VIDEOGRAPHER:  We are back on the record at

14  10:40 -- can you hear me?  Back on the record at 10:47.

15  You may proceed.

16      Q.  (BY MR. KING)  Dr. Neumark, please turn to page 2

17  of your report, paragraph 4.  I'd like to look at

18  paragraph 4a.

19      A.  Okay.

20      Q.  Okay.  How did you determine to focus on

21  employment, promotions and terminations?

22      A.  I mean, I'm trying to understand -- you know --

23  you know, these are the -- I'm trying to understand the --

24  what -- what shapes employment at the company and -- and

25  there's hiring obviously, and, you know, you come to a

Page 33

1  company and you leave the company, and while you're at the
2  company, you move up or not, and those are pretty much the
3  way -- I mean, this is not a pay case.
4         So aside from pay, those are pretty much the
5  things we study and, you know -- and -- and I mean, there
6  was certainly guidance from the attorneys about what
7  questions were of interest.
8         How I -- how I study the questions are, of
9  course, up to me.  I don't -- I don't make up the
10  questions.
11     Q.  So you were asked to look at overall employment
12  as one issue?
13     A.  Yeah.
14     Q.  Okay.  Did you raise an issue or raise a question
15  rather as to whether this is to be done on an aggregated
16  basis or whether you were to determine the pervasiveness
17  you might say across locations or business units with
18  respect to employment, promotions or termination?
19     A.  I did not raise that question at this point.
20     Q.  Okay.  Okay.  You also say as one of your
21  questions is whether the data is consistent with
22  discrimination.  You see that?
23     A.  I do.
24     Q.  Okay.  Did you take it upon yourself to determine
25  whether the data were also consistent with

Page 34

1  nondiscriminatory explanations?
2     A.  As I indicated my -- my -- my -- my goal at this
3  point -- I mean, my -- my main goal was to simply document
4  whether there were disparities in outcomes, understanding
5  that there may be future changes on what else could
6  explain it.
7         Had I had rich data with which to explore
8  that, I would have -- I would have -- I would have at
9  least pushed to do that or asked to do it.  They might
10  have said don't do it at this stage anyways, but it wasn't
11  relevant.
12         But, yeah -- you know, but I
13  have certainly -- certainly my research always in other
14  reports, depending on the data I have available, you
15  know -- either at this point or at a later point certainly
16  looked at the extent to which I could decisively rule out
17  other explanations.
18         And that's why I use the language I use
19  here, to make clear that I have, you know -- that that's
20  where I am right now.  I -- I've documented disparities.
21  Disparities are consistent with discrimination.
22     Q.  But at this juncture, you have not made efforts
23  to rule out other explanations for the same disparities?
24     A.  I have not done anything directly.  I will tell
25  you these disparities are huge, and in my vast experience,

Page 35

1  I've never -- I've never -- I've never seen data where,
2  you know, some control hurdles -- someone might come up
3  with that are going to explain disparities like these, but
4  I've not done it directly, no.
5     Q.  In subparagraph B under -- looking at 4(b),
6  you're asking whether "the data on Wipro's hiring,
7  promotions, and terminations within certain Career Bands
8  are consistent with discrimination in favor of
9  South Asians and against non-South Asians?"
10         Is everything you said with respect to 4a
11  also true about 4(b), that at this juncture, you did
12  formally consider alternative hypotheses to
13  discrimination?
14     A.  Yes, but I -- I guess I would add an important
15  point, which is that, you know, in a sense looking
16  Career Band by Career Band is in -- is in a sense like
17  introducing a control variable.
18         For example -- I'll give you an example.  If
19  I was studying an overall promotions difference, right?
20  So suppose -- suppose -- you know, suppose I -- the
21  overall data on whether one is promoted or not, I might
22  find, let's say, you know -- I'll just give you a
23  hypothetical:  No promotion difference between
24  South Asians and non-South Asians, not what I find, but
25  just to give you a hypothetical.

Page 36

1     Q.  Uh-huh.
2     A.  Now, I might -- one thing I might do is add into
3  the model a control for which band I would -- and talking
4  about a hierarchal band here -- which band you're in, and
5  the reason I would do that is because typically in an
6  organization, promotion rates are lower at lower levels of
7  the structure than at higher levels of the structures.
8         So if south -- if non-South Asians are lower
9  level and South Asians are higher levels, which is in fact
10  the case here, the -- you know, within band promotion rate
11  would be a lot higher for South Asians, but if you looked
12  at the aggregate, you could mis-seemingly get no evidence
13  of higher promotions for South Asians.
14         This aggregating by Career Band is which
15  is sometimes a richer, more flexible way to -- to capture
16  that than -- than just running a single promotion model
17  with a control for which band you're in.
18     Q.  You're aggregating along that dimension of
19  Career Band.  You haven't disaggregated the data in any
20  other --
21         THE REPORTER:  Mr. King, can you repeat that
22  question?  You cut out.
23         MR. KING:  Yeah, I'm -- I'm really sorry
24  about the communications issue.
25     Q.  (BY MR. KING) Let me ask the question again.



Page 37

1  We're still looking at section 4(b), and my question is:

2  Apart from considering outcomes by Career Band, you

3  haven't done any other analyses to determine the pervasiveness

4  of any of those that you found?

5       MR. LOW:  Objection, ambiguous.

6    A.  There are some results by year, although not by

7  year ending, and there are results for Wipro -- overall

8  Wipro Technologies, so those are two different types of

9  disaggregation I report.

10   Q.  (BY MR. KING)  Those are the only two?

11   A.  I think that's correct, yes.

12   Q.  In your summary of findings in paragraph 7, the

13  first sentence says "Wipro's share of employment that is

14  South Asian far exceeds the shares of South Asian in the

15  relevant workforce."

16       How did you determine the relevant

17  workforce?

18   A.  So I -- I -- I take data from the American

19  Community Survey.  It's a very large, random sample of the

20  US population workforce, same years that I use Wipro data

21  for.  I take data on the industry, as best as I could

22  match it, that Wipro operates in.

23       And I take -- so I take that subset of the

24  data from ACS.  I further take that subset of the same

25  occupation that are representative of Wipro, to the best I

Page 38

1  can match those.  And that's -- that's when I try -- I'm

2  trying to think of anything else.  That's what I treat as

3  the relevant workforce.

4    Q.  Okay.  And the American Community Survey is a

5  survey of employment in the United States, correct?

6    A.  Sure.

7    Q.  Why would -- what facts cause you to believe that

8  the United States labor market is descriptive of the

9  relevant labor market from which Wipro hires?

10   A.  Well, I'm -- I'm -- I'm studying Wipro's behavior

11  in the US labor market.  I'm not studying the behavior in

12  other countries.  So if you -- if the question -- if the

13  question -- this is a legal question perhaps, which I

14  can't opine on.

15       But my understanding of the question is what

16  are they doing in the US labor market and -- and -- and --

17  and how does that compare to what -- what would -- what is

18  going on in the rest of the US labor market, so called

19  relevant workforce.

20   Q.  Suppose we are considering the hiring patterns or

21  practices at Wipro.  Can we focus on that?

22   A.  Sure.

23   Q.  Okay.  Would it be appropriate to compare the

24  actual hires made by Wipro to -- let me scratch that.

25       Would it be appropriate to compare the

Page 39

1  actual hires by Wipro of employees of various

2  nationalities to the presence of those nationalities in

3  the relevant US workforce, or would you consider a global

4  labor market to be more appropriate given what you know

5  about Wipro?

6    A.  We're talking about hiring in the US?

7    Q.  Yes, yes.

8    A.  I mean, again, this is a -- this is a legal

9  question, I think, what exactly hiring discrimination

10  means when you're bringing in people on Visas from other

11  countries.

12       I think there's a very reasonable argument

13  to be made that you should be -- you should be doing the

14  comparisons to the US labor market, not the global labor

15  market because that's -- that's the -- that's the hiring

16  scenario.

17       Here's -- here's an example:  You know,

18  suppose I have an -- an office -- my company has one

19  office, and it's in Boise.  And I pick, you know, Boise,

20  Idaho, because I think it's a largely white population.

21  Let's assume that's true.  And now I open a second office

22  in Atlanta, which has a very large black population and,

23  you know, highly educated, qualified, a large -- large

24  black professional class, let's focus on that kind of an

25  office.

Page 40

1       I open an office, and instead of hiring

2  people from Atlanta, I just keep bringing -- you know,

3  some of whom will be minority, if I'm -- if I'm doing

4  nondiscriminatory hiring, some will be black.  I just keep

5  bringing people from Boise, Idaho, to staff that office.

6       Would I as a labor economist -- not as a

7  judge -- as a labor economist view that as hiring

8  discrimination?  Yeah, I would.  And I think that's a good

9  analogy.

10   Q.  So are you suggesting that the sources from which

11  Wipro hires is itself a reflection of discrimination?

12   A.  You mean the fact that they could hire Indians

13  when you "say the sources"?

14   Q.  I thought the example you gave was created for a

15  point that an employer who reaches beyond the local labor

16  market could be doing so for discriminatory reasons?

17   A.  Well, the -- the -- the point of my example is

18  I'm looking at hiring in this new Atlanta office, and that

19  Atlanta hiring -- and in fact I'm just bringing in white

20  people from Boise, that Atlanta hiring -- that office is

21  going to look very white whereas local hiring would

22  have -- would have a higher representation of blacks.

23       So it's really about -- that's -- that's why

24  I asked you -- it's not so much about the source.  It's

25  about, Is my hiring on location, right, reflective of the



Page 41

1 local labor market?  And I -- and that's -- that's the
2 analogy to what I'm doing here.  I'm asking is Wipro's
3 hiring -- its employment, it's not hiring, but is Wipro's
4 hiring in the US comparable or not in terms of South Asian
5 to the local labor market, which I'm defining broadly here
6 as the US labor market, you know, by -- by industry and
7 occupation.
8     Q.  Right.  You recognize that most companies have to
9 select their employees from those who apply for positions?
10     A.  Well, yes, but companies also engage in a lot of
11 recruiting efforts that shape who applies, and I don't
12 know -- I -- so that matters too.
13     Q.  Right.  Employees have no way to coerce someone
14 who doesn't apply to go to work, right?
15     A.  There's no way to coerce anyone to work for them,
16 even if they do apply.
17     Q.  Right.  So the group who apply for positions are
18 often referred to as "the applicant flow."  Isn't that
19 correct?
20     A.  That is correct.  My -- my point is simply the
21 applicant flow is not, you know, fixed by nature.
22     Q.  Right.
23     A.  Right.  I can -- I can go look for Indian Visa
24 workers or I can go recruit on American engineering
25 campuses.  That's a choice.

Page 42

1     Q.  Right.  But you don't know that that kind of
2 selectivity has occurred in this case, do you?
3     A.  I have -- I have not studied the applicant flow
4 data.  As far as I understand, the case isn't even about
5 hiring.  It's about promotions and terminations, for which
6 this, you know, has no bearing.
7     Q.  Yeah.  When did you learn that, by the way, that
8 the case is not about hiring?
9     A.  Well, I knew it was -- I -- I -- I knew it was
10 not directly about hiring because there's no -- as I point
11 out in my report, there's no direct information about
12 hiring out of an applicant pool, and I explain -- I
13 explain why in my report.
14         I -- I did not know because I was not
15 involved in, as I mentioned, you know -- in shaping,
16 editing, drafting, commenting on.  That's not exactly my
17 role anyway, the motion filed by plaintiffs.
18         I thought there, you know -- there might be
19 a discussion of employment per se, which is actually what
20 I can study with my comparison to the ACS data, even
21 though that is not -- you know, the ACS -- I don't see in
22 the ACS data who got hired.  Just, you know, as a flow.  I
23 see who's working there now.
24         So I -- you know, did I -- I might -- I -- I
25 didn't really think about it because I don't really worry

Page 43

1 about the motion the attorneys are writing.  It's not my
2 job, but I did not realize there was not going to be any
3 reference in the claim to the employment differentials,
4 but obviously, I knew that was being shaped by
5 terminations that I was studying.
6     Q.  Okay.  That being true, why did you include a
7 section in your report discussing hiring when you knew
8 that was not part of the case?
9         MR. LOW:  Objection, misstates his
10 testimony.
11     A.  I think -- I think that did misstate my
12 testimony.  I said I wasn't -- I -- I knew I had no -- I
13 just said I -- I -- I knew I had no direct analysis of
14 hiring out of applications, and I have no -- no analysis
15 like that, and I just said that I wasn't aware that there
16 was not going to be any reference in the motion to hiring,
17 even though it might be drawn somewhat -- an inference
18 might be drawn somewhat indirectly from the employment
19 data.
20         MR. KING:  Can we take a five-minute break
21 if you don't mind?
22         VIDEOGRAPHER:  Going off the record at
23 11:05.
24         (Recess taken from 11:05 a.m. to 11:16 a.m.)
25         THE VIDEOGRAPHER:  And we are back on the

Page 44

1 record at 11:16.  You may proceed.
2     Q.  (BY MR. KING)  Dr. Neumark, please turn to page 5
3 of your report and look at paragraph 12.
4     A.  Okay.
5     Q.  Thanks.  And that's where you define what you
6 mean by the relevant labor market.  Is that correct?
7     A.  Yes.  I give more detail later, yes.
8     Q.  Okay.  If I were interested in defining the labor
9 market from which hiring typically occurs, this would not
10 necessarily lead to the definition, would it?
11         MR. LOW:  Objection, vague.
12     A.  I think you're referring -- I think you're
13 referring directly back to your -- your comment about the
14 applicant pool.  So is that -- is that what you're asking
15 me?
16     Q.  (BY MR. KING)  Yes, that's not a bad way to look
17 at it.
18         Is this your approximation to what you think
19 the applicant pool would look like under nondiscriminatory
20 circumstances?
21     A.  Well, let me say -- let me say it this way, and
22 then if I'm not answering your question, I'm sure you will
23 let me know.  We -- we sometimes have in a hiring case
24 applicant data to a company and obviously, you know, who
25 got hired and who didn't or maybe who got job offers and



Page 45

1  who didn't because they may or may not take the job offer.

2         If -- if I'm working on such a case before I

3  accept kind of the applicant data -- the applicant data, I

4  do a lot of checks to make sure they're complete, for

5  example, are there hires who show up who weren't in the

6  applicant data, one -- one indication that I don't have

7  all the applicant data, and companies don't always keep

8  great applicant data because those aren't personnel

9  records in the same way that they have to keep records on

10  employees.

11         Sometimes those data don't exist at all.

12  Sometimes they look very incomplete so they can't be used,

13  and sometimes even you have them and they look complete,

14  you might be concerned about how the applicant pool is

15  shaped, where I recruit, who I choose to recruit, so I go

16  on LinkedIn and look for people with certain ethnicity or

17  whatever.

18         In that case or as -- as just to another --

19  you know, another kind of analysis, you do what's called

20  an external benchmarks analysis, which is what this is,

21  which is trying to say essentially, What is the

22  availability of workers for these types of jobs in the

23  local workforce and that's -- that's what that is.

24     Q.  Okay.  And why do you restrict this to the local

25  labor -- workforce?

Page 46

1     A.  By which you mean the US workforce or -- because

2  I'm hiring -- I'm studying hiring -- well, again, it's not

3  hiring directly.  I'm studying behavior, employment in the

4  US, and asking how it differs in -- in -- in the industry

5  and occupations in which Wipro operates versus Wipro

6  itself.

7     Q.  And -- but you know many hires are made of people

8  who are not residing in the US, correct?

9     A.  I know they bring in Visa workers, and that --

10  that was the issue who obviously aren't -- well, typically

11  not residing in the US although (audio distortion), but

12  putting that aside, yes, I know there is a flow of new --

13  there is a flow of new Visa workers into the country to

14  take some of these jobs.

15         But as we talked about before, I think, you

16  know, there's a legal issue I can't rule on or I probably

17  shouldn't even opine on, but in my -- in my -- you ask me

18  as a labor economist, you know, what should I be comparing

19  a company's hiring to if they're bringing people into a

20  country or some other definition of a labor market, I

21  would say that labor market.  That's at least a

22  reasonable -- a reasonable analysis to do.

23     Q.  I don't know what you meant by "that labor

24  market."  What was "that labor market" in your answer?

25     A.  Well, if -- if we were -- so if we're -- if

Page 47

1  we're -- if we're studying the US as a whole, which is

2  what I'm doing in this analysis, in my -- in my report

3  then it's the -- it's what is the ethnic -- what is the

4  share South Asian, you know, in the industry and

5  occupations in the US labor market.

6         If this were an analysis of, you know,

7  hiring at one location or there were only -- there was one

8  location of this company, then the local labor market

9  might be more -- more narrowly geographically defined.

10     Q.  Please turn to page 7 and paragraph 17.

11     A.  Okay.

12     Q.  Have you gotten there?  Did you review it?

13     A.  Yes.

14     Q.  You acknowledge that you were given a dataset of

15  Wipro applicants, correct?

16     A.  I believe it was a few datasets, if I'm not

17  mistaken.  Yes, data -- data -- I was given data on

18  applicants.

19     Q.  And you were given the names of those applicants?

20     A.  Yes.

21     Q.  All right.  And you know the jobs for which they

22  applied.

23     A.  I -- I -- I don't remember everything that was in

24  the data.  That's not written here unless by that you mean

25  job location.  What -- what I list here is resume ID,

Page 48

1  applicant name and job location, but that -- but it starts

2  with a "such as."  That's not a comprehensive list, and I

3  don't remember the whole list.

4     Q.  And what did you mean by "job location"?  Is that

5  the geographic location of a job?

6     A.  I'm not sure.  I -- I -- judging by the name, I

7  suspect so, but I didn't review that specific information.

8     Q.  Okay.  And why do you think the data were

9  incomplete?

10         MR. LOW:  Calls for speculation.

11     A.  Well, I -- I don't say definitively they weren't

12  complete.  I say I have no information on the completeness

13  of this applicant data.  That was something I looked at

14  very early in the research, and I honestly don't recall

15  the detail of what I did except -- except for recalling

16  that I -- I was by no means convinced they were complete.

17         But I -- but more than that, I don't

18  remember, and I didn't review that -- this, and I indeed

19  haven't looked at for -- you know, since early on when I

20  got the data, which I think was something like a year ago,

21  although that's a guess.

22     Q.  (BY MR. KING) Okay.  So presently you're not sure

23  in what respect the data were incomplete, if any?

24     A.  Correct.

25     Q.  You mentioned the data lacked a race of ethnicity



Page 49

1 of applicants.  Do you see that?

2    A.  Yes.

3    Q.  Is there any reason why you couldn't have gone

4 through the same name matching procedure you describe in

5 your report with respect to the names of applicants?

6    A.  I could have.  I would -- I would be -- remember

7 though that when I study Wipro employees, I have -- and

8 I -- I document this in the table, I get a lot of

9 information on nationality.  I -- I get a lot of

10 identification of South Asians from the nationality data,

11 and then I supplement it with information on the names.

12        Doing a full analysis of the dataset where

13 only use the names would be -- would be, you know -- I

14 could do it.  It would be, you know, not quite as reliable

15 let's say.

16    Q.  But you elected not to?

17    A.  Well, not just for that reason but, yes.

18    Q.  Right.  You preferred instead to use the ACS

19 database to approximate the group from which hires might

20 occur?

21    A.  Well, I -- I want to be clear here.  You know, if

22 you go back to paragraph 7, which has a bunch of parts to

23 it, I reach a conclusion about employment, paragraph (a),

24 about promotions, paragraph (b), about involuntary

25 terminations, paragraph (c).

Page 50

1        You asked before about when I -- you know,

2 when I did or didn't learn that hiring wasn't included.  I

3 mean -- and I -- I clearly was -- a long -- a long time

4 ago because this, you know -- this report didn't change

5 based on what was included in the motion filed by the

6 defendants -- filed by the plaintiffs.

7        I was never pushing a hiring story very hard

8 anyways.  In fact, my main -- it wasn't the question

9 asked, but it certainly wasn't even in my summary of

10 findings.

11        So -- so in that sense I -- I preferred to

12 do it -- you know, to study hiring.  I mean, I -- I

13 suppose but I'm not really focusing on hiring, the only --

14 the only thing I use it for is to say something about

15 employment.  Employment is a product of not just hiring,

16 right?  It's a product of hiring, retention and

17 terminations.

18    Q.  But, in fact, you did use the ACS data rather

19 than the applicant data in approximating the relevant

20 labor market?

21    A.  Yes, to compare -- to compare employment at Wipro

22 to employment in the relevant labor market, I did.  But

23 it's not because the applicant flow data would be the

24 right way to do that because that's only about, you know,

25 Lisa Myers -- only relevant to Lisa Myers, right?

Page 51

1        So Wipro has fewer South Asians because they

2 terminate them at a faster rate, consistent with the

3 evidence I find.  That would -- that wouldn't be reflected

4 in applicant or hire date, at least not directly unless

5 people stop applying because they learn this.

6    Q.  What fraction of those counted in the ACS survey

7 were searching for jobs during the class period in this

8 case?

9    A.  I -- I -- I think I say this -- I think I -- I

10 can dig it up if you wanted to, but nothing in the ACS is

11 hiring.  It's all about where you're employed now, which

12 is why -- and as I just said, I -- I don't draw a

13 conclusion -- a strong conclusion -- I don't -- I'm not

14 sure I say anything in here -- I may somewhere, but

15 certainly in paragraph 7 about hiring per se based on that

16 because it's not literally a hiring flow.

17        It's -- it's indicative of hiring, you

18 know -- there's -- there's no evidence one way or another,

19 you know, the jobs people are in are different from the

20 jobs they're currently looking for, but it's not a direct

21 measure of hiring.

22        It's not a -- the ACS is not -- there are

23 datasets.  They would provide a much smaller sample

24 obviously where I could, you know, follow people over

25 time, and I can see people even saying they're searching

Page 52

1 for a job and taking a certain jobs, but that's not the

2 ACS.

3    Q.  As a literal fact, you don't know if there's

4 anyone in the ACS survey who was interested in working at

5 Wipro?

6    A.  I -- i have no way to measure that directly.

7    Q.  Okay.  Turn to page 13, paragraph 31.

8    A.  Okay.

9    Q.  Okay.  Please look at the second sentence in

10 paragraph 31:  "My analysis of Wipro and external

11 benchmark data shows evidence strongly consistent with

12 Wipro discriminating in favor of South Asians and hiring

13 employees placed in the US positions."

14        Do you see that?

15    A.  Yes, and I -- so I did say I might say it

16 somewhere, and that's -- that's where I say it.  So okay.

17 Fair enough.

18    Q.  Okay.  But, in fact, you told me that the

19 external benchmark data doesn't tell you anything about

20 hiring.  Isn't that true?

21    A.  I -- I -- I -- you'd have to read back that

22 version.  I don't think that's what I said.  I said it --

23 it doesn't provide a direct measure of hiring, right?  It

24 doesn't -- it doesn't literally measure a flow into a job.

25 It measures people working in jobs.



Page 53

1    Q.  Yes.

2    A.  Those things have to be related.  I -- I -- one

3  doesn't know how strongly related they are.  I think

4  that's a more accurate summary of what I said.

5    Q.  But as you yourself point out that the

6  composition of Wipro or any company at any one time

7  depends on more than hiring practices, correct?

8    A.  Yes.  Yes.  But I -- I will say that external

9  benchmarks are used to study hiring discrimination.  Is it

10  as good as clean, complete, you know, untainted applicant

11  data?  No, but we often don't have it.

12    Q.  Right.  Well, I doesn't dispute that it's used.

13  The question is, is it properly used, and what's your

14  opinion about that?  And then we'll go further.

15    A.  My opinion -- my opinion is, it -- it -- you

16  know, I -- I use the word "strongly consistent"

17  deliberately, and the "strongly" here refers to the

18  statistical -- let me be clear.

19        The consistent is the direction of the

20  evidence, and maybe I should have said this.  The

21  "strongly" is the very strong statistical evidence.  I'm

22  not using "strongly" in the sense of what we discussed

23  earlier, which is ruling out other explanations, and one

24  can view this discussion we're having now as ruling out

25  other explanations.

Page 54

1        So if you want to say, Is it hypothetically

2  true -- is it hypothetically possible, right, that there's

3  no discrimination hiring and the employment -- the -- the

4  hugely different share of South Asians is shaped solely by

5  promotions and terminations -- sorry, by terminations and

6  maybe -- maybe, you know, voluntary quits because you

7  don't get promoted or for what -- other reasons.

8        You don't know if the numbers could work out

9  that way, but it's hypothetically true.  It's

10  hypothetically possible.  But, you know, employment and

11  hiring obviously are closely related because on average,

12  people don't stay in jobs for that long.

13        So -- so there's -- there's a presumption

14  that what you see in one is reflected in the other.  It's

15  not a direct measure of hiring.  That -- that is clearly

16  true also.

17    Q.  Just to be clear, the profile you might say of

18  Wipro in terms of employment at any given moment in time,

19  a snapshot, depends on what the profile was at some

20  initial period, perhaps when Wipro first formed in the

21  United States, its hiring experience and its termination

22  experience?

23    A.  Including -- including -- if by termination you

24  mean both voluntarily and involuntary exit -- exit is the

25  more neutral term, yes.

Page 55

1    Q.  Right.

2    A.  Those are the only -- those are the three ways

3  the workforce changes.

4    Q.  That's right.  So you can't compare the profile

5  or the snapshot of Wipro in a moment in time to an

6  external benchmark and conclude which of those three

7  elements of change are responsible, correct?

8    A.  Just from that, no.  The -- the two I observe

9  well in the data are promotions and involuntary

10  terminations, both of which -- well, involuntary

11  terminations boosts the share of South Asian.  Promotions

12  may or may not depending on who leaves and does not get

13  promotion.

14    Q.  I'd like to pose a hypothetical to you.  Suppose

15  it is the case that Americans are the discriminators and

16  South Asians aren't.  All Americans have a taste for

17  discrimination against South Asians.  That's obvious, I

18  don't know --

19        (Simultaneous speakers.)

20    A.  Are you mad at the people making the hiring

21  decisions, which Americans and South Asians don't?

22    Q.  All Americans.

23    A.  Okay.

24    Q.  American-owned companies have a taste for

25  discrimination against outside South Asians.  American

Page 56

1  workers have a taste for discrimination against

2  South Asians, not vice versa.

3        In that world, how would the data look

4  different?

5    A.  Let me just ask you which -- which -- to be a

6  little more specific, which data?  What -- give me some

7  measure of how you're asking.

8    Q.  That's a great point.  Fair enough.  The profile

9  data, the snapshots?

10    A.  Wipro's snapshot?

11    Q.  Yes.

12    A.  Well, I don't know who's making -- I don't

13  know -- I'm not sure if Americans or South Asians are

14  making the hiring decision.

15    Q.  Okay.  Let's suppose American companies

16  discriminate against South Asia in this industry.

17    A.  Uh-huh.

18    Q.  Okay.  You would expect to see fewer South Asians

19  employed at American companies by these same people,

20  correct?

21    A.  If they -- if they -- well, your hypothetical is

22  they have a taste to discriminate --

23    Q.  Yes.

24    A.  And we have laws that hopefully, you know --

25    Q.  Well --



Page 57

1      A. -- make that -- make that not -- not be effective
2 to a greater extent, but there might be some of that.
3      Q. In which case because the South Asian employees
4 must work somewhere, you would expect them to be
5 overrepresented in companies owned by South Asians,
6 correct, who don't have that taste for discrimination?
7      A. I mean, maybe, maybe not. I mean, Wipro has --
8 Wipro has American workers too, who told you just told me
9 also like working with South Asians, and -- and the
10 South Asian share is clearly being driven you by Visa
11 workers as well.
12          So it's not just the Americans and
13 South Asians who can't find jobs. So, I mean, you know,
14 could that happen to some extent? Yeah. Do I think it's
15 the explanation of these huge discrepancies? Highly
16 unlikely, but --
17      Q. You never --
18          (Simultaneous speakers.)
19      A. You are posing a hypothetical, so yes, it could
20 happen to some extent. I don't -- it could happen to some
21 extent. I'd be -- I'd be -- I would very much doubt that
22 it could explain these numbers, you know -- these
23 employment numbers versus the benchmarks, so I can't
24 obviously say that, you know, scientifically.
25          And it wouldn't explain why the South Asians

Page 58

1 get favored in promotion decisions and involuntary
2 termination decisions at Wipro.
3      Q. If Americans are underrepresented or
4 non-South Asians are underrepresented in South Asian
5 companies, as you opined on a number of occasions, they
6 must by definition be overrepresented in non-South Asian
7 companies, correct?
8      A. Yes.
9      Q. They have to work somewhere or there wouldn't be
10 in the ACS survey?
11      A. There wouldn't be in the ACS in this industry,
12 yeah.
13      Q. So you could create a profile of American-owned
14 companies that would be top heavy with Americans, just as
15 you find Wipro top heavy with South Asians?
16      A. Okay. I just want to be clear here. We're --
17 we're -- we're in hypothetical world. I've seen no
18 evidence of some -- of those companies. I haven't -- you
19 know, in my research, in my -- in my -- in my expert
20 witness work, purely anecdotally -- and this is not data,
21 so I'll be clear. I live in the Bay Area. We are filled
22 with American-owned tech companies, and there is a lot of
23 South Asians at those companies.
24          Now again, I can't -- I can't quantify that.
25 So I find what you're suggesting -- you know, I just want

Page 59

1 to be clear. It's hypothetically true, I suspect. I'm --
2 I'm highly suspicious of actually the explanation.
3      Q. But you've never looked at the employment profile
4 of an American-based or an American-owned company other
5 than a South Asian --
6      A. I have not -- I have not yet been engaged by a --
7 a company -- a company in this industry being sued for
8 discrimination against South Asia, which might -- which
9 actually might be viewed as evidence that's not happening,
10 or maybe no one called me up. I can't tell -- I can't
11 distinguish between those two.
12      Q. What is the basis for your assumption that in the
13 absence of discrimination, Wipro's workforce would
14 resemble the demographic data within the ACS?
15      A. Well, I mean, that's -- that's the -- that's
16 the -- I mean, in -- in both research and as far as I know
17 in the legal setting, the -- you know, what we call the
18 no hypothesis if one wasn't discriminating and, you
19 know -- and there weren't some obvious other factor that
20 mattered, that hiring would be neutral, just like we would
21 expect it -- we're discriminating based on pay between men
22 and women that they're -- you know, the pay of similar men
23 and women would be.
24          Do I -- you know, would it be exactly the
25 same? Not necessarily, right? I mean, you -- you raised

Page 60

1 the issue of location, you know. Yeah, there are slightly
2 different states with slightly different shares of
3 South Asians, maybe it wouldn't be exactly equal. But,
4 you know, but that's -- it's -- it's the most obvious
5 starting point for the no hypothesis of what we would see
6 in the absence of discrimination.
7      Q. You're --
8      A. And -- and -- and those other factors I'm talking
9 about, it's not clear which way they push the analysis.
10 It's not clear to make the evidence weaker or stronger.
11 It just changes slightly.
12      Q. But your judgments regarding discrimination and
13 with respect to employment are based on the fact that the
14 demographics of the Wipro workforce does not resemble the
15 demographics of the ACS data?
16      A. It -- it does not resemble the demographics of
17 the ACS data in the same, you know, rough -- well, pretty
18 close to the same industry and pretty close to the same
19 occupation.
20      Q. Right.
21      A. Any -- I think any -- I -- I would -- I think any
22 reasonable labor -- I shouldn't say any, you know, who
23 knows what reasonable means. But I think -- I think most
24 reasonable labor economists would say that is clearly the
25 most natural benchmark to compare Wipro's composition to.



Page 61

1    Q.  Okay.  Suppose one asks an additional question
2 which is, Why don't the two resemble each other.  What
3 information do you have that makes it more likely that
4 it's discrimination rather than some other reason?
5    A.  I don't think I go out on any -- any limbs in
6 this report insisting -- I don't think I say anywhere it
7 is discrimination, and it's not anything else.  I say it's
8 strongly consistent with discrimination, right?
9         There, you know -- I think there's obviously
10 other material that the -- and I don't know -- I don't
11 know if they have other experts or whatever.  But the
12 attorneys may -- may not be talking about or referring to
13 other -- other evidence.
14         But I, you know -- I -- my -- my role here
15 is not -- what, you know -- was not defined as and
16 therefore is not to assess, you know, the qualitative
17 evidence and the declarations of people who say they, you
18 know, experienced discrimination and all that other kind
19 of stuff.  I have a -- I'm just -- I'm here just to do a
20 statistical analysis of the data.
21         So there are other parts of the picture, but
22 I'm not -- you know, I'm not a -- I haven't reviewed
23 those.  I haven't seen most -- really the only other stuff
24 I've seen along those lines -- everything -- everything I
25 looked at and considered is in my report.

Page 62

1         There were obviously some things referenced
2 in the motion that point in that direction, but I'm not
3 testifying about those because I didn't, you know, talk to
4 those people or know them or anything -- anything about
5 that.
6    Q.  So when you say that the data are consistent with
7 discrimination, you're not ruling out the possibility that
8 it's also -- data are also consistent with
9 nondiscriminatory explanations?
10    A.  I cannot decisively rule it out for the reasons
11 we discussed I think right at the outset, which is I
12 haven't estimated, you know, I mean, I'm studying -- all
13 I'm studying here is outcomes like South Asians status
14 group, right, with some disaggregation.
15         So there are some cases like the promotions
16 by band where you could think about that as controls.  But
17 I haven't done a detailed analysis of -- that incorporates
18 other potentially legitimate explanations for the
19 differences because -- you know, it wasn't my
20 understanding -- it wasn't really the goal at this stage,
21 and I didn't have the data anyways.
22         As I said, my understanding of the way this
23 works is, you know, a disparity is established.  The
24 company has, you know -- has the potential to -- you know,
25 to offer not discriminatory explanations.  To extent

Page 63

1 they are based on data, I will presumably be asked to --
2 to weigh in on what I think of those analyses.
3    Q.  Please take a look at paragraph 37.  It's on
4 page 16.
5    A.  Uh-huh, okay.
6    Q.  I'm focusing on this paragraph unlike others
7 where you say it's "consistent with."  Here you're saying
8 the evidence "strongly suggests."
9         Is that a different degree of confidence?
10    A.  No, I don't think so.  I think the same -- I
11 think the same as what I said -- I mean, there's a
12 difference here.  This -- this is not a comparison to
13 benchmark data, right?  This is a comparison of the --
14 because there's no -- there's no -- there's no -- there's
15 no Career Bands in the ACS data obviously.
16         So this is just a comparison of where people
17 are coming at Wipro, South Asians versus non-South Asians.
18 So I -- I -- probably -- it probably would have been just
19 fine to use the same consistent -- I think -- I think the
20 reason I use "suggested" is because -- I'll check before I
21 say this.
22         This is Table 2, I think.  I did not --
23 there's not actually a statistical test in this table.
24 This is just comparing the percentages.  I believe that is
25 why -- because I'm pretty careful on the language.

Page 64

1         I believe that is why I said that instead of
2 "strongly consistent," which I -- I hope I've reserved --
3 you might trip me up on an example, but I hope I've
4 reserved for some reason the statistical test --
5    Q.  So the -- the conclusion you reference in
6 paragraph 37 is not based on formal statistical test?
7    A.  Correct.
8    Q.  And it also isn't based on the analysis that
9 contains nondiscriminatory reasons with respect to the
10 selections that are being made?
11    A.  It's a description of outcomes, the outcome here
12 being the band into which you are hired.  There are
13 statistical tests to do -- I just -- frankly I don't -- I
14 didn't -- I didn't for that particular case -- that
15 particular example.
16         But one can obviously do statistical tests
17 that compare distributions across two dimensions, and
18 I'm -- I'm pretty sure what we would find -- these are
19 huge differences.  There's -- there's no way these
20 wouldn't be strong.
21    Q.  Okay.  You also didn't do a statistical test
22 regarding the uniformity of the differences in each job
23 classification.
24    A.  By which you mean the difference between the
25 percentages in each row versus the last row?

LEXITAS

Page 65

1   Q.  Yes.

2       A.  Sure.  But that's why I said if I compare -- or

3   let's say group -- so the total row is 11,600 people,

4   71 percent -- I'm going to round here, 71 percent

5   non-South Asian, 29 percent South Asian.  Take, oh, I

6   don't know, group C1, 648 people.  Those percentages

7   differ by 29 or 30 percentage points.

8       If you want to take a side bet on that being

9   statistically significant consistent with the last row,

10  I'll be happy to take that bet, or however big you want it

11  to be.

12      And that would be true for many of these

13  rows.  Maybe not group E with 15 people because that's not

14  many people, but these ones with hundreds of people and

15  percentage point differences of 10 or 20 or 30 -- even

16  close to 30 for sure.

17      MR. KING:  Can we go off the record for a

18  second?

19      VIDEOGRAPHER:  Going off the record at

20  11:51.

21      (Recess taken from 11:51 a.m. to 12:28 p.m.)

22      VIDEOGRAPHER:  We are back on the record at

23  12:27.  You may proceed.

24      Q.  (BY MR. KING) Dr. Neumark, I'd like to have one

25  more question about the ACS data, and my question is

Page 66

1   whether you stratified any of your analyses by the

2   education level of any of the individuals reported in that

3   sample?

4       A.  I did not.  I -- I -- I believe -- well, there is

5   education data in the ACS.  I don't think I have education

6   data in the Wipro data.  Obviously conditioning on

7   industry and occupation is going to, you know, capture a

8   lot of education variation, but I didn't do it directly

9   aside.

10      Q.  Okay.  Thank you.

11      Dr. Neumark, I believe you were provided and

12  you reference in your report that you received the

13  promotion policies that were in effect during the class

14  period?

15      A.  Right.

16      MR. KING:  Ms. Rodriguez --

17      A.  I don't know if I have this complete.  I

18  reference two -- two documents.  I don't recall if they're

19  different or not, but, yes.

20      Q.  (BY MR. KING) Well, we're going to put them in

21  evidence, and then you can discuss those in your

22  testimony.

23      MR. KING:  So Ms. Rodriguez if you would

24  please put those into evidence, please.

25      MR. RODRIGUEZ:  Allan, would you like me to

Page 67

1   put in all four or one at a time?

2       MR. KING:  I think all four would be fine.

3       MS. RODRIGUEZ:  I'll be sending it over

4   through the chat function.

5       THE REPORTER:  Are you marking all of those

6   as one exhibit?

7       MR. KING:  You know, maybe we ought to make

8   each one a separate exhibit.  It would be a bit easier

9   perhaps.

10      THE WITNESS:  So did we just get one of

11  them?

12      MR. RODRIGUEZ:  Yes, I'm sending them one by

13  one.  So there should be in four total.

14      (Reporter clarification.)

15      MR. RODRIGUEZ:  When I send them across, I

16  will label them correctly for you for after the

17  deposition.

18      THE REPORTER:  Thank you.

19      MR. KING:  Ms. Rodriguez, would you tell us

20  which ones you are identifying as 2, 3, 4 and 5?

21      MR. RODRIGUEZ:  So they will be identified

22  in the order I send them across, so the one that has 9

23  will be 2.  The one that's 10, 2015, will be 3.  11, 2017

24  will be 4.  And 12, 2018 marked as 5.

25      (Exhibits 2-5 marked.)

Page 68

1   Q.  (BY MR. KING) Dr. Neumark, please look at

2   Exhibit 2.

3       A.  Which is number 9, right?  Okay.  I have it.

4   Make it a little smaller because it came up huge.  Okay.

5       Q.  I'm not sure where the number -- I see.  Okay.

6   Please turn to page 2.

7       A.  Okay.

8       Q.  Under paragraph 2, what's the effective date on

9   Exhibit 2 that you have?

10      A.  March 1, 2014.

11      Q.  Okay.  Have you reviewed this document before?

12      A.  Yes.  Let me make sure -- yeah.  This looks to be

13  the second one I call promotion policy in my materials.

14      Q.  Okay.  Do you see that in paragraph 3 there's a

15  description of the timeline?

16      A.  Yeah.

17      Q.  Okay.  If it's the case that you have to be

18  present to be promoted, do you take account of who is

19  present during -- or at the appropriate dates in order to

20  receive a promotion in your analysis?

21      A.  Sorry.  So I -- so I -- the -- the time -- if

22  you're asking about -- just to make sure I understand the

23  question.  The two lines below timeline refer to when

24  they're effective?

25      Q.  Yes.

Page 69

1    A. So you -- is what you're asking, if I was

2 studying let's say B3 to refer to the first line and

3 someone was hired in -- on June 2nd, they could not have

4 been promoted that year.  Is that what -- you're asking

5 about that.

6    Q. Yeah, yeah.

7    A. I'm just trying to understand the question.

8        No, they would -- they would be considered

9 not -- there's -- there's -- that would be -- so in the

10 year -- in the first year of employment, if they were

11 hired June 1st B3 or below or October 11th, C1 and above,

12 that would not be counted -- that would be -- that would

13 be an observation in the data without a promotion by -- by

14 construction.

15    Q. Right.  But would you delete that person from the

16 pool of eligibles in your analysis?

17    A. I haven't.

18    Q. And the same would be true with respect to the

19 C1 promotions?

20    A. Yeah, probably because it's later, less likely --

21 much less likely to be relevant, correct.

22    Q. Right.  But if I understand, what you did do was

23 ask, were you present in the data between two dates and

24 then were you promoted?

25    A. Correct.

Page 70

1    Q. How long you were in the data is not accounted

2 for in your work?

3    A. Let me think about that for a second.  That's

4 correct.  Well, let me -- let me -- let me -- let me

5 clarify that a little.

6        So, yeah, how long you were present is not

7 reflected in my work, but in my promotion analysis --

8 remember, there's -- there's -- there's a pool column,

9 right, in column -- let's say, for example, column --

10 almost there, sorry -- the last column in 3, and then all

11 of the stuff by band is for the pool analysis.

12        And there I'm counting whether you're ever

13 promoted, so, you know, I -- it -- if you got hired let's

14 say for B3 and below, you know -- if you got hired in July

15 and canned in August or left in August, doesn't matter why

16 you left, then you can say maybe that should not have been

17 in sort of an at risk of being promoted.

18        But for the pooled analysis, because that

19 extend over multiple years, that's going to be very

20 unimportant.

21    Q. But those individuals are included?

22    A. Yes, they -- yes.

23    Q. So again, as a literal matter, if someone is

24 employed for one day, they are in the same pool of being

25 at risk for promotion, correct?

Page 71

1    A. Yes.

2    Q. Did you consider the fact that longer tenure may

3 improve the likelihood of a promotion?

4    A. Well, that -- that goes to our previous

5 discussion, that I have not -- I have not

6 explored model -- sorry.  I have not explored models of

7 potential explanatory factors, you know, I mean, the main

8 reason being, I would -- I -- I don't know of company

9 policy -- I haven't read anything, but my guess would be

10 how you're performing the job is the most important thing

11 for promotions.  It usually is.

12        It's not clear which way tenure goes.  Some

13 of the people have been in the job the long -- for a long

14 time -- the lowest performers, that's why they're still

15 there.

16        I would be -- I would be very, you know,

17 given -- and with respect to the tenure question, given

18 that I have evidence of higher involuntary termination

19 rates for non-South Asians, that sure makes using tenure

20 as a control variable problematic as it's harder -- it's

21 clearly harder for non-South Asian to accumulate tenure

22 that might be required, and in fact, according to some of

23 the other information in this document, is required, as I

24 understand it, as a criteria -- as a criterion for

25 promotions.

Page 72

1    Q. If you go down the same page to paragraph 5.

2    A. Uh-huh.

3    Q. You see that under subparagraph 1, to be

4 promoted, one has to have 12 months of continuos service.

5    A. You cut out.  I think you cut out, at least for

6 me, sorry.

7    Q. Yeah.  Under subparagraph 1, do you see where it

8 says you must have at least 12 months of continuous

9 service?

10    A. Yeah.

11    Q. That requirement is not incorporated into your

12 analysis, is it?

13    A. I -- I have not incorporated these requirements

14 for -- well, that one in particular, I -- I didn't do

15 because it is not clear what to make of matters of

16 continuous service when those can be affected by

17 involuntary termination, and obviously because if you read

18 the remaining items in paragraph 5, there's a bunch of

19 things I have no data on.

20        So again, whether this comes back later with

21 Wipro supplying the data on all these things and gets

22 analyzed remains to be seen, I suppose.

23    Q. Okay.  What about the case of employees who

24 previously were promoted and would not be eligible for a

25 subsequent promotion for another 24 months?  And I'm

1  referring to the requirement of -- on the very next page,
2  the second bullet point under subparagraph 1.
3      A. Right.
4      Q. Is that reflected in any way in your analysis?
5      A. It's not.
6      Q. Moving down that same page, are any of the
7  performance scores included in your analysis?
8      A. No, and that's because to the best of my
9  knowledge Wipro declined to -- well, I don't know whether
10  they have the data, but they declined to turn it over if
11  they do have it.  There's nothing I can do about that.
12           And again whether that surfaces later and we
13  look at the data, we will -- we will see.  You know,
14  performance ratings again -- and this is not my expertise,
15  this is -- usually there's these are industrial psychology
16  folks who address questions of fairness of performance
17  rating, but it is always an issue in these kinds of cases.
18      Q. Moving to paragraph -- I think it's subparagraph
19  4, critical band factors --
20      A. Subparagraph -- you mean, in 5.  Okay.  Yeah.
21      Q. Yeah, it's not the best numbering system.  But do
22  you see it's entitled "Critical Band Factors"?
23      A. Yes.
24      Q. Okay.  And these apply only to employees and
25  peers in Wipro Infotech?

1      A. I see that.
2      Q. Did you segregate the group of Wipro employees in
3  analyzing promotion opportunities by business unit?
4      A. No, because I don't know that I have any -- I
5  frankly don't even know what the paragraph below this
6  means, but I certainly would go through data on
7  whatever -- whatever they purport to be talking about
8  here.
9      Q. Okay.  Did you recognize that managers first must
10  nominate employees there?
11      A. Well, I mean, I can -- I can see it says that,
12  but -- I'm not aware that I have any data on anything like
13  that.  But, you know, to think about not nomination for a
14  promotion as an -- as an independent criterion for
15  promotion seems an odd way to think about it because it's
16  effectively the first stage of promotion decision, you
17  know, as opposed to performance rating, which -- which is
18  objective is the measure of employee performance.
19      I mean, if you told me that South Asians get
20  all the promotions, but that's because managers nominate
21  them, well, does that mean they got the promotion.  No,
22  it's just kicking the can up the road.
23           THE REPORTER:  We are having audio issues
24  again.
25           (Reporter clarification.)

1           VIDEOGRAPHER:  Going off the record at
2  12:43.
3           (Recess taken from 12:43 p.m. to 12:48 p.m.)
4           VIDEOGRAPHER:  And we are back on the record
5  at 12:48.  You may proceed.
6      Q. (BY MR. KING) If only I knew where we left off.
7           THE REPORTER:  Do you need help?
8      Q. (BY MR. KING) I know we were looking through the
9  promotion policies, and take your time to look through
10  this, but I'm hoping this might get us through a lot of
11  other questions.
12      Is it fair to say if we look at Deposition
13  Exhibit 2 that your analysis does not incorporate any of
14  the qualifications and limitations that are included in
15  Exhibit 2 regarding promotions?  I know that's a global
16  question but --
17      A. No.  I do not estimate models for promotions,
18  taking account of things on which I don't have data
19  obviously or, you know, what -- what looks to me like from
20  this -- you know, from this and related documents, you
21  know, other -- other -- a few things I might have data on.
22  Not clear I want to.
23           Anyways, but I -- I'm -- as I said clearly
24  on what I'm doing at this point is documenting disparities
25  and promotion rates.

1      Q. Right.
2      A. And I'm not making stronger claims than that that
3  deviate strongly from the no hypothesis of equal promotion
4  rates, which is consistent with discrimination.
5      Q. Let me try it this way.
6      A. I spilled my coffee.  Give me one second.  The
7  advantage of remote depositions.  You can go I think
8  change your shirt.
9      Q. That's pretty good.
10      We looked through paragraph 3 in Deposition
11  Exhibit 2, and I believe you testified that you did not
12  consider the impact of the timeline specified in
13  paragraph 3, correct?
14      A. That's probably correct, right.  I didn't -- as
15  we established, I didn't take account of the possibility
16  that in a year, you came in after -- you were hired after
17  one of these effective dates and therefore couldn't have
18  showed up as promoted in that year.
19      But -- but the other -- I mean, but I
20  don't -- I don't need to know -- I mean, effective date is
21  not relevant to those who were hired before that because
22  my -- my snapshots are defined as of the end of each year
23  and whether you were promoted in that year.
24      Q. But what if I'm terminated before June 1st and
25  I'm B3 and below, I couldn't receive that promotion, could



Page 77

1   I?

2        A.  Well, actually -- I don't -- I don't actually

3   know.  I -- this would be effective -- I'm not exactly

4   sure -- I mean, principally if you were promoted and then

5   fired, and I don't know that is what is in the data I have

6   is the decision to promote or the recording of for whom it

7   became effective, just like they promoted me voluntarily.

8        I don't -- I'm not sure that would or

9   wouldn't -- I'm not sure that would not show up as

10  promotion in my data.  I understand it wouldn't be

11  effective.  You wouldn't get your higher pay or, you know,

12  whatever until that day.  That's what I interpret as

13  effective.  I -- I simply don't know the link between that

14  and the data.

15       Q.  And would your answer be the same with respect to

16  the next line, C1 and above --

17           (Simultaneous speakers.)

18       A.  Everything would be the same after that.

19       Q.  Okay.  And you didn't account for the fact that

20  you needed 12 months of continuous service.  That's not

21  reflected in your analysis?

22       A.  We already established that, and again it's not

23  clear -- it's not clear -- if I were estimating a model

24  for promotions with more controls, and, you know, we had

25  all this data and all these other things later on.  It's

Page 78

1   not clear I would -- I would want to include that model

2   anyways since I know there's a termination difference

3   across the two groups.

4        That goes back to what we talked about

5   earlier, way earlier in the wage, regression and gender

6   gap for example, over-controlling -- controlling for

7   things I couldn't themselves reflect --

8        Q.  We also discussed this minimum of 24 months

9   waiting period essentially who have been previously

10  promoted.  That's not accounted for?

11       A.  Right.  And then I would not have -- that

12  would -- would also at least partially fall under the data

13  I don't have because I don't have any data before 2014.

14  So if I'm studying that -- you know, at least -- at least

15  for the first two years of the data, let's say, that would

16  be the same problem as for the performance data.  I simply

17  couldn't know whether you were previously promoted.

18       Q.  And then you anticipated my next question, so you

19  didn't include any performance information?

20       A.  I didn't have it.

21       Q.  Okay.  Please turn to Deposition Exhibit 3.

22       A.  Yeah, that's 2278.  I don't -- I don't think I

23  listed this one in my material.  I don't think I have this

24  one, although they are very similar.

25           MR. KING:  I just want to confirm which one

Page 79

1   it is.

2           MR. RODRIGUEZ:  That would be the one

3   labeled number 10 and the year 2015.

4           MR. KING:  Right.  That's Deposition Exhibit

5   Number 3?

6           MR. RODRIGUEZ:  Correct.

7        Q.  (BY MR. KING)  And we can agree since you didn't

8   have it, you couldn't have relied on any information in

9   it?

10       A.  Correct.  It looks to me like I had -- I know

11  these numbers are weird, but I have a 9 and 11, which I

12  think is 2 and 4 judging from my -- looking at my

13  materials page.

14       Q.  Deposition Exhibit Number 4, do you have that

15  now?

16       A.  I do.

17       Q.  Would you have that effective date on page 2 of

18  that exhibit or the second page?

19       A.  September 21, 2017.

20       Q.  Okay.  So would you please look at paragraph 5 on

21  that same page.  You see the first bullet point once again

22  is about 12 months of continuous service, and I assume

23  your answer is the same as earlier?

24       A.  Yes.  My answer would be the same as earlier

25  about what I -- I didn't use or couldn't use and why I

Page 80

1   might not have used it anyways.

2        Q.  All right.  The next bullet point refers to a

3   "Team Rainbow."  Do you see that?

4        A.  I'm sorry, yeah.  I was just -- maybe I am

5   missing -- yes, I do see Team Rainbow in paragraph 5.

6        Q.  Do you know what that is?

7        A.  No.

8        Q.  I take it since you don't know what it is, you

9   couldn't have accounted for it in your analysis?

10       A.  Yes.  Well, I mean, just by -- well, put it this

11  way, I -- I -- I have a -- it seems to be related to the

12  band, so I'm guessing this is just, you know, a subset of

13  bands, in which case I did do it because I looked at -- I

14  looked at promotion differences by bands.

15       So maybe team -- maybe -- it says "in case

16  the joining band of the employee is Team Rainbow," that

17  implies something other than Team Rainbow is not like the

18  bands, so I don't know what it is, but then I wouldn't --

19  then I might not have.

20       Q.  The next bullet point deals with the 24 months in

21  the current Career Band if you had been promoted before.

22  Do you see that?

23       A.  I do.

24       Q.  Okay.  Is your answer the same here as it was

25  with respect to the previous exhibit?

Page 81

1    A. No difference, yep.

2    Q. Okay. Then if you turn to page, you see that

3 there are various performance criteria, and is your answer

4 with respect to the performance criteria the same as with

5 the previous exhibit?

6    A. Yes.

7    Q. Meaning you were not able -- or you did not take

8 it into account?

9    A. The first, I was not able to. I didn't get it.

10 I didn't have the data, and I believe that's because Wipro

11 was asked to provide it -- well, I believe Wipro was asked

12 to provide it and didn't. Whether they could have, I

13 don't know.

14    Q. Okay. Moving down that page to the next

15 subparagraph labeled 3, "Evaluation"?

16    A. Yes.

17    Q. It says in bold, Band 3 and below -- B3 & Below"?

18    A. Yes.

19    Q. You see something referred to as "Trend.Nxt

20 guidelines."

21    A. Yes.

22    Q. Do you know what those are?

23    A. No.

24    Q. Okay. Is it fair to say that if you didn't know

25 what they are, you could not have taken them into account?

Page 82

1    A. Yes, I mean, there was -- there's -- there was,

2 you know, an early decision that I was going to look at

3 just disparities and the outcome. So I didn't -- there

4 wasn't a need to figure out what all these things were.

5    Q. Okay.

6    A. And that data -- I didn't have data. This is

7 under "Evaluation." I didn't have data on evaluations.

8 That was kind of the end of the story.

9    Q. If you turn to -- well, let's use the Bates label

10 at the bottom 827 because the pages aren't numbered.

11    A. Oh, same document?

12    Q. Same document, sir.

13    A. Okay.

14    Q. Great. Please look at the paragraph below the

15 diagram and the sentence -- second sentence says "Final

16 promotion decision is taken after leadership review and is

17 also dependent on there being a vacancy at the higher

18 band."

19        Did you in any way incorporate the notion

20 that a vacancy was required in order for a candidate to be

21 promoted?

22    A. To the best of my knowledge, I have -- I have no

23 information on vacancies or anything like that you, know,

24 but I should say is I can't -- I can't quite imagine a

25 reason why this would generate the difference between

Page 83

1 promotion rates between South Asians and non-South Asian.

2 A vacancy is a vacancy.

3    Q. Then on Bates page 828 --

4    A. Yes.

5    Q. -- you see it describes that "Trend.Nxt

6 competency framework"?

7    A. Yes.

8    Q. Did that figure at all in your analysis?

9    A. Didn't for the same reason I described and

10 explained earlier.

11    Q. Okay. Sorry. The phone will stop ringing in a

12 second. Please let's look at Exhibit 5.

13    A. Okay.

14    Q. Did you previously receive this document?

15    A. I -- I don't believe so. It's not in my

16 materials. It looks similar to what we talked about, but

17 I think I only got two of the four.

18    Q. Okay. Just to be sure we're talking about the

19 same exhibit --

20    A. Oh, I'm sorry, this is a different -- I'm sorry.

21 Global Company -- 49 -- 42929.

22    Q. Yes.

23    A. Yeah. I don't list it here, which hopefully

24 means I didn't get it because this is supposed to be

25 everything I got and -- everything I got and deemed

Page 84

1 relevant, so I don't recall. I -- I -- my best

2 assessment is I did not get it.

3    Q. Okay. Let's put this aside then. In

4 paragraph 39 --

5    A. Back to my report?

6    Q. Yes. Thank you for the reminder.

7    A. Okay.

8    Q. And that's Exhibit 1. Paragraph 39 reports the

9 results for your promotion analysis.

10    A. Right.

11    Q. And I just wanted to confirm that in this first

12 paragraph, there are no controls for anything, and this

13 might be referred to as a 2x2 analysis essentially, where

14 you use South Asian or non-South Asian, whether you are

15 promoted or you're not promoted?

16    A. Just looking at the table to confirm, but yeah.

17        (Simultaneous speakers.)

18    Q. Correct?

19    A. Yeah.

20    Q. Okay. And then in table -- I'm sorry,

21 paragraph 41, you're reporting on results using

22 Career Bands. Am I correct?

23    A. Correct.

24    Q. And the results that your reference are recorded

25 in Table 4. Are there any disparities in Table 4 that are

LEXITAS

Page 85

1 not significant in your opinion?

2    A.  Well, let's -- let's just be clear on one thing,

3 you know.  When we say statistically significant, you

4 always have to specify a significance level -- and the

5 Court should use a 5 or 1 percent level, but you know, you

6 can define statistically significance at a 47 percent

7 level if you want.

8    Q.  By whom --

9    A.  So if there's a 5 percent level, which I'm

10 getting to, then it would be -- the not not significant

11 5 percent level is the group A1, A2, A3, AA, D2 just on

12 the borderline and E.  Those, by the way are -- except for

13 A3 and AA, those are bands with a lot fewer people.

14    Q.  Thank you.

15        When you identify an individual with a band,

16 is it the band into which you are promoted or the band

17 from which you are promoted?

18    A.  What I'm using here is -- is -- is almost exactly

19 the band from which you were promoted.  I actually -- I'm

20 doing a slight simplification here as the notes explain.

21 It's the -- it's the -- as it says, it's the band at which

22 you were first observed in the data, so which is 2014 if

23 you were already working and later -- later if you got

24 hired subsequent to that.

25        We don't -- I don't track it kind of

Page 86

1 dynamically, but there's almost no cases of people being

2 promoted more than once, so that -- that should be thought

3 of as virtually equivalent to the band you were being

4 promoted from.

5    Q.  And you don't take into account how long anyone

6 is in a band, correct?

7    A.  Correct, for the same reasons I explained

8 earlier.

9    Q.  Right.  Is it a fair summary to say that within

10 each of the bands, you consider only South Asian versus

11 non-South Asian status but no other differentiating

12 factors?

13    A.  That's accurate.  I'm documenting the disparities

14 in this case by Table 4.

15    Q.  And in paragraph 42 your conclusion is that the

16 results are strongly consistent with discrimination?

17    A.  Well, you left out a part, "in higher Career

18 Bands" is what the sentence says.

19    Q.  Oh, right, right.  Exactly.

20    A.  And in the paragraph above I'm a lot more

21 specific about which band.

22    Q.  Okay.  I just want to emphasize that your opinion

23 is consistency, not let's say exclusivity in the sense

24 that you've ruled out alternative explanations?

25    A.  That's correct.  I have not done analyses that

Page 87

1 could rule out alternative explanations because I don't

2 have the data, and as I said before that -- you know, if

3 data are produced or arguments are produced, I assume I'll

4 have a chance to respond to that.

5        My -- my understanding is the way (audio

6 distortion) they are here for these -- applications.

7    Q.  I know you noticed that some of the data you've

8 been provided includes what the company refers to as

9 contract employees, and you've identified who they are in

10 your dataset.

11        Am I correct in believing that you've

12 excluded them from all of your analyses?

13    A.  The only -- the only places they are included is

14 in the assignment of names.  I don't -- because as we

15 discussed earlier -- earlier, I'm using the data on people

16 whose nationality is South Asian as part of my source of

17 South Asian names, and there would be no reason to not --

18 more information, no reason not to use them for that --

19 for that information, but they do not get used anywhere

20 else, I believe.

21    Q.  Let me rephrase then what I asked before.  These

22 contract employees play no part in any of your

23 quantitative analyses?

24    A.  Correct.  There are I believe -- I believe -- I

25 believe every table of quantitative analysis either says

Page 88

1 they're excluded or says -- as noted from the earlier

2 table, which says the same thing.

3    Q.  Okay.  Have you considered the hiring of --

4 sorry, voluntary terminations with Wipro in any fashion?

5    A.  No.

6    Q.  Do you know whether South Asians predominate

7 among voluntary terminations?

8    A.  You mean disproportionately?

9    Q.  Yes.

10    A.  I mean, I'm sure -- I'm sure they predominate

11 because they predominate on employment, but I -- I have

12 not looked -- I have not -- to answer my first question --

13 your first question:  I have not looked at those data, so

14 I don't know more.

15    Q.  And they were never a part of any analysis you

16 performed?

17    A.  No.  I've never -- I've never seen voluntary

18 terminations treated in a discrimination case as an -- as

19 an outcome of interest.  I mean, in the economics

20 literature, we are sometimes -- you know, we sort of -- we

21 recognize the possibility that someone who is made very

22 unhappy at work may voluntarily quit, even though it's not

23 really voluntary, but that's a -- you know, it's a

24 theoretical curiosity.

25    Q.  Have you done any analysis of how Visas impact



Page 89

1  the decision to quit voluntarily?

2  **A. No.**

3  Q. In any study that you've done previously?

4  **A. You mean in any case?**

5  Q. Yeah.

6  **A. So sort of -- do you mean have I studied the**

7  **effect of Visa status separately from -- not necessarily**

8  **along with -- with nationality; is that what you're**

9  **asking?**

10  Q. I'm struggling about the separately from

11  qualification or in combination.  It seems to me it would

12  be relevant as well.

13  **A. Right.  Right.  Right.  I don't -- I didn't**

14  **review all my other -- I didn't review reports for other**

15  **cases to prepare for this depo, I guess, for obvious**

16  **reasons.  I don't think so.**

17  Q. So the methodology, just in a nutshell, in your

18  involuntary discrimination is look at everybody who was

19  there who could have been involuntarily terminated, and

20  then see whether the proportion of termination differs

21  between South Asians and non-South Asian?

22  **A. The proportion of involuntary termination is**

23  **different?**

24  Q. Yes.

25  **A. Yes.**

Page 90

1  Q. Suppose it's the case because of Visa issues,

2  South Asian employees are more motivated to leave before

3  they're terminated involuntarily.

4  **A. You don't have to ask -- answer my question**

5  **because you're the one asking questions, but just -- just**

6  **so I know -- why would that happen just so I can think of**

7  **what you have in mind?**

8  Q. Well, there may be more than one cause.  But

9  suppose these individuals are required to repatriate after

10  a period of time, so they remove themselves from the pool

11  of those who could be involuntarily terminated.

12  **A. I mean, it's -- I say two things.  It's a**

13  **hypothetical.  It's not clear why you'd do that because I**

14  **suppose if I were here and really wanted to be here, I'd**

15  **say, terminate me first, and then -- and then I'll decide**

16  **what to do.**

17  **But also understand there's a -- this may**

18  **not be relevant but, you know, to exactly answer your**

19  **hypothetical, but in terms of analysis, my understanding**

20  **is there's a stipulation that reference to what the**

21  **implication of going back to India is for terminations**

22  **analyses is off the table.**

23  Q. Well, we can argue about that, but what

24  about as -- as a statistical matter or an economic matter.

25  **A. I would state it again --**

Page 91

1  Q. These people are removing themselves from the

2  pool.

3  **A. I mean, you know, I'll -- I'll just be clear.**

4  **I -- I have no reason to believe it's true.  I just --**

5  **just I think it's important for a clear answer about the**

6  **hypothetical.**

7  Q. Uh-huh.

8  **A. But obviously if it was impossible for**

9  **South Asian Visa holders to be involuntarily terminated,**

10  **then I -- I would estimate a lower involuntary termination**

11  **rate for them to be clear.**

12  Q. I was having trouble understanding your answer.

13  Would you say it's impossible -- the question is:  If

14  South Asians are motivated to voluntarily quit or remove

15  themselves from the pool voluntarily because either

16  they're incentivized to get alternative employment or

17  because they are being repatriated or for any reason that

18  disproportionately affected them relative to

19  non-South Asian, that -- but that would bias the

20  conclusions you had reached by only analyzing involuntary

21  terminations.

22  **A. Well --**

23  MR. LOW:  Objection, asked and answered, but

24  go ahead.

25  **A. I mean, you're constructing the hypothetical, and**

Page 92

1  **your hypothetical is that if you're a non-South Asian and**

2  **the company wants to get rid of you, they just**

3  **involuntarily terminate you.  If you're a South Asian,**

4  **they say, we're going to involuntary terminate you, but**

5  **before -- but either they give you a warning or you just**

6  **choose to do before they do, you do something else.**

7  **Sure, then it's biased.  I don't know why**

8  **it's any more likely to be biased in that direction than**

9  **the other direction, and I don't know how plausible the**

10  **whole scenario is anyways.**

11  Q. (BY MR. KING)  What if the hypothetical is true,

12  the bias would only be in one direction, correct?

13  **A. I think -- I think -- I think I've acknowledged**

14  **that, but I think for the purpose of being clear, it's**

15  **important just to say that they don't -- you know, in the**

16  **absence of evidence, the opposite is equally likely.**

17  **Maybe -- maybe there's a lot of South Asians**

18  **to leave first I have no idea.  But obviously, you know,**

19  **if you do something else before you get fired because**

20  **you're told you're going to get fired tomorrow, then**

21  **getting fired is not necessarily the -- you know, the be**

22  **all and end all indicator of the company wanting to get**

23  **rid of you.**

24  Q. Have you done any analyses of Visa holders

25  relative to non-Visa holders in any fashion in this case?



Page 93

1    A.  Not directly except obviously a lot more of the
2  South Asians are Visa holders.
3    Q.  But you didn't separately look at how non-Visa
4  holding South Asians might fair?
5    A.  Correct.
6    Q.  Did you consider whether the potential mobility
7  of South Asians versus non-South Asian in the US may
8  differentially affect the likelihood of obtaining a job if
9  they are on the bench?
10    A.  No, I have no -- I have no data that I'm aware of
11  on -- well, certainly on a potential mobility obviously or
12  actual mobility.  Well, let me see potential -- potential
13  mobility.
14    Q.  Right.  When you look at the specific reasons for
15  termination, it's on Table 7, page 29.
16    A.  Got it.
17    Q.  Would you agree there are three primary reasons
18  for involuntary termination:  Redundancy, chronic
19  nonbillable and poor performance?
20    A.  Well, I mean, I -- I sorted these by order of how
21  many there are, and those -- those are the three biggest.
22  One could argue disciplinary issues at 530 is pretty
23  close, and then there's a pretty big drop off.
24         (Simultaneous speakers.)
25    Q.  Yeah.

Page 94

1    A.  Predominant is a --
2    Q.  -- we can include disciplinary issues.
3    A.  Okay.  All right.
4         THE WITNESS:  Sorry, Sara.
5    A.  Those are the biggest.
6    Q.  (BY MR. KING)  Okay.  Looking at discipline,
7  would you agree that disciplinary problems typically are
8  more prominent among younger employees than older
9  employees?
10    A.  I have no idea.  If they were 16, it wouldn't
11  surprise me, but they're probably not 16.
12    Q.  What about tenure, would you think that
13  disciplinary problems are more common among long-tenured
14  employees rather than short-tenured employees?
15    A.  I mean, I could -- I could invent stories either
16  way, you know, you're young, you want to keep your job.
17  You're old, and you feel protected.  I mean, I'm a tenured
18  professor which is a different definition of the word
19  tenured, so I can really misbehave but that's not the
20  point.
21    Q.  Yeah.
22    A.  But, you know, I'm not aware -- put it this way,
23  I'm not aware of, I think, of any labor economics research
24  where we have data on these kinds of things by which I,
25  mean, some kind of, you know -- you got fired because of

Page 95

1  poor performance, you got fired because of disciplinary
2  issues.
3         We have very little data on people getting
4  fired even without a reason.
5    Q.  What's you understanding of chronic nonbillable?
6    A.  My understanding of chronic nonbillable is from
7  the bench, and I -- I know -- I sort of know what that
8  means aside from documents because my son is a consultant,
9  so I know what on the bench means because -- he's never
10  been there more than a couple of days, but he gets very
11  nervous, but he becomes -- he becomes bill -- fortunately
12  he becomes billable quickly.
13         I don't know -- I don't know if it
14  encompasses anything else, but I don't -- I don't think it
15  is.
16    Q.  Would you disagree that the time you are likely
17  to spend on the bench will increase the more selective you
18  are about accepting subsequent employment?
19    A.  So you have in mind a scenario where I'm on the
20  bench and I get offered assignments and turn them down.
21    Q.  Yes.
22    A.  I mean, by definition of the way you set it up,
23  yes, I have no idea if that happened.  My -- from what I
24  know of -- my kids know their MBA friends, they never turn
25  them down, but maybe, you know, that's -- I don't know

Page 96

1  more.  That's anecdotal I will acknowledge.
2    Q.  Okay.
3    A.  They want to get back to work, and consultants
4  travel all the time.
5    Q.  What's your understanding of redundancy?
6    A.  Well, the English use it the same way we use
7  unemployed.  So I'm always a little confused by that term.
8  But I think that just means we don't really need you, you
9  know, whether work has diminished or whatever.  But I'm
10  not -- it's a label they use.  I don't know exactly what
11  it is in this context.
12    Q.  Do you understand whether redundancy is
13  determined on an individual basis or is it the case that a
14  unit of employment can be discontinued?
15    A.  I would interpret it in general as -- as more
16  likely due to -- well, yeah, I mean, not the immediate.
17  I -- I -- my -- I'm shooting from the hip here because I
18  don't have -- I didn't -- I haven't read anything that
19  sort of explains what these are.
20         But looking at the labels, it doesn't look
21  as much like an independent behavioral kind of category,
22  but I'm only supplying an educated guess to be clear, just
23  because a lot of other ones do sound like that.  That's
24  why I'm saying that.
25    Q.  Look at Table 7.  I just want to understand the



Page 97

1 column heading that says "Percent of involuntarily
2 terminated for a reason."
3    A. The "of" -- the "of" is confusing.  The "of"
4 should -- the "of" shouldn't be there.  Well, it's the
5 percentage -- the tot- -- if you take the percentages,
6 let's say the one -- the fourth column, the one for
7 South Asians --
8    Q. Yeah.
9    A. -- and you add up all those percentages, you will
10 get the overall termination rate.  So this is -- this is
11 the percent involuntarily terminated for a reason -- well,
12 as long as a reason is always recorded.  But you can be
13 involuntarily terminated for one reason, and they should
14 add up in principle to the total involuntary terminations.
15    Q. Right.  The percentages, if I understand it
16 correctly, are the percentage of all those who could have
17 been terminated --
18    A. Right.
19    Q. -- as opposed to the denominator of only those
20 who, in fact, were terminated?
21    A. Correct.  That's why -- that's why down the
22 column it adds up to --
23    Q. Right.
24    A. -- to the overall involuntary termination rate,
25 so the "of" is a little -- it should probably -- because

Page 99

1 Thank you.
2       MR. KING:  I'm finished.  Thank you very
3 much, Dr. Neumark.
4       THE VIDEOGRAPHER:  Shall we conclude?
5       MR. KING:  Yes.
6       THE VIDEOGRAPHER:  Okay.  Going off the
7 record at 1:38.  Thank you, everyone.
8       (Deposition concluded at 1:38 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 98

1 it makes it a little less clear than it could.
2    Q. Okay.
3       MR. KING:  A five-minute break, please.
4       VIDEOGRAPHER:  Going off the record at 1:29.
5       (Recess taken from 1:29 p.m. to 1:37 p.m.)
6       VIDEOGRAPHER:  And we are back on the record
7 at 1:37.  You may proceed.
8       MR. KING:  I'll pass the witness.
9            EXAMINATION
10 BY MR. LOW:
11    Q. Just one question, Dr. Neumark.  You were asked a
12 bunch of questions about what was in your report and what
13 analyses you have done in your report.
14       Is it fair to say that the best source of
15 what you did in your report is to read the report itself?
16    A. I hope so, yes.
17    Q. And if you had any details, it would be reflected
18 in your report?
19    A. Of course.  There's a lot of details.  There's a
20 lot of table notes and, you know, I reviewed it, but I --
21 it's not -- you know, not like you would for a college
22 exam where I can't look anything up.  I always -- I always
23 am clear that -- and I hope everyone agrees that
24 depositions are not memory tests.
25       MR. LOW:  I don't have any other questions.

Page 100

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
2              HOUSTON DIVISION
3 JAMES PHILLIPS, ET AL.    )
          Plaintiffs       )
4                          )
                           )
5 VS.                      )  Civil Action No.
                           )  4:18-cv-00821
6                          )
  WIPRO LIMITED,           )
7       Defendant          )
8
           REPORTER'S CERTIFICATION
9      DEPOSITION OF DAVID NEUMARK, PH.D.
           TAKEN AUGUST 25, 2021
10
11      I, SARA BIELAMOWICZ, Certified Shorthand Reporter
12 and Notary Public in and for the State of Texas, hereby
13 certify to the following:
14      That the witness, DAVID NEUMARK, PH.D., was duly
15 sworn by the officer and that the transcript of the oral
16 deposition is a true record of the testimony given by the
17 witness;
18      That the original deposition was delivered to Mr.
19 Allan G. King;
20      That a copy of this certificate was served on all
21 parties and/or the witness shown herein on
22 _____.
23      I further certify that pursuant to FRCP No.
24 30(f)(i) that the signature of the deponent was not
25 requested by the deponent or a party before the completion

LEXITAS

David Neumark, PH.D.

Page 101

```
 1  of the deposition.
 2       I further certify that I am neither counsel for,
 3  related to, nor employed by any of the parties in the
 4  action in which this proceeding was taken, and further
 5  that I am not financially or otherwise interested in the
 6  outcome of the action.
 7   Subscribed and sworn to on this the 9th day of
 8   September, 2021.
 9
10
11
        SARA BIELAMOWICZ, CSR, RP
12      CSR NO. 4838; Expiration Date: 1-31-23
        Lexitas - Firm Registration No. 95
13      13101 Northwest Freeway, Suite 210
        Houston, Texas 77040
14      281-469-5580
15
16
17
18
19
20
21
22
23
24
25
```

