IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES PHILLIPS, and ROBERT SAEMIAN, | § § § | |
| Plaintiffs | § § | CIVIL ACTION NO. 4:18-CV-00821 |
| v. | § § | |
| WIPRO LIMITED, | § § | |
| Defendant. | § § | |

<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Respectfully submitted,

By: */s/ Kerry E Notestine*

Of Counsel:

J. Bradley Spalding
Texas Bar No. 00786253
Federal I.D. No. 21169
bspalding@littler.com
Nehal S. Anand
Texas Bar No. 24070600
Federal I.D. No. 1061200
nanand@littler.com
LITTLER MENDELSON, P.C.
1301 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 951-9400
Facsimile: (713) 951-9212

Kerry E. Notestine (Attorney-in-Charge)
Texas Bar No. 15116950
Federal I.D. No. 2423
knotestine@littler.com
LITTLER MENDELSON, P.C.
1301 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 951-9400
Facsimile: (713) 951-9212

ATTORNEYS FOR DEFENDANT
WIPRO LIMITED

## TABLE OF CONTENTS

PAGE

I. SUMMARY OF ARGUMENT.................................................................................1

II. STATEMENT OF FACTS..................................................................................2

    A. Wipro Background.................................................................................2

    B. Phillips's Employment.........................................................................2

        1. *Phillips's Work for Wipro on the Dish Network Project.*...........2

        2. *Phillips Failed to Find Another Position while on the Bench*.................4

        3. *Phillips Applied for Rehire*.................................................5

    C. Saemian's Employment.........................................................................5

    D. Phillips and Saemian File this Lawsuit.................................................8

III. STANDARD OF REVIEW.................................................................................9

IV. ARGUMENT & AUTHORITIES..........................................................................9

    A. The Plaintiffs' Claims and Required Proof.........................................9

    B. Wipro is Entitled to Summary Judgment on Phillips and Saemian's Individual Claims................................................................10

        1. *Phillips's Failure to Hire Claim Fails as a Matter of Law*.................10

        2. *The Plaintiffs' Failure to Promote Claims Fail as a Matter of Law*........14

        3. *The Plaintiffs' Termination Claims Fail as a Matter of Law*.................16

    C. The Plaintiffs' Disparate Impact Claims Should be Dismissed.........................20

        1. *The Plaintiffs Failed to Exhaust the Administrative Prerequisites to their Disparate Impact Claim.*.................20

        2. *A Disparate Impact Plaintiff Must Identify with Specificity a Facially Neutral Policy that Caused the Alleged Disparate Impact.*........23

V. CONCLUSION.................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anaya v. Hous. Indep. Sch. Dist.*,
No. CV H-14-2065, 2016 WL 1060350 (S.D. Tex. Feb. 23, 2016).......................................23

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ......................................................................................................................9

*Auguster v. Vermillion Parish Sch. Bd.*,
249 F.3d 400 (5th Cir. 2001) ....................................................................................................18

*Brooks v. Firestone Polymers, LLC*,
70 F. Supp. 3d 816 (E.D. Tex. 2014) .......................................................................................15

*Brown v. Wyndham Hotel Mgmt. Inc.*,
No. CV H-16-00015, 2016 WL 2595073 (S.D. Tex. May 5, 2016) ......................................23

*Bryant v. Compass Grp. USA Inc.*,
413 F.3d 471 (5th Cir. 2005) ....................................................................................................19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ......................................................................................................................9

*EEOC v. Texas Instruments, Inc.*,
100 F.3d 1173 (5th Cir. 1996) ..................................................................................................19

*Eugene v. Rumsfeld*,
168 F. Supp. 2d 655 (S.D. Tex. 2001)......................................................................................14

*Eyob v. Mitsubishi Caterpillar Forklift Am., Inc.*,
745 F. App'x 209 (5th Cir. 2018) (per curiam) ......................................................................18

*Fonteneaux v. Shell Oil Co.*,
289 F. App'x 695 (5th Cir. 2008) (per curiam) ......................................................................11

*Gordon v. Peters*,
489 F. Supp. 2d 729 (S.D. Tex. 2007).......................................................................................22

*Griggs v. Duke Power Co.*,
401 U.S. 424 (1971) ....................................................................................................................20

*Hamilton v. Starcon Int'l, Inc.*,
No. 08-CV-2815, 2009 WL 10715033 (S.D. Tex. May 12, 2009).......................................12

# TABLE OF AUTHORITIES
(CONTINUED)

*Hernandez v. Metro. Transit Auth. of Harris Cnty.*,
   673 F. App'x 414 (5th Cir. 2016) (per curiam) ................................................. 19

*Hinds v. Baker Hughes, Inc*,
   2007 WL 9710942 (W.D. Tex. 2007) .............................................................. 20

*Hypolite v. City of Houston*,
   493 F. App'x 597 (5th Cir. 2012) (per curiam) ................................................. 13

*Ihsan v. Weatherford U.S., LP*,
   No. H-17-2546, 2019 WL 2191141 (S.D. Tex. May 21, 2019).......................... 18

*Jones v. Bernanke*,
   557 F.3d 670 (D.C. Cir. 2009) ....................................................................... 11

*Koehler v. Infosys Techs. Ltd. Inc.*,
   107 F. Supp. 3d 940 (E.D. Wis. 2015) ............................................................ 25

*LaPierre v. Benson Nissan, Inc.*,
   86 F.3d 444 (5th Cir. 1996) .......................................................................... 16

*Munoz v. Orr*,
   200 F.3d 291 (5th Cir. 2000) ..................................................................... 10, 24

*Norman v. S. Hens, Inc.*,
   No. 2:12-CV-106-KS-MTP, 2013 WL 2251745 (S.D. Miss. May 22, 2013) ......... 26

*Pacheco v. Mineta*,
   448 F.3d 783 (5th Cir. 2006) ..................................................................... 22, 24

*Palmer v. Cognizant Tech. Sols. Corp.*,
   2019 WL 6354362 (C.D. Cal. Aug. 9, 2019)..................................................... 25

*Patrick v. Principi*,
   275 F.3d 44 (5th Cir. 2001) (per curiam) ......................................................... 13

*Pegram v. Honeywell, Inc.*,
   361 F.3d 272 (5th Cir. 2004) ..................................................................... 10, 11

*Richardson v. Porter Hedges, LLC*,
   22 F. Supp. 3d 661 (S.D. Tex. 2014).......................................................... 22, 23

*Smith v. City of Jackson*,
   544 U.S. 228 (2005) ..................................................................................... 23

# TABLE OF AUTHORITIES

(CONTINUED)

PAGE

*Stewart v. Houston Lighting & Power Co.*,
  998 F. Supp. 746 (S.D. Tex. 1998) ....................................................................13

*Stout v. Baxter Healthcare Corp.*,
  282 F.3d 856 (5th Cir. 2002) ............................................................................23

*Teamsters v. United States*,
  431 U.S. 324 (1977) ............................................................................................9

*Walker v. Accenture PLC*,
  511 F. Supp. 3d 169 (D. Conn. 2020) ...............................................................25

*Walther v. Lone Star Gas Co.*,
  977 F.2d 161 (5th Cir. 1992) ............................................................................19

*Whitfield v. Wood Grp. PSN, Inc.*,
  No. CV 17-17450, 2019 WL 4213412 (E.D. La. Sept. 5, 2019) .........................12

*Wojciechowski v. Nat'l Oilwell Varco, L.P.*,
  763 F. Supp. 2d 832 (S.D. Tex. 2011)...............................................................15

*Wright v. Admin. Rev. Bd., United States Dep't of Lab.*,
  836 F. App'x 248 (5th Cir. 2020) ........................................................................7

**Statutes**

28 U.S.C. 1658....................................................................................................11

42 U.S.C. § 2000e-2(k) .......................................................................................20

Civil Rights Act of 1866, 42 U.S.C. §1981................................. 1, 10, 11, 12, 14, 16, 20

Title VII of the Civil Rights Act of 1964 ............................................. 1, 2, 10, 12, 13, 14, 16, 20

The defendant, Wipro Limited (Wipro), moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on the claims made by the plaintiffs, James Phillips and Robert Saemian.  Wipro is seeking complete summary judgment on all claims.

I.     SUMMARY OF ARGUMENT

The plaintiffs assert claims for disparate treatment in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981, and disparate treatment and disparate impact in violation of Title VII of the Civil Rights Act of 1964. *Amended Complaint (Dkt. 137) at pp. 17–19.*  The crux of their claims is that Wipro favored Indian/South Asian workers at the expense of themselves and other non-South Asians. *See id. at pp. 1–2.*  Phillips and Saemian both identify as American and white. *Id. at 2; Ex. A, Deposition of Robert Saemian at 46:13-20.*[1]  Phillips alleges Wipro failed to promote him, did not refer him for certain positions after his initial assignment ended, and terminated him, all because he is not Indian/South Asian. *Amended Complaint (Dkt. 137) at pp. 8–11.*  Saemian alleges Wipro failed to promote him and terminated him for the same reasons. *Id. at pp. 11–15.*

Wipro is entitled to summary judgment on Phillips's claims.  The statute of limitations under §1981 and the procedural prerequisites to bringing suit under Title VII bar the majority of Phillips's claims.   Phillips specifically disclaims any unlawful discrimination during his employment both in his EEOC charge and in his Original Complaint.  Therefore, he waived his Title VII promotion, referral, and termination claims because he failed to exhaust the procedural prerequisites.  Moreover, because Phillips did not plead these claims until 2020, and they do not relate back to his Original Complaint, which alleged only post-employment wrongs, both his

---

[1] Deposition references are to page then to line number.  References to numeric exhibits are to documents made exhibits at the Plaintiffs' depositions.

§1981 and Title VII claims are time-barred.  Wipro also is entitled to summary judgment on the merits of his claims.

Wipro also is entitled to summary judgment on Saemian's claims.  The procedural prerequisites under Title VII bar Saemian's promotion claim.  In addition, Saemian could not receive a promotion under the terms of Wipro's promotion policy because Wipro discharged him before his promotion could have occurred.  Furthermore, Saemian's poor performance justified not awarding him a promotion and terminating him, and he is unable to demonstrate that his race or national origin motivated Wipro's decisions.

With respect to the plaintiffs' Title VII disparate impact claims, the plaintiffs' claims are untimely, and they fail to identify a facially neutral practice which adversely affected them.  Accordingly, summary judgment is warranted on all the plaintiffs' claims.

II.   STATEMENT OF FACTS

A.   Wipro Background

Wipro Limited is a global information technology (IT), consulting, and business process services company founded in India with its corporate office in Bangalore. *See* Wipro Limited., 2020-21 *Annual Report* (2021), available at Wipro.com.  Wipro employees frequently work on teams that partner with their clients' in-house IT staff.  Wipro bills its clients for these services and refers to the work performed directly on behalf of these clients as "billable work." *Ex. B, Deposition of James Phillips at 150:10-24; Saemian Dep. at 19:10-20.*

B.   Phillips's Employment

1.   *Phillips's Work for Wipro on the Dish Network Project.*

Wipro hired Phillips to work on a project for client Dish Network (Dish) in Denver, in June 2013. *Phillips Dep. at 18:21–25; 99:5–8; Ex. 33.*  Phillips is a software engineer who specialized in application (app) development for the Android platform. *Phillips Dep. at 47:2–9; Ex. 33.*  At

Dish, he designed Android apps for field sales and fleet support. *Ex. 33; Ex. C, Kishore Nekkalapudi Decl. at ¶4.* Phillips's role on the project was to execute the architecture or design phase of the app, with December 31, 2013, being the expected end-date of his assignment. *Nekkalapudi Decl. at ¶6; Dispatched Contractor Service Order attached as Exhibit A to Nekkalapudi Decl.*

As 2013 was drawing to a close, Phillips's work on the design phase of the Dish project was ending, and Wipro management notified him that he should seek assignment to another billable position to remain employed. *Phillips Dep. at 166:13-23; 192:5-7, 194:23-195:17.* Wipro provided Phillips several leads on available positions. On December 17, 2013, Phillips received an email from Smita Baruah, Lead Talent Acquisition at Wipro, inquiring about his availability for a position as an on-site technical lead in Boca Raton, Florida. *Ex. 39 (email from S. Baruah dated Dec. 17, 2013); Phillips Dep. at 190:12-194:7.* In January 2014, Phillips received notice of an opportunity to work on a project for Apple, Inc. *Ex. 40; Phillips Dep. at 194:19-25; 195:1-17.* Neither of these opportunities led to billable work for Phillips because he was not qualified for the positions, as he admitted in his deposition. *Phillips Dep. at 192:8-25; 194:1-7; 195:11-25; 196-199:1-10.*

Phillips's limited term engagement on the Dish project ended later than expected, in March 2014, relegating him to "benched" status. *Nekkalapudi Decl. at ¶¶9-10; Phillips Dep. at 201:3–17.* Benched employees perform no work but receive full pay and benefits while searching for another billable assignment. *Nekkalapudi Decl. at ¶10; Phillips Dep. at 221:11–15.* Wipro generally benches employees for four weeks and terminates benched employees who are unable to find billable work within the allotted time-period. *Ex. D, Plaintiff James Phillips' Second Suppl. Resp. and Obj. to Def. Wipro Limited's First Set of Interrogs., Response to Interrogatory No. 9; Nekkalapudi Decl. at ¶10.*

3

Wipro did not replace Phillips on the Dish project when he completed his design work. *Nekkalapudi Decl. at* ¶11. Rather, Wipro assigned Shankar Kumarasamy to work on the Dish project several months before Phillips finished his work on the app design. Kumarasamy's role was to develop the applications based on the proofs of concept designed by Phillips. *Nekkalapudi Decl. at* ¶ 11. Kumarasamy physically moved to the client site to continue the development of the Android applications, with software developer Praveen Kumar Katta, shortly before the end of Phillips's assignment. *Nekkalapudi Decl. at* ¶11. Notwithstanding Phillips's contention, Wipro did not hire Kumarasamy to replace Phillips, because he was assigned to that project well before Phillips's contract ended and did not perform the same work as Phillips on the Dish project. *Nekkalapudi Decl. at* ¶11. In any event, Phillips has waived any claims that accrued during his employment.

2.    *Phillips Failed to Find Another Position while on the Bench*

On May 9, 2014, after being on the bench more than two months, Wipro sent Phillips an email reminding him he could not remain on the bench indefinitely. *Ex. 46.* The email further stated that if Phillips did not find a billable position in the next two weeks, Wipro would terminate his employment as of May 23, 2014. *Id.* After Phillips objected that the time he spent pursuing Wipro projects that did not materialize had prevented him from finding other opportunities, Wipro extended Phillips's employment an additional four weeks until June 20, 2014. *Ex. 52.* Ultimately, Phillips was unable to locate any billable project during that extended timeframe, and Wipro terminated him effective June 20, 2014.[2] *Ex. 54.*

---

[2] Because Wipro terminated Phillips on June 20, 2014, we will refer to his inability to obtain subsequent employment with Wipro as his "rehire" claim. We will reference his claim that Wipro should have found him a position while he was benched as his "referral" claim.

4

3.      *Phillips Applied for Rehire*

Phillips recalls that on July 16, 2014, after his termination, a third-party recruiter contacted him for two positions with Wipro—an Android application development role in Hillsboro, Oregon and a Datacom testing role in San Jose. *Ex. 55 (email to J. Phillips dated July 16, 2014)*.  Phillips requested consideration for the Hillsboro job but concedes he did not meet all qualifications for either position. *Phillips Dep. at 247:5–250:21 (no expertise on "remote services and local services" for Hillsboro and "L3 protocol" for San Jose)*.  Another third-party recruiter contacted him for the same Hillsboro Android application development position in August 2014, for which he also was unsuited, because the client was "looking for a very specific person." *Ex. 59 (email to J. Phillips dated Aug. 20, 2014); Phillips Dep. at 256:3–257:13*.

In August, multiple third-party recruiters contacted him regarding an Android architect position in Mounds View, Minnesota. *Ex. 56 (email to J. Phillips dated Aug. 18, 2014); Ex. 58 (email to J. Phillips dated Aug. 18, 2014); Ex. 62 (email to J. Phillips dated Aug. 28, 2014)*.  Phillips lacked the qualifications for this position as well because the client was looking for a "specialist" and a virtual "needle in a haystack." *Phillips Dep. at 252:17–253:24*.  Nevertheless, Phillips interviewed for the job and Wipro <u>and</u> its client determined that he did not have the necessary skills for the role. *Ex. 65 (Sept. 12, 2014 email from R. Kamat)*.  Phillips ultimately found work for a different employer (Davita). *Ex. 33*.

C.      <u>Saemian's Employment</u>

Wipro hired Saemian, in May 2014, as an Enterprise Asset Manager (EAM) Practice Lead for the Americas in the Energy Division of Wipro's Energy, Natural Resources and Utilities (ENU) business unit. *Saemian Dep. at 17:1–7; 25:18–20*.  The ENU's EAM Americas practice at that time was nascent, with a team of only three, and Saemian's task was to develop, lead, and expand this practice. *Saemian Dep. at 16:13-20*.  Global EAM Practice Lead Richard Prime, with approval

from Prime's supervisor, Stuart Deignan, hired Saemian. *Saemian Dep. at 17:1–7; 31:11–13.*
Prime and Deignan are white and based in the United Kingdom (Prime in Scotland and Deignan
in England). *Ex. E, Richard Prime Decl. at ¶3.*  Although Saemian lived in Orlando when he
applied and Wipro hired him, he understood the position was located in Houston. *Saemian Dep.
at 59:13–60:7.*  He agreed to relocate to Houston and received a $10,000 relocation bonus to cover
the expense of the move. *Prime Decl. at ¶4.*

Saemian's position was a blended role, working 50% on business development and 50%
on billable projects. *Prime Decl. at ¶4; Saemian Dep. at 74:25–77:3; Exs. 3, 8.*  Prime instructed
Saemian that his revenue target was $2 million to $3 million in his first year of employment. *Prime
Decl. at ¶4; Saemian Dep. at 24:7–11.*  As the year unfolded, however, Saemian achieved minimal
success finding billable work or converting business development leads into revenue; nevertheless,
he enjoyed the use of his expense account to the tune of $70,000. *Prime Decl. at ¶15; Saemian
Dep. at 81:1-82:3; Ex. 8.*

Saemian's failure to hit his revenue or billing targets, while egregious, were not his only
shortfalls.  During his 13 months of employment, Saemian failed to integrate the three existing
members of the Energy Division team or any new employees he hired into a unified team that met
the Company's expectations. *Prime Decl. at ¶¶5, 6, 8.*  Despite Prime's clear and repeated
instructions to Saemian that his direct reports should be working on billable projects, Saemian led
his new employees to believe they were responsible primarily for business development, which
left them confused about their roles. *Prime Decl. at ¶6; Exs. 3, 7, 8.*  Because Saemian was not
performing the billable work his job required, the Human Resources Department gave him a
written warning in December 2014. *Saemian Dep. at 177:8–16; Ex. 12.*  It informed him that if
he could not find a billable project within 30 days, Wipro would terminate his employment. *Id.*
Prime urged Wipro management to keep Saemian despite his lack of billable work, and Wipro did

not terminate Saemian after his 30-day probation, although he had yet to find a billable project, because of Prime's advocacy. *Prime Decl. at ¶7.*

Saemian ultimately exhausted even Prime's patience.  By the spring of 2015, nearly a year after beginning his employment, Saemian still had not moved to Houston (adding to an expense account that was bursting at the seams), had not converted his pipeline of potential customers into actual sales, was still not performing sufficient billable work, and failed to integrate his team into a cohesive unit. *Prime Decl. at ¶8.*  As a result, his new hires emulated his performance and failed to find billable work as well. *Id.; Ex. 13.*  Prime completed a performance appraisal of Saemian in Spring 2015. *Prime Decl. at ¶9; Ex. 21; Saemian Dep. at 231:9–13.*  Prime issued Saemian a "Highly Valued Contribution" (HVC) rating, an average rating in the Wipro performance appraisal system. *Id.*  Prime chose not to rate Saemian below-average despite his performance issues because Human Resources would have placed Saemian on a formal performance improvement plan with a specific deadline for Prime to wring some improvement and progress from Saemian. *Prime Decl. at ¶9.*

Promotion was not a serious consideration for Saemian because his employment was hanging by a thread. *Prime Decl. at ¶10.*  Prime's reluctance to act on Saemian's poor performance in early 2015 was criticized by Prime's supervisor, Deignan, who pressured Prime to push Saemian harder to improve.[3] *Prime Decl. at ¶11.*  Deignan was displeased with Saemian's performance, which reflected poorly on Prime. *Id.*  In late April 2015, Prime responded by emailing Saemian regarding his poor cost management and included a list of action items that required improvement. *Prime Decl. at ¶12; Ex. 14.*  Saemian failed to improve in any of these respects.  He still had originated only $154,000 in sales, but incurred $70,000 in expenses, much of it reflecting travel

---

[3] *Wright v. Admin. Rev. Bd., United States Dep't of Lab.*, 836 F. App'x 248, 254 (5th Cir. 2020) (admitting statements by third parties not offered to prove the truth of their content but to demonstrate the basis for the recommendation to terminate plaintiff).

between his home in Orlando and the office in Houston. *Prime Decl. at ¶15.* In addition, Wipro was receiving little or no return on his annual salary of $165,000, and the four employees he hired were similarly unproductive. To top things off, the Utilities sales team complained to Prime about Saemian's hostility and attitude. *Prime Decl. at ¶13; Ex. 16.*

On June 15, 2015, Prime met with Saemian in Houston and sharply reprimanded him. *Prime Decl. at ¶14; Ex. 17.* Prime instructed Saemian that, by the end of June, Saemian was to present a plan to achieve $3 million in revenue and 80% billable time for his team in the coming year and requested weekly reports of the team's progress; or else Saemian would be fired. *Id.; Saemian Dep. at 211:16-24.* By July 1, 2015, Saemian—despite being told to deliver or be dismissed—failed to develop the required plan or make the weekly reports. *Prime Decl. at ¶15.* At that point, Prime, with the support of Deignan, decided to terminate Saemian.[4] *Prime Decl. at ¶16.; Ex. 17.* Saemian was informed of his termination on July 2, 2015.[5] *Id.* Three days after Prime and Deignan terminated Saemian, Wipro offered him a new position on the Maximo team, but Saemian rejected it. *Saemian Dep. at 113:12-119:22.*

D.     Phillips and Saemian File this Lawsuit

Phillips and Saemian filed this lawsuit on December 1, 2017, in the United States District Court for the Northern District of California. *Original Complaint (Dkt.1).* Wipro moved to transfer this case to the Southern District of Texas where Saemian worked at the time of his termination. The California district judge granted this motion on March 14, 2018. *Dkt. 25.* On March 13, 2020, the plaintiffs filed their Amended Complaint. *Dkt. 137.* This case has been pending for more than three years and the parties have had ample time to engage in discovery including depositions,

---

[4] Although Saemian had sold his house in Orlando and moved to Houston, this unfortunate timing resulted because Saemian took more than a year to make the move. *Saemian Dep. at 59:13–60:7.*
[5] Saemian still lives in Houston and is working in what he describes as a "better job," earning more than he did at Wipro, and is "much happier." *Saemian Dep. at 289:17-290:13.*

interrogatories and document production.  The factual record is sufficiently developed for the Court to consider this motion.

III.     STANDARD OF REVIEW

The standard of review on a motion for summary judgment is well known to this Court. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

IV.     ARGUMENT & AUTHORITIES

A.     The Plaintiffs' Claims and Required Proof

The alleged scheme that is the cornerstone of the plaintiffs' complaint centers around the Company's claimed preference for Indian/South Asian employees eligible to work in the United States.  The plaintiffs allege Wipro obtained visas for these individuals in order to hire, promote, and retain them in place of white American applicants and employees.  The plaintiffs allege this visa scheme implements a pattern or practice of discrimination in violation of §1981 and Title VII.

The burden shifting framework appropriate to a pattern or practice claim, once proof of the pattern or practice is made, is explained in *Teamsters v. United States*, 431 U.S. 324, 362 n.50 (1977):

> The proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy.  The Government need only show that an alleged individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proved discrimination.  As in *Franks*, the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons.

*Id*. at 362 (citations omitted).  For purposes of this motion only, Wipro assumes that the plaintiffs can establish that Wipro engages in a pattern or practice of discrimination, which provides a presumption to the plaintiffs that Wipro's alleged adverse actions were motivated by intentional discrimination.  Despite this presumption, Wipro is entitled to summary judgment on the

9

discrimination claims of both plaintiffs for reasons unrelated to this ostensible pattern or practice. *See Munoz v. Orr*, 200 F.3d 291, 307 (5th Cir. 2000) (affirming lower court's grant of summary judgment in a pattern or practice class action).

A plaintiff claiming disparate impact under Title VII, on the other hand, must identify one or more specific, facially neutral practices that caused a statistically significant adverse impact against their protected group. However, the plaintiffs were not adversely affected by any neutral policy. Instead, it was only limited job skills in the case of Phillips and poor performance in the case of Saemian which impacted their employment with Wipro. The plaintiffs point to an alleged visa scheme as the facially neutral practice for their disparate impact claim, but this alleged scheme is a claim of *intentional* discrimination and not a neutral employment practice that is fair in form but which adversely affected the protected group. Further, no alleged visa scheme can be responsible for the skills Phillips lacked or the revenue Saemian never originated. Thus, plaintiffs cannot prove they were adversely affected by any neutral policy they allege.

Accordingly, Wipro is entitled to summary judgment on the plaintiffs' disparate treatment and disparate impact claims for the reasons stated in detail below. Because class representatives must be members of the class they purport to represent, dismissing the plaintiffs' individual claims results in the dismissal of the putative class action as well.

B.    Wipro is Entitled to Summary Judgment on Phillips and Saemian's Individual Claims

   1.    *Phillips's Failure to Hire Claim Fails as a Matter of Law*

Saemian does not make a failure to hire claim. Phillips's failure-to-hire claims under §1981 are barred by the applicable statute of limitations. The Fifth Circuit applies a two-year statute of limitations to §1981 claims that were actionable prior to the Civil Rights Act of 1991, which amended §1981. Failure to hire claims were actionable under §1981 prior to the 1991 Civil Rights Act. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 278 (5th Cir. 2004) (citing *Byers v. Dallas Morning*

*News*, 209 F.3d 419, 424 (5th Cir. 2000)); *see also Fonteneaux v. Shell Oil Co.*, 289 F. App'x 695, 698–99 (5th Cir. 2008) (per curiam) (applying two-year statute of limitations to conduct that was actionable prior to the 1991 amendments to Section 1981).

Wipro employed Phillips from June 17, 2013 until June 20, 2014. *Ex. 66 (Phillips Charge) ¶8; Dkt. 137 ¶¶24, 27.*  Phillips claims that he applied for several positions after his employment ended, his last application being rejected in September 2014. *Ex. 66 (Phillips Charge) at ¶¶10– 14; Dkt. 137 ¶¶28–31.*  Phillips filed this lawsuit on December 1, 2017.  Because Phillips's failure to hire and rehire claims under §1981 pre-date December 1, 2015, the earliest date in the actionable period, his hiring claims under §1981 are barred by the two-year statute of limitations. *See Pegram*, 361 F.3d at 278.

Despite repeatedly disclaiming his intention to contest Wipro's decisions during the course of his employment, Phillips's amended complaint now alleges Wipro failed to find him a suitable position while he was benched. *Dkt. 137 at pp. 9-11.*  Whether this is deemed an additional "failure to hire" claim or a new cause of action, it is barred by limitations.  Because these events occurred before Phillips's formal termination, they accrued prior to June 20, 2014.  If these are considered hiring claims, they are barred by the two-year statute.  If they are not hiring claims, they are barred by §1981's four-year statute because they were not pleaded until March 13, 2020.[6]

---

[6] Phillips's claims related to his employment are untimely even if a four-year limitations period applies under §1981 because they were specifically disclaimed in his Original Complaint. *See 28 U.S.C. 1658* (prescribing a 4-year limitations period for civil actions arising under Acts of Congress Enacted after [December 1, 1990] which would include claims cognizable under the Civil Rights Act of 1991).  Phillips for the first time alleges, in his Amended Complaint filed March 13, 2020, that he suffered discrimination *during* his employment with Wipro.  However, that allegation was made more than four years after his employment ended, on June 20, 2014.  In addition, these newly-pleaded allegations do not relate back to the date of the Original Complaint (December 1, 2017).  To relate back, a new claim must arise from the same conduct, transaction, or occurrence set out in the original pleading. FRCP 15(c)(1)(B); *Jones v. Bernanke*, 557 F.3d 670, 674-75 (D.C. Cir. 2009) (when amended discrimination claims differed from original claims in time and type, they do not relate back).  Phillips specifically disclaims in his Original Complaint all acts of discrimination occurring during his employment. *See Dkt. 1, ¶¶55, 60, and 65.*  Thus,

11

Title VII requires a plaintiff to exhaust administrative remedies before bringing suit, by filing a charge of discrimination with the EEOC stating the grounds for his complaint. But Phillips expressly excluded from his EEOC charge all claims that accrued during his employment with Wipro.  Specifically, Phillips's charge specifically and affirmatively states:

> Mr. Phillips asserts failure to hire claims herein, but does not assert legal claims with respect to the period he was employed by the Respondents.

*Ex. 66 (Phillips Charge) at ¶8.* [7]  Thus, an investigation into those claims could not reasonably have grown from Phillips's charge. *See Hamilton v. Starcon Int'l, Inc.*, No. 08-CV-2815, 2009 WL 10715033, at *4 (S.D. Tex. May 12, 2009) (finding plaintiff failed to exhaust a failure-to-hire claim when his EEOC charge discussed only the circumstances surrounding his termination and did not discuss the hiring process); *see also Whitfield v. Wood Grp. PSN, Inc.*, No. CV 17-17450, 2019 WL 4213412, at *9–10 (E.D. La. Sept. 5, 2019) (dismissing failure-to-hire claim that was not raised in plaintiff's EEOC charge).  The time-period for alleged discrimination is referenced as only July 2014 to September 2014. *Ex. 66 (Phillips Charge) at p. 1.*

Moreover, the plaintiffs' Original Complaint asserts Phillips is making a claim for discrimination only regarding acts occurring after his employment ended. *See Dkt. 1, ¶¶55, 60, and 65.*  The plaintiffs omitted these paragraphs from their amended complaint but do not specifically assert that Phillips now alleges discrimination during his employment, which would be contrary to his charge and original complaint.[8] *See Dkt. 137, ¶¶56-69.*  Finally, if Phillips's own charge and pleadings were not enough to dispose of this issue, Phillips <u>confirmed in his</u>

---

Phillips's pre-termination claims under §1981 are all untimely under either §1981's two- or four-year statute of limitations.

[7] Because Phillips's charge excludes actions during his employment, his "failure to hire" claim must pertain to Wipro's failure to rehire him after his employment terminated on June 20, 2014.

[8] For these same reasons, Phillips's recent "referral," promotion, and termination claims do not relate back to his original complaint under Rule 15(c) because they do not arise from the same facts alleged in his original complaint.

deposition that he does not assert any claim of unlawful discrimination related to the time he was employed by Wipro. *Phillips Dep. at 275:7-20.* As a result, the only hiring claim this Court needs to address is Phillips's post-termination hiring claims under Title VII. The statute of limitation and procedural prerequisite issues referenced above bar his pre-termination claims, including those regarding his benching and subsequent failure to find a position while on the bench.[9]

Regarding his post-termination "failure to rehire" claim, Phillips alleges that two third-party recruiters contacted him for an Android application development position in Hillsboro, Oregon. Phillips admitted that he did not meet the qualifications for this position that he was not a fit for this position because "they're looking for a very specific person." *See Section III(B)(3) above; Phillips Dep. at 247:18–250:21; 256:3–357:13, Exs. 55, 59.* He also alleges that multiple third-party recruiters contacted Phillips regarding an Android architect position in Mounds View, Minnesota. Phillips admitted at his deposition that he lacked the qualifications for this position, again reiterating that the client was looking for a "specialist" and "a needle in a haystack." Phillips interviewed for the job and Wipro <u>and</u> its client determined that he did not have the necessary skills for the role. *See Section II(B)(3) above; Phillips Dep. at 252:17–253:24; Exs. 56, 58, 62, 65.*

Based on Phillips's own testimony, he was not qualified for these positions. His lack of qualifications is a legitimate, non-discriminatory reason for Wipro to reject him for these positions. *See, e.g.*, *Hypolite v. City of Houston*, 493 F. App'x 597, 604 (5th Cir. 2012) (per curiam) (finding legitimate, non-discriminatory reason not to select candidates when employer provided evidence plaintiffs were not qualified for the positions for which they applied); *Patrick v. Principi*, 275 F.3d 44, at *6 (5th Cir. 2001) (per curiam) (finding employer's reasoning that plaintiff was not qualified for a position to be legitimate and non-retaliatory); *Stewart v. Houston Lighting & Power Co.*, 998

---

[9] To the extent that the Court would not dismiss any pre-termination claims for failure to locate an alternative position, Phillips admitted he was not qualified for the positions identified for him. *See pp. 3-5 above.*

F. Supp. 746, 752–53 (S.D. Tex. 1998) (finding plaintiff's lack of qualification for position to be legitimate, non-discriminatory explanation as a matter of law).  As a result, Phillips's admission that he was unqualified for the positions entitles Wipro to summary judgment on his individual disparate treatment hiring claims under §1981 and Title VII.

>    2.    *The Plaintiffs' Failure to Promote Claims Fail as a Matter of Law*

As referenced above, Phillips disclaimed unlawful discrimination during his employment in his EEOC charge and his Original Complaint.  Therefore, Phillips's newly asserted promotion claim in his Amended Complaint (filed on March 13, 2020), based on events during his employment, is barred by limitations under §1981, and his Title VII claim regarding a promotion is precluded because he failed to file a timely charge of discrimination with the EEOC. Furthermore, this claim does not relate back to his Original Complaint because he expressly waived this claim in that filing.[10] *Dkt. 1 ¶¶60, 65; Dkt. 137 ¶¶24, 35; Ex. 66.*  Even assuming for the purposes of argument only that the Court would consider the merits of a promotion claim for Phillips, he did not qualify for a promotion under Wipro's applicable promotion policy.  That policy requires at least a "highly valued contributor" (HVC) rating and Phillips received a "more contribution expected" rating which disqualified him from receiving a promotion.  In addition, he was terminated on June 20, 2014, which meant he could not be awarded a promotion that only is effective in October.  *Ex. 38 (Phillips Performance Evaluation); see also Ex. F, Promotions policy v. 1.3.*

Similarly, Saemian does not have a viable promotion claim.  Saemian makes no mention in his EEOC charge of discrimination that Wipro allegedly failed to promote him because of his race or nationality.  This omission means that his Title VII allegation of a discriminatory failure to promote has not been administratively exhausted.  *See Eugene v. Rumsfeld*, 168 F. Supp. 2d 655,

---

[10] *See notes 6-8 and associated text, above.*

673 (S.D. Tex. 2001) (dismissing failure to promote and failure to rehire claims because plaintiff did not raise them in a formal complaint of discrimination and they "would not have fallen within the scope of a reasonable investigation into her previously asserted claims."); *Brooks v. Firestone Polymers, LLC*, 70 F. Supp. 3d 816, 842 (E.D. Tex. 2014) (dismissing failure to promote claim when plaintiff failed to mention or even allude to it in his EEOC charge).

Even though his failure to promote claim potentially is within §1981's four-year statute, it fails on the merits, as a matter of law.  Wipro's promotions policy requires an employee to work for Wipro for 12 months before being eligible for promotion. *Ex. 22 §5.*  Importantly, Wipro awards promotions to eligible employees in the plaintiffs' grades no earlier than December following the employee's one-year anniversary.[11]  *Ex. 22 §3; Ex. H, Deposition of Tarika Mitchelson at 20:18-24;23:15-25;24:1-5.*  But Saemian was terminated prior to December 2015, the earliest date on which he could have been promoted.[12]  This renders moot the question of whether he should have been recommended for a promotion he was ineligible to receive.  Furthermore, by the time of his one-year anniversary, Saemian was performing so poorly that his continued employment was at risk, and any expectation of a promotion was fanciful. *Prime Decl. at ¶¶5-8, 12-15; Ex. 14 (April 30, 2015 email setting forth expectations for Saemian to improve his performance).*[13]  Furthermore, Saemian asserts that the position to which he was denied a

---

[11] The prior version of the promotions policy applied to promotions during Phillips's employment and had an October date for promotion awards. *Ex. F, Promotions policy v. 1.3.*  Under the next version of the promotions policy, the company finalized promotions in December for individuals are nominated for promotion earlier in the year.  *Ex. 22; Mitchelson Dep. at 25:19-25; 26:1-9.*  Phillips was a grade C1 as indicated in his employment agreement. *Ex. 36, p. 2.*  Saemian was grade C2 as indicated in his employment agreement. *Ex. G. Saemian's Employment Agreement.*
[12] Saemian was terminated on July 2, 2015. *Prime Decl. at ¶20; Ex. 17.*
[13] Both plaintiffs claim they did not receive performance reviews. *Dkt. 137 ¶¶24, 35.*  Failure to give a performance review is not an adverse employment action. *See Wojciechowski v. Nat'l Oilwell Varco, L.P.*, 763 F. Supp. 2d 832, 857 (S.D. Tex. 2011).  Even if it were, the undisputed evidence shows that plaintiffs did, in fact, each receive an annual performance review. *Ex. 21 (Saemian Performance Review); Ex. 38 (Phillips Performance Review).*

promotion was global practice lead—the position that was held at all times during his employment by his supervisor, Richard Prime. *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 (5th Cir. 1996) (In a failure to promote claim, a plaintiff must show "(1) that he is a member of a protected class, (2) that he sought and was qualified for an *available employment position*, (3) that he was rejected for that position, and (4) that the employer continued to seek applicants with the plaintiff's qualifications.") (emphasis added) *Ex. I, Robert Saemian's Second Supplemental Resp. and Objections to Def. Wipro Limited's First Set of Interrogs., at 10-11; Prime Decl. ¶¶ 2, 10.* As a result, the plaintiffs' promotion claims fail as a matter of law.

3.  *The Plaintiffs' Termination Claims Fail as a Matter of Law*

Like his hiring and promotion claims, Phillips's EEOC charge specifically disavows any claims that arose during his employment, including the termination of his employment. This bars his Title VII claim of unlawful termination. Phillips's discriminatory termination claim under §1981 also is barred by the applicable statute of limitations because it was raised for the first time in his amended complaint. *See pp. 11-13, above.* As with Phillips' promotion claim, any termination claim that the Court might find to be timely also fails on the merits. Phillips admitted that he lacked qualifications for jobs identified for him while on the bench before his termination. *See pp. 3-5 above.* Accordingly, Wipro is entitled to summary judgment on Phillips's termination claim.

Regarding Saemian, the undisputed evidence shows that Wipro terminated him due to his poor performance. *Prime Decl. at ¶¶5-8, 13-16; Exs. 8, 10, 11, 14, 16, 17.* Saemian's failings were consistent, pervasive, and overarching in scope. Saemian's issues are exemplified by, but not limited to, the following examples, which suffice to explain his termination:

- Prime set Saemian's business development target at a minimum of $2 million during his first year. By the conclusion of that year, Saemian had landed one account and secured only $154,000 in revenue. That revenue was offset by $70,000 in expenses as well as the salaries

16

for four additional team members hired by Saemian, more than doubling the size of the team he inherited. *Prime Decl. at ¶¶6, 15; Ex. 3, 8; Saemian Dep. at 74:25–77:4.*

- Saemian was expected to spend 50% of his time billing, but was unable to secure any work at all, leading to the Human Resources Department warning him in December 2014 that he would be terminated within 30 days if he could not find a billable assignment. *Ex. 12; Saemian Dep. at 177:8–16; Prime Decl. at ¶7.*

- Despite being counseled several times by Prime, Saemian virtually ignored the three Houston team members he inherited and led his four new hires to believe that their responsibility was to focus on business development rather than billing. *Prime Decl. at ¶¶5-6; Ex 3, 7, 8, 9, 10, 13.*

- Saemian took on an adversarial relationship with other departments and business units, leading to a number of complaints from Wipro managers and employees with whom it was necessary for Saemian's team to interact. *Saemian Dep. at 107:22-109:1, 173:19-174:16, 206:5-209:1, 209:10-211:9; Ex. 4, 11, 16.*

- Prime met with Saemian on June 15, 2015, and informed him that, by the end of the month, he was to: (1) provide Prime with a written plan for how his team would achieve $3 million in revenue in the coming year; and (2) provide weekly reports to Prime regarding the progress of his team.  Not only did Saemian not provide the plan (or so much as a question, phone call or request for more time) by July 1st, he also failed to provide any of the weekly reports requested by Prime. *Ex. 17.*

Prime's increasing frustration with Saemian is reflected in a series of communications.  On October 16, 2014, Prime tells Saemian that he has attended three trade shows, which led to travel expenses but no sales as a result; has doubled the size of his team, but without any work to provide them, effectively reducing his time sold by 50 percent; and Prime warns him that if this did not change, layoffs would follow.  *Ex. 6.*  On April 22, 2015, Prime tells Deignan "this is exactly what I feared was happening in the Americas EAM practice: a disconnect between Bob's [Saemian's] 2x new hires and the 3x originals who have been left to themselves….  I need a trip to Houston in May to iron this out once & for all." *Ex. 13.*  On April 30, 2015, another e-mail to Deignan: "I'm reading Bob the riot act:  he's costing me a $$ fortune in expenses and his total FY15 sales of $154K (!) with lots of talk is getting me nowhere.  I'll spell this out to him on the phone today too & flatten his usual double-talk:  he pursues his leads more rigorously and keeps me fully up to

17

date—or he finds another job/he's fired." *Ex. 14.*  On May 21, 2015, Prime updates Deignan on

Saemian's relationships with other Wipro business units:

> This problem just gets worse with Bob, despite my talking to him about building
> bridges with Sales, maximizing Leveraged Revenue in ENU verticals & talking to
> his practice members to create organic growth in the projects they already have.  I
> must now spend some time repairing the bridges with Utilities & BAS; and then
> head to Houston for a face-to-face with Bob to iron this out…I don't know how
> much more blunt I can make it, because I've been very blunt so far.

*Ex. 16.*  In short, Saemian's poor performance touched all the bases for termination, from a failure

to meet objective targets, to an inability to lead his team, or even get along with others.  Neither

Prime nor Deignan is Indian or South Asian.

These shortcomings take on additional significance when viewed in the context of Prime's

repeated attempts to throw Saemian a lifeline—first by lobbying the Human Resources

Department to rescind its December 2014 directive that Saemian was to find a billable project

within 30 days or be fired, and then by warning Saemian in June 2015 that he was to provide Prime

a business plan and regular progress reports or be fired. *Prime Decl. at ¶¶7, 14.*  In the end,

Saemian left Prime and Deignan no choice.  Failure to meet the performance expectations of a

position is a legitimate, non-discriminatory reason for terminating Saemian's employment. *Ihsan*

*v. Weatherford U.S., LP*, No. H-17-2546, 2019 WL 2191141, at *6 (S.D. Tex. May 21, 2019)

(citing *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315 (5th Cir. 1997)) (finding plaintiff's poor job

performance to be a legitimate, non-discriminatory reason for his termination); *see also Eyob v.*

*Mitsubishi Caterpillar Forklift Am., Inc.*, 745 F. App'x 209, (5th Cir. 2018) (per curiam) (same).

As a result, Wipro has conclusively established the legitimacy of Saemian's discharge.

All that remains are the plaintiffs' speculation and bald assertions that Wipro's actions

were discriminatory.  This is insufficient to carry their burden.  The Fifth Circuit has consistently

held that an employee's subjective belief of discrimination is not probative evidence. *Auguster v.*

*Vermillion Parish Sch. Bd.*, 249 F.3d 400, 403 (5th Cir. 2001) (quoting *Bauer v. Albemarle Corp.*,

169 F.3d 962, 967 (5th Cir. 1999)); *Hernandez v. Metro. Transit Auth. of Harris Cnty.*, 673 F. App'x 414, 419 (5th Cir. 2016) (per curiam) (finding no evidence of pretext when plaintiff offered only speculation and his own subjective belief that he was denied a promotion based on his race). The plaintiffs may disagree with Wipro's reasoning for its actions, but their disagreement does not make Wipro's decisions discriminatory. "Employment discrimination laws are not intended to be a vehicle for judicial second-guessing of business decisions, nor to transform the courts into personnel managers." *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (quoting *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507–08 (5th Cir.1988)) (internal punctuation omitted). In sum, the plaintiffs cannot carry their burden with respect to their disparate treatment claims under §1981 and Title VII. Accordingly, summary judgment for Wipro is appropriate.[14]

---

[14] Wipro has admitted for purposes of this motion that a presumption of a pattern and practice exists, but that presumption is not sufficient to withstand a lack of proof supporting the individual plaintiffs' claims. *See, e.g., EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173 (5th Cir. 1996); *Walther v. Lone Star Gas Co.*, 977 F.2d 161 (5th Cir. 1992). The record indicates that the plaintiffs have no viable evidence of discriminatory intent or pretext. Phillips' primary claim of intent was that an Indian/South Asian replaced him, but the evidence demonstrates that his role ended by contract and Kumarasamy moved on site to conduct a different phase of the project. *See II(B)(1) above.* He also alleges that the Indian South Asian employees all spoke Hindi but gives no basis for how this negatively affected him in his job. *Dkt. 137 at ¶25.* Saemian's claims are undermined because the "same actors" Prime and Deignan both hired and fired him, undermining a claim of unlawful animus. *Prime Decl. at ¶16.* He also claims that a sales director told him that he heard an *unidentified* Wipro executive claim that Wipro made people miserable so the company could replace them with Indians. *Dkt. 137 at ¶37.* This is inadmissible hearsay and a stray remark that is not competent evidence of unlawful intent. Furthermore, Saemian admitted in his deposition that two subordinate employees he claims were replaced by South Asians were in fact not replaced. *Dkt. 137 at ¶38; Saemian Dep. at 212:16-213:22; 260:8-22; Prime Decl. at ¶8; Ex. J, Declaration of Sammy Seiffedine at ¶4.* In addition, Saemian's credibility is undermined by his own testimony that he would and did lie to get employment. *Saemian Dep. at 292:1-301:19.* Finally, Saemian, like Phillips, was not replaced by an Indian South Asian. *Prime Decl. at ¶17; Seiffedine Decl. at ¶3.* Thus, the plaintiffs' claims fail for lack of evidence of unlawful intent or pretext.

C.      The Plaintiffs' Disparate Impact Claims Should be Dismissed

The plaintiffs assert a claim of disparate impact discrimination in violation of Title VII. Title VII permits a plaintiff to challenge practices that are fair in form but impact a particular demographic group disproportionately. *Griggs v. Duke Power Co.,* 401 U.S. 424 (1971); 42 U.S.C. § 2000e-2(k).   The disparate impact theory is aimed at removing barriers to equal employment opportunity that are not necessarily intended or designed to discriminate – "practices that are fair in form, but discriminatory in operation" in that they operate as "built-in headwinds for [a protected class] and are unrelated to measuring job capability." 401 U.S. 431, 432; EEOC Compliance Manual, §15, at 123-124 n. 71-73 (2006).   Such claims are cognizable under Title VII but not under §1981. *Hinds v. Baker Hughes, Inc*, 2007 WL 9710942, at *2 (W.D. Tex. 2007).   Wipro is entitled to summary judgment on the plaintiffs' disparate impact claims because the plaintiffs failed to exhaust their administrative remedies and failed to identify a neutral employment practice that affected their promotions, terminations, or rehiring at Wipro. Should the Court disagree, it should find plaintiffs were not adversely affected by the policies and practices they allege as discriminatory in this lawsuit.   Wipro did not cause Phillips to lack the skills he needed to fill the jobs to which he applied, and did not cause Saemian to perform so poorly.

1.      *The Plaintiffs Failed to Exhaust the Administrative Prerequisites to their Disparate Impact Claim.*

Plaintiffs' disparate impact claims also should be dismissed because the plaintiffs failed to identify the challenged employment practices in a charge of discrimination filed with the EEOC. Phillips only asserts failure to rehire after his termination of employment in his charge. *See Phillips Charge, Ex. 66 to Phillips Dep. at ¶8* ("Mr. Phillips asserts failure to hire claims herein, but does not assert legal claims with respect to the period he was employed by Respondents.") Thus, his charge cannot be the basis for a disparate impact claim regarding pre-termination hiring, promotions or terminations.

20

Regarding his rehiring claim, Phillips alleges that Wipro denied him several positions after his termination.  Specifically, he alleges that all those involved in assisting him to find a position were Indian/South Asian implying that those individuals preferred South Asian applicants (*Ex. 66* ¶¶10, 12-14); on "information and belief" Wipro hired South Asians for the positions he sought (*Id.* ¶¶10, 12–14); an unnamed management representative made unidentified discriminatory comments and communicated in Hindi (*Id.* ¶9), and Wipro sought South Asian local hires (*Id.* ¶15).  These are all allegations of discriminatory intent (that do not demonstrate unlawful animus at all) and not practices fair in form, but which create barriers to the protected group.  Phillips alleged the visa scheme in his charge but never alleges that the visa scheme affected him directly, because he conceded he was unqualified for the positions he sought.  The closest he comes is to allege that South Asians received the positions he sought but does not allege that those South Asians were in the U.S. on visas, nor does he claim comparable qualifications.

Similarly, Saemian's EEOC charge cannot be the basis for the hiring, promotion, and termination disparate impact claims.  Saemian's charge does not allege that Wipro failed to hire or promote him because of his race or nationality.  He alleges Wipro preferred South Asians for jobs and used the visa scheme to accomplish this preference (allegations of intentional discrimination) but fails to allege a neutral policy that affected him personally. *See Saemian Charge at ¶¶8-14, 29-35.*[15]  Saemian alleges that after his discharge, Wipro replaced him with a South Asian, but he never alleges that the company used the visa scheme to take his job.  To the contrary, Saemian alleges that this "Indian worker" was already "working with Respondents in a different position"

---

[15] Saemian's charge is attached to this motion as a separate exhibit.  Because Saemian submitted the charge to the EEOC under oath it is admissible under Rule 801(d).

and Wipro asked Saemian to share sales information with this worker so that he could take over Saemian's job. *Saemian Charge at ¶ 26.*[16]

The plaintiffs' charges state identically, in conclusory fashion: "Respondents' policies and practices described herein have a disparate impact that is discriminatory and adverse in effect upon white employees, *even if the policies and practices were deemed lawful or neutral in intent* with regard to race and national origin." *Ex. 66 (Phillips charge) at ¶25; Saemian Charge at ¶34* (emphasis added).  In other words, the plaintiffs' charges admit they complain about purposeful discrimination, while merely uttering the term of art "disparate impact"—again failing to identify *any neutral policy whatsoever*.  A disparate impact investigation "could not reasonably have been expected to grow out of" the plaintiffs' charges because they facially allege disparate treatment, identify no neutral employment policy that was applied to them, and complain of past incidents of disparate treatment only. *Pacheco*, 448 F.3d at 792; *see also Richardson*, 22 F. Supp. at 666 (dismissing disparate impact claim when administrative charge failed to identify a facially neutral policy); *Gordon v. Peters*, 489 F. Supp. 2d 729, 736 (S.D. Tex. 2007) (same).  Accordingly, the plaintiffs' disparate impact claims should be dismissed based on their failure to make their disparate impact claims the subject of timely filed charges.

---

[16] Saemian also alleges a number of claims of discriminatory comments and inappropriate practices by management (*Ex. K, Saemian Charge at ¶¶8-10, 18, 21-22*), and that as a result South Asians made up a large percentage of Wipro's employees (*id.* at ¶¶7, 12-14, 17), but these are claims of illegally motivated discrimination, not disparate impact.  Thus, his charge cannot be the basis for a disparate impact claim in hiring, promotion, or termination.

2.       *A Disparate Impact Plaintiff Must Identify with Specificity a Facially Neutral Policy that Caused the Alleged Disparate Impact.*

To establish a *prima facie* case of disparate impact discrimination, the plaintiffs must (1)identify the employment practice that has the allegedly disproportionate impact and (2) establish causation. *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir. 2002).  The plaintiffs fail at the outset because they fail to identify any neutral employment practice. *Brown v. Wyndham Hotel Mgmt. Inc.*, No. CV H-16-00015, 2016 WL 2595073, at *5 (S.D. Tex. May 5, 2016) ("To state a disparate-impact claim, a party must identify 'a facially neutral policy. . . that, in fact, has a disproportionately adverse effect on a protected class.'") (quoting *Pacheco v. Mineta*, 448 F.3d 783, 792 (5th Cir. 2006)) (ellipses in original)); *see also Richardson v. Porter Hedges, LLC*, 22 F. Supp. 3d 661, 665 (S.D. Tex. 2014) (same).

The plaintiffs base their disparate impact claims on an alleged scheme to displace white American applicants and workers with South Asian/Indian workers brought over to the U.S. on H1-B visas.  But the "scheme" alleged by the plaintiffs is intentional, not facially neutral.  It could not be a *scheme* were it neutral.  Moreover, U.S. citizens are exempt from the H1-B visa process, so it has no applicability to Phillips or Saemian.  Thus, the alleged visa scheme is not like an education requirement, or a test, or a height requirement, that is applied universally to all applicants, with differential effects among demographic groups.

The Supreme Court has stated "the employee is 'responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities.'" *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (explaining in an Age Discrimination in Employment Act case that a plaintiff must identify the "specific test, requirement, or practice within" the challenged pay practice) (citation omitted) (emphasis in original); *see also Anaya v. Hous. Indep. Sch. Dist.*, No. CV H-14-2065, 2016 WL 1060350, at *4 (S.D. Tex. Feb. 23, 2016), *report and recommendation adopted*, 2016 WL 1070860 (S.D. Tex.

23

Mar. 15, 2016) (dismissing disparate impact class claims where plaintiff failed to specify "how the grievance process itself, or any identifiable part thereof, had a disparate impact on her in particular, or Hispanic females in general").  The Fifth Circuit has stated that a disparate impact framework is not the proper mechanism with which to attack the cumulative effects of an employer's practices. The plaintiffs must isolate and identify the specific employment practices allegedly responsible for observed statistical disparities. *Munoz v. Orr*, 200 F.3d 291, 304 (5th Cir. 2000).

The plaintiffs' failure to identify a facially neutral policy has persisted since the inception of this lawsuit.[17]  Plaintiffs identify four "prongs" of Wipro's alleged scheme to discriminate, each of which explicitly is *intentional*, and not the unintended result of a neutral policy.  First, the plaintiffs claim Wipro engages in a practice of securing various types of visas for overseas workers to staff U.S. positions and that "[a]ll, or substantially all, of the individuals for whom Wipro secures visas are South Asian and Indian" who "are given preference for these positions" and often displace non-South Asian and non-Indian individuals from their positions. *Dkt. 137 ¶15–20.* Second, the plaintiffs claim Wipro "gives preference to South Asian and Indian applicants located in the U.S. over non-South Asian and non-Indian applications." *Dkt. 137 ¶18.*  Third and fourth, the plaintiffs allege that, "because of its discriminatory preference for South Asians and Indians," Wipro both "promotes South Asians and Indians at disproportionately high rates" and "terminates non-South Asians and non-Indians at disproportionately high rates." *Dkt. 137 ¶¶19–20.*  Each of these allegations contemplate favoritism by Wipro towards South Asians and Indians, relative to persons of other races and nations.  But intentional discrimination cannot form the basis of a disparate impact claim. *See Pacheco*, 448 F.3d at 792 (explaining that allegations "of a larger

---

[17] Plaintiffs' Original Complaint also failed to identify a single facially neutral policy to support a disparate impact claim. *See Dkt. 1 ¶¶14–20.*  Wipro previously raised this issue in a Motion for Judgment on the Pleadings filed on March 15, 2019. *See Dkt. 58 at 3–5.*  The motion was denied as moot. *Dkt. 134 at 3 n.1.*

pattern of *intentional* discrimination" fail to state a claim for disparate-impact discrimination) (emphasis in original).

Wipro recognizes that some courts have indicated that the employment practice identified for a disparate impact claim does not necessarily have to be neutral. *See Palmer v. Cognizant Tech. Sols. Corp.*, 2019 WL 6354362, at *3 (C.D. Cal. Aug. 9, 2019) (indicating there is a split in authority among the Circuits with the Fifth Circuit requiring a neutral policy). There also have been cases where courts have rejected challenges to disparate impact claims asserting visa schemes similar to the one alleged here. *Walker v. Accenture PLC*, 511 F. Supp. 3d 169, 192 (D. Conn. 2020); *Koehler v. Infosys Techs. Ltd. Inc.*, 107 F. Supp. 3d 940, 947 (E.D. Wis. 2015). As an initial matter, these three cases all addressed motions under Rule 12(b)(6) and not motions for summary judgment. The plaintiffs have had three years to conduct discovery and develop their claims. Thus, the decisions on those motions are not applicable to this motion.

The plaintiffs testified they know of no facially neutral, but discriminatory policy. Indeed, neither plaintiff could identify a single facially neutral policy in his deposition. The only example Saemian identified was the timing of how individuals were replaced—that non-South Asians and non-Indians would be benched or terminated on a Friday and a South Asian or Indian would appear the following Monday as a replacement. *Saemian Dep. at 267:6–269:2; see also Phillips Dep. at 57:24-25; 58:1-3* (admitting he had no documents to support a disparate impact claim). Saemian's allegation again speaks to intentional discrimination. There is nothing facially neutral in the policy Saemian testified to—in fact, he admitted that the policy was designed to discriminate. *Saemian Dep. at 271:19–272:13*. Lacking any evidence of a facially neutral policy, this claim must fail.[18]

---

[18] If the Court is persuaded that any of the intentional acts the plaintiffs allege somehow qualify as a facially neutral policy, Wipro reiterates that it took all alleged adverse employment actions against plaintiffs for legitimate, non-discriminatory reasons, and plaintiffs cannot show that those reasons are pretextual. *See footnote 15 above.*

*See Norman v. S. Hens, Inc.*, No. 2:12-CV-106-KS-MTP, 2013 WL 2251745, at *3 (S.D. Miss. May 22, 2013) (granting summary judgment for defendant when plaintiff did not identify a neutral policy and offered no evidence that any policy or procedure had a disproportionately adverse effect).  Accordingly, summary judgment is warranted on the plaintiffs' disparate impact claims.

V.   CONCLUSION

Wipro is entitled to summary judgment as a matter of law.  There are no genuine issues of material fact that preclude summary judgment on any claims made by the plaintiffs in this case.


Dated:  September 14, 2021

Of Counsel:
J. Bradley Spalding
Texas Bar No. 00786253
Federal I.D. No. 21169
bspalding@littler.com
Nehal S. Anand
Texas Bar No. 24070600
Federal I.D. No. 1061200
nanand@littler.com
LITTLER MENDELSON, P.C.
1301 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 951-9400
Facsimile: (713) 951-9212

Respectfully submitted,

By: */s/ Kerry E Notestine*
        Kerry E. Notestine (Attorney-in-Charge)
        Texas Bar No. 15116950
        Federal I.D. No. 2423
        knotestine@littler.com
        LITTLER MENDELSON, P.C.
        1301 McKinney Street, Suite 1900
        Houston, Texas 77010
        Telephone: (713) 951-9400
        Facsimile: (713) 951-9212

ATTORNEYS FOR DEFENDANT
WIPRO LIMITED

CERTIFICATE OF SERVICE

I certify that on September 14, 2021, I filed the foregoing document using the Court's CM/ECF system, which automatically sent notice to the following counsel of record:

Daniel Kotchen
Lindsey Grunert
Daniel Low
Amy M. Roller
KOTCHEN & LOW LLP
1745 Kalorama Road, NW, Suite 101
Washington, D.C.  20009

Dwaine M. Massey
MASSEY LAW FIRM PLLC
601 Sawyer Street, Suite 225
Houston, Texas 77007

ATTORNEYS FOR PLAINTIFFS

*/s/Kerry E Notestine*
Kerry E. Notestine

4845-8052-6843.1 / 102985-1001

27